UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVSION

| | |
|---|---|
| ASHLEE INSCOE, | Case No.: |
| Plaintiff, | |
| vs. | COMPLAINT FOR DAMAGES AND DECLATORY AND INJUNCTIVE RELIEF |
| THE NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; EDDIE BUFFALOE JR., in his official and individual capacities as Secretary of The North Carolina Department of Public Safety; CHARLOTTE JORDAN-WILLIAMS, in her official and individual capacities as Prison Rape Elimination Act Director, Division of Prisons, North Carolina Department of Public Safety; RONNIE HUNEYCUTT; JAMES WATSON; DERICK FOX; JAMES WALDROOP; F.N.U. GOFORTH; EDNA SILVERS; F.N.U. NATHAN HICKS; SHAWN BUCHANAN; CHRIS MILLER; RUSSELL CARVER; JOHN DOE(S)/JANE DOE(S), | JURY TRIAL DEMANDED |
| Defendants | |

1. This is a civil rights action filed by Ashlee Inscoe, a state prisoner, for damages, injunctive relief, and declaratory relief under 42 U.S.C. Section 1983, alleging: Intrusive, degrading,

COMPLAINT - 1

and unlawful searches in violation of the Fourth Amendment of the United States Constitution;

2. Use of force, unsafe housing, sexual assault, sexual abuse, sexual harassment, voyeurism, sexual exploitation, failure to protect, and reckless endangerment in violation of the Eighth Amendment to the United States Constitution;

3. The failure and/or refusal to provide the same protections, privileges, amenities, and housing as other women in women's facilities, in violation of the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution.

## I.   JURISDICTION

4. The court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 42 U.S.C. § 1331(1) and 1343, and the Americans with Disabilities Act ("ADA"). 42 U.S.C. §12101 *et seq.*

5. The court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C. § 1367.

6. Venue of this action is proper with this court as offices of the North Carolina Department of Public Safety ("DPS") and the decisions for housing, treatment, and medical care for plaintiffs were made in and about this district.

7. This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a) because it so related to Plaintiff's federal law claims that it is part of the same case or controversy under Article III of the U.S. Constitution.

8. This Court has personal jurisdiction over Defendants as residents of North Carolina.

9. Plaintiff has exhausted all available administrative remedies for the claims alleged herein.

## II.   PARTIES

COMPLAINT - 2

10. The Plaintiff, Ashlee Inscoe, is an incarcerated woman in the North Carolina Department of Public Safety and until recently, was housed at Avery-Mitchell Correctional Institution ("AMCI") during these events and leading up to February 16, 2022, on which she was transferred to Nash Correctional Institution ("Nash").

11. Defendant DPS is a public entity as defined by Title II of the ADA and constitutes a program or activity receiving federal financial assistance under the Rehab Act. DPS is sued under the ADA, Rehab Act, and Article I, Section 27 of the state Constitution.

12. Defendant Eddie Buffaloe Jr. is the Secretary of DPS. He is responsible for overall operation of DPS, including North Carolina's prisons. Defendant Buffaloe has a legal duty to ensure the safety, health, and wellbeing of and to provide needed health care to all persons in DPS custody. Upon information and belief, Defendant Buffaloe is also the final reviewer and decisionmaker of grievances submitted pursuant to DPS's Administrative Remedy Procedure. He is sued in his official and individual capacities under §1983 for violations of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

13. Defendant Charlotte Williams is the Prison Rape Elimination Act ("PREA") Director for all of DPS Adult Correction and Juvenile Justice. She is responsible for developing, implementing, and overseeing DPS efforts to comply with PREA standards in all of its facilities. Defendant Williams has a legal duty to ensure the safety, health, and wellbeing and to provide needed health care to all persons in DOP custody. Upon information and belief, Defendant Williams is a member of DTARC. She is sued in her official and individual capacities under §1983 for violations of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

COMPLAINT - 3

14. Defendant Ronnie Huneycutt was the Warden of Avery-Mitchell Correctional Institution ("AMCI"). He was/is legally responsible for the overall operation of AMCI, including the management of staff, training, and the safety, health, and wellbeing of all incarcerated persons housed at AMCI. He is being sued in his official and individual capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

15. Defendant James B. Watson is/was a correctional captain at AMCI. He is/was responsible for PREA compliance and investigations along with being responsible for training of staff and safety, health, and wellbeing of all incarcerated persons at AMCI. He is being sued in his official and individual capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

16. Defendant Derick Fox is/was a correctional Lieutenant at AMCI. He is/was responsible for PREA compliance, investigations, training staff, and for the safety, health, and wellbeing of all incarcerated persons at AMCI. He is being sued in his official and individual capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

17. Defendant James Waldroop is/was a Unit Manager at AMCI. He is responsible for the operations of the unit, the training, actions, and behavior of the staff, and the safety, health, and wellbeing of the inmates assigned to his housing unit. He is being sued in his official and individual capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

18. Defendants Edna Silvers and F.N.U. Goforth are Correctional Sergeants. They are responsible for the actions and behavior of all staff that are assigned to their shift/unit, and

COMPLAINT - 4

responsible for the safety, health, and wellbeing of all incarcerated person assigned to their housing unit(s). They are being sued in their official and individual capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

19. Defendants F.N.U. (Nathan) Hicks, Shawn Buchanan, Chris Miller, and Russell Carver are/were correctional officer(s) at AMCI. They are responsible for the safety, health, and wellbeing of all incarcerated persons in and about their assigned post(s) at AMCI. They are being sued in their individual and official capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

20. Defendant(s) John Doe/Jane Doe are employed by the NCDPS and responsible for the safety, health, and wellbeing and general care of all incarcerated persons either in the DPS or under their care or supervision. They are sued in their individual and/or official capacities under §1983 for violations of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights and under Article I, Section 27 of the state Constitution.

### III.   FACTUAL BACKGROUND

21. Plaintiff Ashlee Inscoe is an intersex woman. Ms. Inscoe is incarcerated in the North Carolina Department of Public Safety ("DPS") and housed in male facilities, posing grave risk to her physical and sexual safety, her physical and psychological health, and her overall wellbeing.

22. "Intersex" is a general term used for a variety of conditions in which a person is born with atypical reproductive or sexual anatomy. For instance, a person may be born with some combination of stereotypically male genitals and stereotypically female genitals—for

COMPLAINT - 5

example, a girl may be born with a noticeably large clitoris, or lacking a vaginal opening, or a boy may be born with a notably small penis or a scrotum that is divided so that it has formed more like labia. *"What is Intersex?,"* The Intersex Society of North America, https://isna.org/faq/what_is_intersex/.

23. Per NCDPS medical records, "Ashlee was born with chromosomes of a female; but her external genitals developed to take on the appearance of male genitalia within a few months after birth....The labia ("lips" or folds of skin of the external female genitals" fuse, and the clitoris enlarges to appear like a penis.) In most cases, this person has a normal uterus and fallopian tubes." In addition, a May 6, 2022 CT scan at UNC-Chapel Hill indicated that Ms. Inscoe has ambiguous genitalia, evidence of a scar on her ventral abdominal wall, and mild surgical change. The scar and surgical change are consistent with the hysterectomy Ms. Inscoe had when she was teenager.

24. Ms. Inscoe was born in 1980. Based on a doctor's recommendation that she be raised as a "boy," because of a larger-than-typical clitoris, her parents named her "William," and raised her as male. However, Ms. Inscoe's gender identity is female. Gender identity refers to every individual's innate sense of their own gender. Growing up, Ms. Inscoe always knew that she was a girl. She was unhappy as a child and tended to play with and be friends with girls. When she began puberty, in or around 1994, physicians performed a hysterectomy to remove her uterus. Ms. Inscoe was also prescribed testosterone therapy in an attempt to force her to live as a boy. This led her to experience depression and suicidality, and mental health professionals advocated for her to receive estrogen and to live as a girl instead.

25. Ms. Inscoe has spent a vast majority of her life as a woman. She has at times (in North Carolina) had to present herself in a more masculine manner to hide the fact from others that

COMPLAINT - 6

she is intersex and to keep herself safe from being targeted by homophobic and transphobic persons and victimized by hate-based violence. (It has been well-established that intersex and transgender persons are at a very high risk both in public and in confinement to be the target of brutal physical and sexual violence.)

26. Ms. Inscoe has both primary and secondary female sex characteristics (i.e., female breast, buttocks, widened hips, and female speech, mannerisms, and personality.) She has also undergone gender affirming genital surgery (bottom surgery), has been on estrogen(s) for hormone replacement therapy for almost 25 years and has continued on those hormones in DPS.

27. Medical understanding of intersex conditions has advanced considerably since Ms. Inscoe was a child. "*What's the History Behind the Intersex Rights Movement?*," The Intersex Society of North America, https://isna.org/faq/history/.

28. While Ms. Inscoe herself is the best source of information about her gender identity, it is notable that medical professionals, including medical doctors, a registered nurse, a physician's assistant (PA), and a psychologist in the employ of NCDPS, are unanimous that Ms. Inscoe is a female and that she should be housed in a women's prison.

29. NCDPS's own medical records acknowledge the following:

    a. Eric Klett, MD: "40 yo genetic female gender female (?? Intersex) returns for follow up....Karyotype in 2008 showed XX." (May 21, 2021)

COMPLAINT - 7

b. Becky L. White, MD: "39 yo biologic female (XX karyotype[1] per UNC Endocrinology note....Patient requesting transfer to female correctional institution as per endocrinologist's recommendation." (March 30, 2021)

c. Shawn K. Hartzog, M.A. (Staff Psychologist): "Ms. Inscoe continues to lament over her situation and being unable to get DPS to change its mind regarding her need to transfer to a female facility or to otherwise address the lack of adequate policy for addressing her intersex condition as an inmate. IM reports multiple abuses by multiples offices, and this is the consequence of being considered a male by the system while being a female in a male facility." (May 14, 2021)

d. Shawn K. Hartzog, M.A. (Staff Psychologist): "As far as DPS policy and decisions regarding assignment to a male vs. female facility, I have supported Inmate Inscoe's concerns and request....Ultimately, however, this is not within the authority of the facility and has been referred to DTARC as a non-routine accommodation recommendation." (April 1, 2021)

e. Shawn K. Hartzog, M.A. (Staff Psychologist): "Met with Assistant Director of Behavioral Health Services, Dr. Yearick, regarding IM Inscoe's legal case in CA, housing in female facility in state of CA, and references to the case in professional literature and case law." (January 20, 2021)

f. Carol L. Bowers, RN: "Review of karyotype from California CI in 2008 shows the patient is XX female. Recommend that the patient be transferred to an all-female CI." (October 9, 2020)

---

[1] A karyotype is "the number and visual appearance of the chromosomes in the cell nuclei of an organism or species." *Karyotype.* Lexico (2021).

COMPLAINT - 8

g. Robert J. Uhren, MD: Both this consultant and an endocrinologist recommend transfer to female unit." (October 1, 2020)

h. Carol L. Bowers, RN: Biologic female per Endocrinology note 9/18/20. Endocrinologist and C. Bernart C-PA recommend patient be transferred to female correctional facility." (October 1, 2020)

i. Christopher D. Bernart, PA-C: "39 yo biologic female (XX karyotype per UNC Endocrinology note in HERO 9/18/20). (September 29, 2020)

j. Eric Klett, MD: "Ashley (sic) (aka William) Inscoe is a 39-year-old sex female, gender female individual who returns for followup of hormone therapy....The patient reports being born with partial gonadal intersex for which she underwent surgery, report that she had an ovary removed and hysterectomy. Review of records from CI in California in 2008 shows that patient's karyotype is XX. She identifies as female and wants to be transferred to an all-female CI." (September 18, 2020)

k. Shawn K. Hartzog, M.A. (Staff Psychologist): "Based on the newly attained medical evidence, Inmate Inscoe's claims of being a biological female have been validated....Given the evidence provided along with policy considerations, it is clearly indicated that action is needed to prevent any further risk of sexual victimization....It would benefit both Ms. Inscoe and NCDPS to transfer Ms. Inscoe to a correctional facility for women." (April 7, 2020)

l. Shawn K. Hartzog, M.A. (Staff Psychologist): William Inscoe's preferred name is Ashlee, a name reflecting both this inmate's gender identity and this inmate's chromosomal genotype from birth. As such, inmate Inscoe will hereafter be referred to in this report as either "Ms. Inscoe" or "Ashlee." (April 6, 2020)

COMPLAINT - 9

m. Foundation Laboratory: Chromosomal Test Results: Karyotype: XX (February 26, 2008) Ex. Laboratory Results.

n. Denise C. Carpenter, PA-C: "Hermaphrodite identifying and living as female. Biologic female (XX karyotype)." (September 29, 2021) Ex. Q, Physician Note.

o. UNC-Chapel Hill (CT scan): "Ambiguous genitalia…gonadal tissue (??) located in inguinal canal." (May 6, 2022)

30. Female-identified people housed in a male prison facility are not physically safe or safe from sexual assault. Sexual victimization in adult correctional facilities is highly prevalent. *See* Emily D. Buehler, PhD., U.S. Dep't of Justice, "Sexual Victimization Reported by Adult Correctional Authorities" (June 2021). The prison and jail standards for the Prison Rape Elimination Act consider "intersex" status to be a high-risk factor for sexual victimization and abuse. *See* Prison Rape Elimination Act, Prisons and Jails Standards, 25 C.F.R. Part 115, at §115.41.

31. When Ms. Inscoe was housed in a male prison in the State of California, she was gang-raped. Afterward, she underwent genetic chromosomal testing; the State of California came to understand that she was an intersex woman; and the State of California transferred her to a female prison. *Id.* As noted by the NCDPS psychologist; "these facts highlight the vulnerability of Ms. Inscoe consistent with identified risk factors for transgender and intersex inmates as identified by PREA and the Department of Justice's National PREA Resource Center." *Id.*

32. Being at a male prison, Ms. Inscoe is subjected to sexual harassment and sexual abuse on a regular basis. Incarcerated men grab her breasts and buttocks, make sexually explicit comments, and proposition her for sex. Incarcerated men gawk at her breasts and naked body

COMPLAINT - 10

in the dorm shower area, where she lives communally with 33 men. Male correctional officers also make sexually explicit comments, deliberately and cruelly misgender her, force her to use the dead-name[2] "William" on paperwork, and have subjected her to cross-gender strip searches and pat searches.

33. In addition to the fear and exposure to violence and harassment Ms. Inscoe faces every day as a woman who is forced to live in a dorm unit of an all-male prison, she faces systemic humiliation by staff who refuse to recognize her gender or to use her name and pronouns. Ms. Inscoe is subjected to intrusive searches by male officers despite her requests to be searched by female officers. These searches are often performed in front of additional male staff members and male incarcerated people and are characterized by vulgar comments about Ms. Inscoe's body. At this time, Ms. Inscoe's physical and emotional health are greatly deteriorating, and further harm can only be avoided through DPS's immediate compliance with her request for transfer to the North Carolina Correctional Institute for Women.

**A. Erroneous Housing Refusal to Transfer to Women's Facility**

34. In April 2020, in accordance with appropriate policy, the facility made a formal request to the Division Transgender Accommodation Review Committee ("DTARC") to transfer Ms. Inscoe to a female facility. In May 2020, DTARC responded to this request by asking Ms. Inscoe to be seen by an endocrinologist. In September 2020, Dr. Klett examined Ms. Inscoe, verified her intersex status and "female habitus," and recommended her transfer to a women's facility. A second doctor—Dr. Bernart—likewise advised transferring Ms. Inscoe to a women's facility after reviewing her medical records and Dr. Klett's report. The Facility

---

[2] The name given at birth that does not comport with an individual's gender identity and which is no longer used.
COMPLAINT - 11

Transgender Accommodation Request Committee ("FTARC"), consistent with DPS policy regarding "non-routine" accommodations, referred the request back to DTARC in October 2020. (FTARC letter of 10/13/2020 at page 1.) Finally in November 2020, DTARC and DPS denied the request to transfer Ms. Inscoe—against medical experts' advice—because of her "gender assigned at birth" and vague "safety concerns."

35. On March 18, 2021, the Avery-Mitchell Facility TARC again advised Division TARC that Ms. Inscoe needs to be transferred to a "women's facility," and again submitted a "non-routine" accommodation to Division TARC. Division TARC and DPS denied the request and entered it into the medical records on or about December 13-15, 2021.

36. DTARC's Jon Peiper stated that "her current (Ashlee Inscoe) housing assignment is best for her safety, health and wellbeing." This was said after Ms. Inscoe's story was covered on multiple major media outlets, where she publicly declared that she is not safe in a men's prison and talked about the abuses that she has faced with staff doing nothing about it.

37. On February 16, 2022, Ms. Inscoe was transferred to Nash Correctional Institute, a male facility operated by NCDPS. The Facility TARC at Nash C.I. has refused to recommend Ms. Inscoe to be transferred to a women's facility, and is adamant on treating her the same as other male inmates despite knowing that she is a woman.

38. Ms. Inscoe has had to continue to endure male inmates making sexual advances, sexually derogatory comments towards her, and staff constantly misgendering her. This has been detrimental to Ms. Inscoe's wellbeing. She has tried to tell staff, but they refuse to do anything about it.

COMPLAINT - 12

39. For over three years, DPS has denied Ms. Inscoe's repeated requests to be transferred to a facility for women.[3] By forcing Ms. Inscoe to remain in a men's prison, DPS is violating not only its own policy—absent any indication that Ms. Inscoe's presence in a women's facility would "compromis[e] facility safety and security" in any way whatsoever—but also the clear requirements of the Prison Rape Elimination Act (PREA) and its implementing regulations as well as Ms. Inscoe's rights under the Fourth, Eighth, and Fourteenth Amendments.

40. As an intersex woman who has suffered sexual violence and rape while incarcerated among men, and who fears for her own safety every day, it seems DPS has only relied on the sex she was assigned at birth in making her placement determination. This suggests that she and other incarcerated intersex people are being impermissibly subjected to a blanket rule with regard to placement.

41. DPS's own policy mirrors the language of these sections very closely, but regardless of what is printed on paper, the de facto policy DPS seems to be following instead disregards these requirements. Ms. Inscoe has been repeatedly told that she cannot be housed in a women's facility because she was assigned male at birth. This is a clear violation of PREA's

---

[3] DPS policy provides for "gender-identity-consistent facility transfer" following review by first FTARC and then DTARC, with DTARC's recommendation to be referred to the Assistant Commissioner of Prisons and Director of Health & Wellness Services for their determination. The FTARC process "should reflect individualized consideration and review." When reviewing requests for facility transfer on the basis of gender identity, the policy directs DTARC to "consider on a case-by-case basis whether an accommodation will ensure the offender's health and welfare without compromising facility safety and security." For all accommodation requests, the policy requires "review[] on a case by case basis considering the offender's medical and mental health history as well as risk safety profile."5 While the policy is entitled "Evaluation & Management of Transgender Offenders," the policy contains an express definition of "intersex" within its text, and nowhere does the policy state that requests by transgender individuals who are also intersex are to be reviewed under any more restrictive criteria, nor that an individual's intersex status should be any reason to fail to apply the policy when a request for gender-identity-consistent facility transfer is made. Among criteria prison officials must use to assess incarcerated people's risk of sexual victimization are: "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming; [w]hether the inmate has previously experienced sexual victimization; [and] [t]he inmate's own perception of vulnerability." DPS Policy Chapter F .3400 (PREA) and Chapter F .4300 Evaluation and Management of Transgender Offenders.

COMPLAINT - 13

individualized-determination requirement and fails to take into account Ms. Inscoe's view of her own safety, which must be given "serious consideration," and Ms. Inscoe's past experiences of being sexually assaulted by incarcerated people (as well as staff) in all-male facilities.[4]

42. A letter reflecting discussions by FTARC members on October 8, 2020, reveals hostility to Ms. Inscoe's requests for accommodations based on her status as both intersex and transgender. To the extent that the denial of Ms. Inscoe's transfer request is rooted in her being intersex, this reasoning is both nonsensical and a violation of her right to Equal Protection under the Fourteenth Amendment. The referenced DPS policy specifies a process for transferring transgender individuals to facilities consistent with their gender, as discussed above. At the request of DPS and Avery-Mitchell C.I. facility staff, multiple medical providers have examined Ms. Inscoe and/or reviewed records documenting her examinations and the physicians' impressions, and these medical personnel have all affirmed that Ms. Inscoe is intersex and has sex characteristics that are typical of people who are assigned female at birth (her uterus was removed as a teenager). After one such examination, Dr. Damico reported having "no doubt" that Ms. Inscoe is female. And yet, DPS refuses to treat her as such, instead discriminating against Ms. Inscoe on the basis of her transgender and intersex status.

## A. Sexual Assault

---

[4] Over the past 20 years, Congress, the U.S. Department of Justice, congressionally convened commissions, and other expert bodies have extensively researched the incidence of sexual violence in correctional settings. Before implementing the final PREA regulations in May 2012, the Justice Department reviewed nine years of comments and reports by corrections staff and administrators, advocates, and health experts about the efficacy of different strategies for combating sexual abuse in detention. The research into sexual assault in confinement consistently documents the heightened vulnerability of intersex and transgender women to sexual victimization at the hands of facility staff and other incarcerated people in correctional settings.

COMPLAINT - 14

43. Plaintiff has reported to DPS staff multiple times over the past 3 years at Avery-Mitchell (AMCI) incidences of staff and inmate sexual abuse, sexual harassment, physical abuse, and gender-based harassment and discrimination.

44. Ms. Inscoe's report(s) to staff were not taken seriously and resulted in her being retaliated against by staff and inmates to her detriment.

45. On December 12, 2019, at about 5:00am, Ms. Inscoe was told to go to Inmate Receiving at AMCI for an outside medical appointment and had to be taken by car to Chapel Hill, NC.

46. When Ms. Inscoe arrived at inmate receiving, she was met by Office Russell Carver (Defendant) and Myron Hollifield, both male officers.

47. Ms. Inscoe was completely (strip) searched by Carver. She was forced to completely remove all of her clothes, which exposed her breast, buttocks, and genitalia while Carver searched Ms. Inscoe's clothing and placed it on the floor.

48. Carver forced Ms. Inscoe to spread her legs apart while he inspected her genitalia. He then made her turn and face the wall and spread her buttocks apart and bend at the waist so he could inspect her genitalia and buttocks.[5]

49. Carver stood and watched Ms. Inscoe get dressed and once she was dressed, he placed her in full restraints (handcuffs, leg cuffs, waist chain, and "blackbox") and led Ms. Inscoe outside to the awaiting vehicle and left the facility.

50. During the trip, Ms. Inscoe was not allowed to use any restroom facilities and remained in full restraints.

---

[5] Defendant Carver has done this to Ms. Inscoe several times in the past which Ms. Inscoe did report to staff and yet Administration and supervisors did nothing to prevent it from happening again or to protect Ms. Inscoe from intrusive searches by male staff when she is a woman.

COMPLAINT - 15

51. It was approximately a 4-5 hour ride by car from ACMI to Chapel Hill, NC.

52. When Ms. Inscoe arrived at the doctor's office at UNC Meadowmont Endocrinology – 300 Meadowmont Village Circle, Chapel Hill, NC, she told Carver and Hollifield that she needed to use the restroom.

53. Ms. Inscoe was taken to the second floor via elevator by Carver and Hollifield. Carver told Ms. Inscoe "Stand here" (with Hollifield) which was in the hall outside of the bathrooms near the lobby.

54. Carver walked in the men's restroom and came back out a few moments later and took Ms. Inscoe into the men's restroom while Hollifield remained in the hallway.

55. Ms. Inscoe told Carver that she has to sit to be able to urinate.

56. Carver removed the waistchain and blackbox from her cuffs and from around her waist.

57. Ms. Inscoe then entered the stall letting the door close and she then pulled her pants and panties down and sat on the toilet to relieve herself.

58. Carver opened the stall door and stood in its entrance staring at Ms. Inscoe as she attempted to urinate.

59. Ms. Inscoe became afraid and noticed that Carver was looking at Ms. Inscoe's genital area and smiling at her. She kept her legs closed in an attempt to keep Carver from seeing her genitalia.

60. She observed Carver rubbing his groin/pubic area as he looked at her and she observed his penis becoming erect as it "bulged" in his pants.

61. Carver then pulled his penis out of his pants and said to Ms. Inscoe: "Suck it and I'll buy you lunch, but if you tell anyone, I will make your life a living hell."

62. Ms. Inscoe told Carver: "No!"

COMPLAINT - 16

63. Carver stepped forward to Ms. Inscoe as she remained on the toilet and placed his hand on her head and then placed his penis to her mouth and forced his penis into her against her will which choked Ms. Inscoe and caused her to gag and not be able to breathe.

64. She noticed that as Carver was doing this, he had his hand on his pistol as he forced himself into a thrusting motion while holding Ms. Inscoe's head and hair until he seemed to have climaxed and ejaculated into Ms. Inscoe's mouth.

65. Ms. Inscoe stated that she could "taste semen in [her] mouth."

66. Carver stepped back and wiped himself off. Ms. Inscoe stood up and pulled her pants up and Carver forced her to go to the sink and wash her hands and face and told her to rinse her mouth out with water and spit into the sink.

67. Carver was at one point a law enforcement officer (Sheriff's Deputy) prior to working for NCPDS. Plaintiff has substantial reason to believe that Carver was aware of the need for preservation of evidence, especially important in cases of sexual assault.

68. Carver placed the blackbox on Ms. Inscoe's handcuffs and placed the waistchain back on her waist and through her beltloops telling her to turn as he did so.

69. When Ms. Inscoe had her back to Carver, he pulled the chain and pressed his pubic area against her buttocks and said that he wanted that next, referring to her buttocks.

70. Carver finished securing Ms. Inscoe's restraints and started escorting her out of the restroom. Before leaving, Carver placed his finger over his mouth in a "shhh" gesture and told Ms. Inscoe not to tell anyone.

71. Hollifield was in the hallway when Carver led her out. Hollifield was using his personal cell phone. Ms. Inscoe was taken to a waiting room until she was called to see the doctor with both officers present with her in the room.

COMPLAINT - 17

72. After the appointment, Ms. Inscoe was taken back to the vehicle by both defendants and they traveled back toward Spruce Pine, NC.

73. One Ms. Inscoe arrived back at AMCI, she was again intrusively strip searched by Carver and he again made threats to cause her harm if she reported what he did to her.

**B. Sexual Harassment**

74. On 5/22/20, Officer FNU Honeycutt came in the dorm Ms. Inscoe was housed in and proceeded to search Ms. Inscoe's locked and personal belongings out of retaliation from being reported that he along with another officer was brining in drugs and tobacco and allowing inmate(s) that were (are) part of the white supremacist gangs to assault, extort, and rob other inmates.

75. Honeycutt confiscated Ms. Inscoe's personal belongings and made vulgar and degrading comments to her in the presence of 33 male inmates. He said to her: "Why do you like a man putting his dick inside of you? That's why you have AIDS." He also said that "[her] first sign of AIDS was a severe pounding in [her] ass."

76. Honeycutt then threatened Ms. Inscoe, saying "I am going to keep fucking with you until I found out which of you wrote this note."

77. Ms. Inscoe reported this to Case Manager Jennifer Norman, who contacted Captain James Watson (defendant).

78. Watson talked to Ms. Inscoe in the education area but did nothing to her knowledge to investigate or strop the sexual harassment she was experiencing.

79. On 7/1/20, Ms. Inscoe mailed a letter to Defendant Charlotte Jordan-Williams (PREA Office) located at 512 N. Salisbury Street, Raleigh, NC (DPS Headquarters) to make a report of the sexual abuse and harassment that she has had to endure at AMCI.

COMPLAINT - 18

80. Ms. Inscoe was interviewed by Correctional Sergeant Green on 7/17/20 at about 12:30am. Sgt. Green took Ms. Inscoe's statement about the threats of violence and sexual harassment during the times Ms. Inscoe was complete (strip) searched by men.

81. Even though she reported these things, she was still being harassed and degraded by staff as a form of punishment for reporting and seeking help.

82. On about 10/5/2020 at about 7:00pm, Ms. Inscoe was in Yancey Unit, B Wing – A block due to having COVID and was on quarantine. She was paged to report to the hallway to take her medications.

83. As she was getting her medications from Nurse V. Wright RN, Wright had referred to Ms. Inscoe with male pronouns "he." Ms. Inscoe said to her: "Please refer to me using female pronouns." As Wright was talking to Defendant Shawn Buchanan about Ms. Inscoe:

84. Buchanan immediately began belligerently yelling at Ms. Inscoe saying to her: "You are a goddamn man, not a woman. I'm tired of your shit, if you were a woman you would be at a woman's prison; now shut the fuck up!"

85. Officer Nathan Hicks (Defendant) was in the B wing control booth and laughed and mocked Ms. Inscoe as she went back to her dorm. She asked Hicks if she could talk to the Sergeant, Defendant Edna Silvers. Hicks sent her to the Sergeant's office.

86. When Ms. Inscoe went to the Sergeant's office, she told Sgt. Silvers what Buchanan had just said to and did to her. Silvers said she would take care of it and sent Ms. Inscoe back to her dorm.

87. Moments later, Hicks paged Ms. Inscoe to report to the unit clotheshouse (also located in B-wing hallway). When she arrived, Hicks was at the clotheshouse door with a male inmate who was the clotheshouse worker.

COMPLAINT - 19

88. Hicks started yelling at Ms. Inscoe saying: "You want to go tell the sergeant that Buchanan cussed you and wouldn't let the nurse refer to you as a woman. I've told you, you are not a special boy, you're a man."

89. Hicks told Ms. Inscoe that Silvers told him to "upsize" her ("his") pants from an already loose men's size 40" pants to a men's size 45" pants, but at the time, Ms. Inscoe only had a 34" waist. She let Hicks know that a 45" is way too big for her.

90. Ms. Inscoe also possessed at the time a medical (DC-490) duty status issued by medical that specified her sizes. This was also entered into the DPS OPUS system and it clearly indicated that Ms. Inscoe wears a size 7 women's underpants (panties) and 40-C bra. Yet even though Ms. Inscoe is a woman she's forced to wear men's clothes and men's pants.

91. Hicks' yelling at Ms. Inscoe had gotten the attention of about 130 male inmates housed on B-wing and Hicks forced Ms. Inscoe to remove her pants in the open and in full view of the inmate clotheshouse worker (male), the control booth officer, and the inmates standing in the dorm windows watching her.

92. Hicks told Ms. Inscoe: "I don't like the way you look and you want to tell Sarge [Silvers] that you're a woman." Hicks ordered the clotheshouse worker to give her a size 45" pants.

93. Ms. Inscoe told Hicks again that the pants are way too big and asked to talk to Silvers. Hicks started screaming at her and said to her: "Do it now, take your pants off and do it." Every time she took her hands off of her pants, they would fall down, further exposing her buttocks and genitalia. This resulted in men making cat calls, taunting her, laughing at her, telling her to "shake her ass" and "let me see that pussy girl."

94. Ms. Inscoe feared for her safety and when she was called to the Sergeant's office later that night, she told Sgt. Silvers that she was not safe. Yet Silvers didn't care.

COMPLAINT - 20

95. Silvers allowed Defendants Hicks and Buchanan to yell and scream at Ms. Inscoe while in the sergeant's offices and told Ms. Inscoe that she is an embarrassment to look at, that she didn't deserve to live, and should be ashamed of who and what she is.

96. Silvers told Ms. Inscoe: "You are a man, and you need to act like a man and if you were a woman, you would be at a woman's prison." During this time, Ms. Inscoe was crying, scared, and humiliated.

97. Buchanan then grabbed Ms. Inscoe by the throat and slammed her against the concrete wall and choked her causing her to not be able to breathe.

98. He (Buchanan) told Ms. Inscoe: "My son is gay and I hate him, what do you think I could do to you." He then called her a "faggot" and said he couldn't stand her. Buchanan continued choking Ms. Inscoe and she recalled hearing "I'll beat your ass" before losing consciousness.

99. Defendant Silvers did nothing to stop Buchanan and Hicks or to protect Ms. Inscoe from their abuse and assault on her. (Ms. Inscoe believes that at the time, Buchanan was over 300 pounds.)

100.    When Ms. Inscoe was sent back to the dorm, she called the *63 PREA Reporting number, and told the person what happened. She also notified Captain Grindstaff on first shift the following day and even to the Unit Manager James Waldroop, and to her knowledge, nothing was done and her pleas for help were ignored.

101.    On 10/7/20 at about 7:00pm, Ms. Inscoe was again in the B-wing hall getting her medication from the nurse.

102.    While Ms. Inscoe was doing so, Dustin Dellinger (Assistant Unit Manager) told Ms. Inscoe to come into the core hall (G Hall) where Dellinger was talking to Hicks and Buchanan.

COMPLAINT - 21

103. When Ms. Inscoe entered the hall, Buchanan again became uncontrollable and started yelling at her and cursing Ms. Inscoe and made threats to assault her. Buchanan then swung his fist at Ms. Inscoe out of apparent anger and struck the concrete wall and began cursing even more at her.

104. Buchanan told her: "I'll beat your goddamn ass…" Dellinger, Hicks, and Sgt. Silvers (whom was in the sergeant's office) did nothing to stop Buchanan or protect Ms. Inscoe from further abuse and injury.

105. On 10/8/20, Ms. Inscoe was told to report to Mr. Waldroop's office on Yancey Unit. Dellinger and Waldroop were both in the office.

106. Waldroop talked to her about the events that took place over the previous days involving Dellinger, Buchanan, Hicks, and Silvers.

107. Waldroop told Ms. Inscoe that he would take care of it and said it wouldn't happen again, and he told her if she filed a grievance she would be placed in segregation.

108. Waldroop then proceeded to discuss with Ms. Inscoe the Facility TARC decisions held earlier that day. (The meeting was scheduled prior to these events in October 2020.)

109. At the meeting, Ms. Inscoe had already requested in writing an opportunity to shower separately from male inmates. This was denied.

110. Ms. Inscoe was told: "If you want to shower separate, I'll place you in the hole." Waldroop also told Ms. Inscoe that: "DPS staff will not use female pronouns because [s]he's at a men's prison, that is per Jason Penland." (Assistant Superintendent of Programs.)

111. Ms. Inscoe was excused from Waldroop's office. She also states: "This same type of purposeful harassment continued and I would try to talk to Mr. Hartzog and to Captain

COMPLAINT - 22

Watson about it, but it did no good." She further stated that she talked to staff, lieutenants, captains, sergeants, nobody cared. Ms. Inscoe's reports only resulted in further reprisals.

112. On about 4/18/21 at about 10:00pm-11:00pm, Ms. Inscoe was woken up and instructed to report to the Yancey Unit Multipurpose Room to take a drug test (urinalysis).

113. Ms. Inscoe entered the multipurpose room and officer F.N.U. Buchanan[6] and Officers B. Hoilman and C. Miller were in the room. Sergeant F.N.U. Goforth was the sergeant in Yancey Unit and in his office.

114. Ms. Inscoe, when it came her turn to take the test, told Buchanan that she needed to be able to sit to pee (urinate). Buchanan told Miller: "See what the stripes [sergeant] has to say."

115. Miller left the room, and came back a few minutes later and yelled at Ms. Inscoe saying, "let's go!" and led Ms. Inscoe into the sergeant's office where Sgt. Goforth and Hicks was in the office. Miller came in behind Ms. Inscoe and slammed the door and stood against it.

116. Goforth began yelling at Ms. Inscoe and told her: "This is a men's prison and the state says you're a man! Now you are going to put your dick in that cup and you will stand up and piss like a man."

117. Goforth then told her: "I don't give a shit about you and I don't give a shit what first shift does or says, this is my shift! Now piss in that cup or I will beat your little ass and put you in the hole on every 'A' charge [disciplinary class level] I can think of!"

118. Ms. Inscoe told Goforth that she doesn't have a typical "man's penis" but a clitoris and she has to sit to pee.

---

[6] The Officer Buchanan mentioned in this even is not Shawn Buchanan.
COMPLAINT - 23

119.    Goforth started laughing sarcastically and told her to pull her pants down and show him

        what she has.

120.    She told Goforth: "No, I will pee in that cup but have to sit to pee so I don't pee all over

        myself."

121.    At that time, Goforth stood up and told Ms. Inscoe to pull her pants down or he would

        have Miller pull them down for her.[7]

122.    Out of fear of their threats of bodily harm, Ms. Inscoe pulled her pants down. Ms. Inscoe

        also states that "Miller, Hicks, and Goforth have a reputation of beating and assaulting

        inmates for no reason."

123.    When Ms. Inscoe pulled her pants down, Miller said: "Looky Sarge, he's wearin'

        damngum girl's panties…" Goforth said: "Them too," pointing at her panties and said:

        "Show us you don't have a dick!"

124.    Ms. Inscoe complied to their malicious and degrading orders and when she pulled her

        panties down, Miller started laughing at her and said: "He's a sissy, Sarge. He ain't even got

        a dick!"

125.    Ms. Inscoe bent down to pull her panties and pants up, and Miller balled his fist like he

        was going to hit (punch) Ms. Inscoe and told her: "I ain't tell you to pull them britches up."

126.    Goforth told Ms. Inscoe: "Take that cup and go in there [bathroom] and sit your little

        sissy ass down and piss in it like a little bitch." Then he said: "I don't care if you go crying to

        [Captain] Watson about this. I've worked for him for years and he will take my side."

_____

[7] DPS Policy prohibits staff from searching or inspecting a person's genitalia for his purpose. Chapter
F .0103/PREA 28 CFR 65 115.19
COMPLAINT - 24

127. She pulled her clothes up, left the office and went to the bathroom and sat to pee (urinate). While Officers Miller, Hicks, and Hoilman all stood with the bathroom door open, taunting and staring at her as she urinated in the cup.

128. Ms. Inscoe states: "They were laughing at me, taunting me, and making fun of my genitalia as I tried to urinate." She further stated that Buchanan was in the multipurpose room during this event and he didn't do anything to stop them or to protect her or ensure her safety, health, and wellbeing, and during this time, a female officer (Twyla Townsend) was in the B-Wing control booth and could have easily been relieved so she could supervise Ms. Inscoe as she took the drug test.

129. Ms. Inscoe reported this to Captain Watson. But no PREA investigation was conducted for the sexual harassment and voyeurism. Ms. Inscoe continued to be harassed.

130. On 10/13/21, Ms. Inscoe was in the inmate dining hall and as she went through the serving line, Officer F.N.U. Jimeson said to her in the presence of numerous inmates: "Are you still suitcasing everyone's dope?" (Suitcasing is a term in prison for placing objects into your vagina or rectum.)

131. Ms. Inscoe reported what he said to her to Captain Watson on 10/14/21 after Jimeson again harassed Ms. Inscoe by saying to her in the dining hall that she should be ashamed of herself for being who she is (a woman) and told her he was going to get her.

132. On 10/15/21, at about 9:15am, Ms. Inscoe was again harassed by Jimeson as she went to medical to get her medication. This harassment came after she reported him.

133. Ms. Inscoe then attempted to file a grievance to report his sexual harassment to Sgt. Tammy Jones, but Jones would not accept her grievance and said: "Browning (Landon Browning, unit manager) said he's not going to accept your grievance(s)."

COMPLAINT - 25

134.  Over 12 hours later, Ms. Inscoe was able to give her grievance to Captain Rene Reel who placed it on Captain Watson's desk.

135.  It wasn't until December 1, 2021, that Ms. Inscoe was called to the education area to see Lt. Derick Fox to write a statement on what happened with Jimeson.

136.  Fox told Ms. Inscoe that he would write her up and charge her with an "A" charge then put her in the hole if she didn't state that Jimeson wasn't sexually harassing her. He said: "I go by preponderance of evidence. That means if my officer says he didn't do it, then that's my 51 percent of evidence."

137.  Out of fear and coercion, Ms. Inscoe wrote a statement that she didn't wish to write.

138.  On June 8, 2021, at about 6:30pm, Ms. Inscoe was at the medication line and as she was waiting, other inmates were making hate-filled comments and threats toward her and calling her a "faggot and queer, etc.," while Officer Renfro was laughing about it and encouraging them to harass her.

139.  Renfro said that he "hates faggots and before the cameras were installed, [he] would let inmates jump on the queers and beat the shit out of them." Then he said, "I wish it would go back to the older days and we could get rid of them queers."

140.  On 6/15/21, Ms. Inscoe was called to go the warehouse to get her legal mail.

141.  When she arrived there, Sgt. F.N.U. Banks started yelling at her and F.N.U. Washburn said, "I wouldn't give his ass any mail!" Sgt. Banks didn't give Ms. Inscoe her legal mail and told her to "get the fuck out of my warehouse!"

142.  It was two days later before Banks called her back up to get her mail.

COMPLAINT - 26

143.     On 6/18/21, Ms. Inscoe was harassed by Officers Goulding, Hoss, and Lowery at the medication window at which Goulding said in the presence of about 20 inmates: "I'm tired of seeing that queer. He walks around here thinking he's a woman."

144.     On multiple occasions, those same officers have made threats to Ms. Inscoe, harassed her and made vulgar remarks about her body, appearance, clothing, and gender.

145.     On 6/27/21, Ms. Inscoe was again at the medication window when a male inmate was telling other inmates in the presence of staff that Ms. Inscoe has "AIDS" and that she deserves to die. Staff started laughing about what he was saying and the inmate said she "sucks dick" and "someone needs to fuck [her] until [she] bleeds to death."

146.     On 7/20/21, Ms. Inscoe went to the dining hall to eat lunch, and when she got her tray, she had a teaspoon of food on her tray (literally a teaspoon!).

147.     She went to the kitchen steward, Officer Chad Clark, to show him her tray and he said to her, "I don't like you. You're a queer and if my guys want to starve your ass then I'll let them. You don't deserve to get that much."

148.     On 9/15/21, Ms. Inscoe was called to report to the education area to talk to Captains Brian Watson and Nathan Crowe in regards to an article published in various media outlets in regards to DPS housing Ms. Inscoe, an intersex woman, in a male facility.

149.     She was told to write a statement (DC-138) saying she is safe or she was going to be placed in segregation, have all of her personal property taken, and be "punished" for speaking out to the media, her attorney, and for exercising her constitutionally protected rights.

150.     Warden Huneycutt told her to state that she is safe at Avery-Mitchell but he knew that she was not.

COMPLAINT - 27

151.   Once inmates found out that she is a female/hermaphrodite, they began to harass her and aggressively pressure her for sex.

152.   On 10/8/21, Ms. Inscoe was again strip searched by a male guard (Officer F.N.U. Autry), even though female staff were available and she requested to be searched by a woman.

153.   Autry told her: "You're at a men's prison and you're not a woman. You get searched by a man."

154.   She didn't argue with him and complied with the search. There wasn't any exigent circumstance, and multiple female staff were available on that shift to search Ms. Inscoe.

155.   On 11/1/21 at about 4:00pm, Ms. Inscoe had left the medical area and was going back to her dorm. As she got near the dining hall, Officers Marty Cooper and Stacey Peterson (both male) came out of the dining hall leaving their post to harass Ms. Inscoe about her "appearance" when Peterson said: "You want to put a PREA on Jimeson, I'll teach you to do that, you need to act like a man."

156.   Peterson and Cooper placed numerous inmates in potential danger just to harass Ms. Inscoe.

157.   On 11/10/21, at about 5:00am, Ms. Inscoe was taken to inmate Receiving for an outside medical trip by Officer F.N.U. Hensley (male).

158.   Officers Ross Burge and Rodney Austin came in to transport her. Hensley began telling them that Ms. Inscoe "is a man, [s]he gets treated like a man, searched by a man." Hensley continued using male pronouns in referring to her and told Burge and Austin that they must do the same. (Ms. Inscoe states that Burge and Austin did not do as Hensley said and didn't misgender her nor cause her any unneeded embarrassment.)

COMPLAINT - 28

159. On 11/13/21, at about 3:15pm, Ms. Inscoe was paged to report to the Sergeant's office on Yancey Unit by Sgt. Burt Young.

160. When Ms. Inscoe got to the Sergeant's office, she noticed Sgt. Renfro and Office Colvin in that office and Officer Green in the relief sergeant office across the hall.

161. Renfro told Ms. Inscoe to come into the office and close the door (out of camera view). But Ms. Inscoe did not and stated she didn't feel safe doing so.

162. Sgt. Young jumped up out of his chair and started cursing and threatening Ms. Inscoe and called her a "whiney little bitch."

163. Green said: "Sarge, he's gonna write a grievance on you." Young said: "You little faggot, you write a grievance on me if you want to and I'll take that grievance and shove it up your goddamn ass!" Then told her to go back to her block.

164. Green replied: "I'm tired of all these dick sucking queers. Young said: "I've got something in store for that one [Ms. Inscoe]."

165. On 12/9/21, Ms. Inscoe was paged to the warehouse for legal mail. Upon arriving at the warehouse, Ms. Inscoe noticed that she had mail from Attorney Cynthia Totten/Just Detention International.

166. Ms. F.N.U. Sellers and Officer Ivan Hoyle opened Ms. Inscoe's mail and began reading it. Hoyle told her: "This has nothing to do with your case! This talks about sexual abuse!"

167. Ms. Inscoe told Hoyle that she is a survivor of sexual abuse and rape. Hoyle told her: "Well, if you were raped, you probably deserved it!" Then Sellers said to her: "If you didn't look like that, you wouldn't have to worry about being raped," referring to her gender. Hoyle told Ms. Inscoe he was throwing her mail away.

COMPLAINT - 29

168.     Ms. Inscoe went back to the housing unit and was crying and in distress. She asked staff

to please let her talk to Sgt. Jones or Mr. Waldroop. No one would.

169.     Ms. Inscoe was told by Officers Cory Boone and Brianna Pritchard to go ask Sgt. Renfro

to call. Renfro was in A-wing control.

170.     When Ms. Inscoe asked Renfro if we would call Sgt. Jones, Renfro began yelling at her

and said: "Get the fuck of here, put in a request!" Then kicked the metal passthrough door

into Ms. Inscoe's face.

171.     Ms. Inscoe went back out and was crying and in distress and staff did nothing to help her

and laughed at her.

172.     On 12/13/21 at 3:00pm, Ms. Inscoe was again called to the warehouse for legal mail by

Sgt. F.N.U. Banks.

173.     When Ms. Inscoe got to the warehouse, Sgt. Banks and Rena Dellinger (mailroom clerk)

were there with two pieces of mail for Ms. Inscoe, both clearly marked as legal mail and

from an attorney.

174.     Banks opened her mail, read it, and gave it to Ivan Hoyle who left the warehouse and Ms.

Inscoe's presence and went to the admin section. He was gone about 15 minutes. When he

returned, he told her that she couldn't have her mail.

175.     Banks told Ms. Inscoe: "You want to think you were a victim, I'll show you what being a

victim is. I'll make you a victim and beat your goddamn ass!" Then told her: "Get out of my

goddamn warehouse!"

176.     Ms. Inscoe did not get her legal mail and it was returned to the sender.

177.     On 12/24/21 at 6:00am, Sgt. Burt Young sent Renfro in to wake Ms. Inscoe up and

moved her out of retaliation to a dorm that Ms. Inscoe told Young she was not safe in.

COMPLAINT - 30

178.   When she told Young she didn't feel safe, he replied by telling her: "I don't give a shit if you feel safe or if someone stomps your ass and fucks you. Now you will go where I put you or I'll write you up and throw your ass in the hole!"

179.   Ms. Inscoe talked to Lt. Hundley and Cpt. Grindstaff when she went to lunch and asked them why she was moved and they stated they didn't know anything about it.

180.   Ms. Inscoe told them that she wasn't safe and their response was: "Talk to Captain Watson when he comes back from vacation."

181.   Ms. Inscoe went back to the unit and told Renfro that she didn't feel safe and was already having issues with an inmate, and he told her: "Learn to fuck or fight!"

182.   On 12/25/21, Ms. Inscoe was going to the outside recreation yard on Yancey Unit. When she was in the A-Wing Hallway, Officer Renfro opened the dormitory doors allowing a mob of male prisoners to flood into the hallway and as a result of that, an inmate grabbed Ms. Inscoe's buttocks with his hands and was groping her and she could not get away as she was surrounded and Renfro would not open the yard door. She reported this to staff and they thought it funny, and said "You're a man and this is a men's prison."

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

183.   The plaintiff has exhausted her administrative remedies with respect to all claims and defendants.

## V.   CAUSES OF ACTION

## COUNT 1

### Failure to Protect (Eighth Amendment)

184.   The allegations of the preceding paragraphs are incorporated as if fully set forth herein.

COMPLAINT - 31

185. Defendants Buffaloe, Ishee, Harris, Williams, Huneycutt, Watson, Fox, Waldroop, Goforth, Silvers, Hicks, Buchanan, Miller, Carver, and John Doe(s)/Jane Doe(s) have a constitutional obligation to protect Ms. Inscoe from being assaulted or otherwise subjected to violence in prison and Ms. Inscoe has a constitutional right to be protected from physical assault, sexual abuse, and other violence in prison. Upon the direction of and/or knowledge by Defendants.

186. Ms. Inscoe was/is confined in conditions posing a substantial risk of harm, including but not limited to being confined in a men's prison, being housed with male inmates, being assigned to a dormitory with male inmates, being denied female clothing and commissary items/personal feminine hygiene items, being subject to repeated, prolonged, and/or extreme sexual harassment and abuse, being forced to use open communal restrooms with men, forced to shower and change clothes with men, being strip searched by men, being sexually assaulted by staff forcing her to perform oral sex, having male inmates masturbate and ejaculate on her and being consistently and intentionally misgendered by these defendants and correctional staff and DPS employees under their control and supervision.

187. Despite being on notice that Ms. Inscoe is a woman, these defendants failed to perform a sufficient or meaningful individualized assessment of Ms. Inscoe's risk of being assaulted, her views of her own safety were not taken into account and/or were repeatedly ignored, and, despite the notations of her risk of being victimized in her OPUS record, and her purported designation for PREA monitoring, sufficient or meaningful precautions were not taken to prevent her from harassment and abuse, despite the obviousness of the risk.

188. Additionally, Defendants knew and/or should have known that housing Ms. Inscoe with male prisoners placed her at a substantial risk of harm, including because Ms. Inscoe

COMPLAINT - 32

requested to be transferred to a women's correctional facility (NCCIW) pursuant to NCDPS policy, citing the risk of irreparable harm. Despite this knowledge, these Defendants failed to transfer Ms. Inscoe to a women's prison.

189. As a direct result of the refusal to transfer Ms. Inscoe to a women's prison, Ms. Inscoe was subjected to physical assault by defendants Buchanan, Hicks, Silvers, and Carver resulting in substantial physical injury. Ms. Inscoe was also subjected to sexual assault by Defendant Carver, resulting in physical injury and psychological trauma. Ms. Inscoe was also subjected to voyeurism, sexual exploitation, and sexual harassment by Defendants Hicks, Miller, Goforth, Carver, Buchanan, Silvers, Waldroop, and J. Does.

190. By failing to properly investigate Ms. Inscoe's assault and abuse by guards and /or take affirmative action to reprimand or punish staff and/or inmates, Defendants Watson, Waldroop, Huneycutt (warden), Fox, Ishee, and Jordan-Williams ratified the conduct of all defendants; sent a signal to these defendants, other DPS and Correctional staff, and other prisoners that assault, other violence, sexual abuse, sexual harassment, and discrimination of Ms. Inscoe on account of her gender identity or expression, gender, sexuality, HIV status, and medical/intersex status, would be met with impunity; and subjected Ms. Inscoe to additional risk of serious harm.

191. Defendants' acts or omissions were motivated by actual malice or accompanied by a wanton and willful disregard of individuals who foreseeably might be harmed by those acts or omissions.

192. As a direct and proximate result of DPS policies and Defendants' actions, Ms. Inscoe has suffered extensive injuries, trauma, humiliation, and degradation.

COMPLAINT - 33

193.    The actions of Defendants participating in, condoning, ratifying, perpetuating, aiding, and abetting direct actions, rules, policies, and otherwise being deliberately indifferent to and recklessly endangering plaintiff by housing a woman with men and subjecting her to cruel and unusual punishment which violates plaintiff Ashlee Inscoe's right to be free from cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

## Count 2

## Equal Protection under the Law in Violation of the Fourteenth Amendment to the United States Constitution

194.    The actions of Defendants Buffaloe, Ishee, Harris, Williams, Huneycutt, Watson, Fox, Waldroop, Goforth, Silvers, Hicks, Buchanan, Miller, Carver, and John Doe(s)/Jane Doe(s) participating in, condoning, ratifying, perpetuating, aiding, and abetting direct actions that discriminated against plaintiff on the basis of her gender, gender identity and expression, her bodily appearance, sexuality, and medical condition without limitation by consistently misgendering her by referring to her as a male or a man, using male pronouns, by denying her female clothing and female commissary and hygiene items, by verbally and physically harassing her on the basis of gender, gender expression and identity, forcing her to be strip (complete) and pat/frisk (routine) searched by male staff, and by otherwise failing to respect her as a woman and respect her gender identity and expression. This discrimination has been and is so severe and pervasive that it constitutes a hostile and abusive environment and is in no way reasonably related to legitimate penological interests, in violation of plaintiff Ashlee Inscoe's rights to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

COMPLAINT - 34

## Count 3

### Unreasonable Searches in Violation of the Fourth Amendment to the United States Constitution

195.　The actions of Defendants Buffaloe, Ishee, Harris, Williams, Huneycutt, Watson, Fox, Waldroop, Goforth, Silvers, Hicks, Buchanan, Miller, Carver, and John Doe(s)/Jane Doe(s) participating in, condoning, ratifying, perpetuating, aid and abetting direction actions, rules, or prison policies that have caused plaintiff to be strip (complete) and pat/frisk (routine) searched by male staff known as a "cross gender search" (28 CFR § 115.15 et al., Prison Rape Elimination Act of 2003 National Standards) when plaintiff on myriad of occasions requested to be searched solely by a woman/female staff and caused plaintiff to be sexually harassed and abused by staff and inmates and has deprived and violated plaintiff Ashlee Inscoe's right(s) to be free from unreasonable searches in violation of the Fourth Amendment to the Constitution of the United States.

## Count 4

### Discrimination on the Basis of Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. §12101 et. seq.

196.　Plaintiff incorporates the allegations in all preceding paragraphs as if fully stated herein.

197.　Defendant North Carolina Dept. of Public Safety is a "public entity" as defined by the ADA (Americans with Disabilities Act).

198.　The Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities and from excluding person with disabilities from participating in, or denying them the benefits of, the services, programs, or activities of such a public entity (42 U.S.C. §§12131-12134).

COMPLAINT - 35

199.     Based on Ms. Inscoe's diagnosis of hermaphroditism/intersex, as well as cryptorchidism

and gender dysphoria, which has been recognized and documented by DPS, Ms. Inscoe is a

person with a "disability" within the meaning and scope of 42 U.S.C. §12102.

Hermaphroditism/intersex (disorder of sex development) is both a genito-urinary disorder

and sexual reproductive disorder, and is a physical impairment that results in severe distress

and limitations on her major life activities that includes social functioning, using the

restroom, ensuring her safety, and social interactions.

200.     DPS provides accommodations and healthcare to other inmates with disabilities other

than hermaphroditism/intersex, cryptorchidism.

201.     Ms. Inscoe is also a "qualified individual with a disability" under the ADA because she is

incarcerated in DPS facilities. Therefore, she is eligible to participate in DPS services,

programs, and activities. However, DPS is failing to provide Ms. Inscoe equal access to

prison life on the basis of her disabilities and refuse and fail to accommodate her. DPS is also

failing to make reasonable modifications to its rules, policies, and/or practices, necessary to

accommodate her disabilities and provide her an equal opportunity to participate safely, fully,

and equally in her prison life, including an opportunity to receive needed health care.

202.     DPS has and continues to discriminate against Ms. Inscoe in violation of the ADA by

maintaining policies, procedures, and practices that deny her access to treatment and support

that she needs to manage her disabilities and is causing her ongoing harm to her health and

safety solely because of her disability. DPS is violating ADA because it excludes Ms. Inscoe

from and denies her the benefits of the health care programs operated by DPS and other

program operated by DPS and available to other women, because of her disabilities and

intersex status.

COMPLAINT - 36

203. DPS has discriminated against and continues to discriminate against Ms. Inscoe in violation of the ADA by failing to provide proper and reasonable training to health care, custody, and administration staff in responding to persons that are intersex.

## Count 5

### Cruel or Unusual Punishment in Violation of N.C. Const., Art . I., Section 27

204. Plaintiff incorporates the allegations in all preceding paragraphs as if stated fully herein.

205. North Carolina's constitutional prohibition on "cruel and unusual punishments" provides at least the same level of protection as the Eighth Amendment. *See State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998). The North Carolina Supreme Court has stated that "[o]ur state constitutional provision emphasizes the importance of this interest in North Carolina." *Medley v. N.C. Dep't of Correction*, 330 N.C. 837, 844, 412 S.E.2d 654, 659 (1992).

206. For the same reasons alleged herein, Defendants have been deliberately indifferent to Plaintiff's serious medical, housing, and safety needs in violation of the state Constitution.

207. Plaintiff has no other adequate remedy under state law for the violation of her state constitutional right to be free from cruel or unusual punishment.

## VI.   REQUEST FOR RELIEF

208. WHEREFORE, Plaintiff requests that the court grant the following relief:

    a. Issue immediate, preliminary, and permanent injunctive relief ordering defendants or their agents to:

        i. Treat Ms. Inscoe the same as all other women held in NCDPS women's facilities;

COMPLAINT - 37

    ii.   Use only female pronouns when speaking to or about Ms. Inscoe;

   iii.   Only allow complete/strip and routine/pat-frisk searches of Ms. Inscoe to be conducted by female correctional officers only, never male correctional officers except in legitimate exigent circumstances as defined by the PREA standards 28 CFR § 115;

   iv.   Train all NCDPS staff on how to appropriately accommodate, treat, and communicate with intersex and transgender prisoners and/or prisoners with gender dysphoria;

   v.   Discipline all NCDPS staff who fail to appropriately accommodate, treat, and communicate with intersex and transgender prisons and/or prisoners with gender dysphoria;

   vi.   Ensure that Ms. Inscoe is provided meaningful opportunity for out-of-cell time of at least four hours or more per day, given her status as a member of a vulnerable population who should not be subjected to isolated confinement;

   vii.   When Ms. Inscoe is transported to out of facility appointments, court, medical, and interdepartmentally, ensure that Ms. Inscoe is accompanied or escorted by at least one female correctional officer in case she needs to utilize the restroom, remove her clothing for exams, and otherwise provide the same gender-specific protection as other women in NCDPS;

   viii.   Not discriminate against Ms. Inscoe on the basis of her sex, gender, gender identity or expression, or intersex status, and;

   ix.   Any further injunctive relief necessary to ensure Ms. Inscoe's rights are not violated.

COMPLAINT - 38

b. Declaratory relief including, but not limited to, a declaration that the Defendants have violated:

   i. The Fourth Amendment to the United States Constitution by unlawfully and/or intrusively subjecting Ms. Inscoe to cross-gender strip and pat/frisk searches;

   ii. The Eighth Amendment to the United States Constitution by punishing Ms. Inscoe cruelly and/or unusually, by subjecting her to unreasonable and excessive force, subjecting her to near constant sexual abuse and harassment, and by failing to protect her and by housing her with men;

   iii. The Fourteenth Amendment to the United States Constitution by treating Ms. Inscoe differently than all other women in NCDPS custody;

   iv. The Fourteenth Amendment to the United States Constitution by making and/or enforcing law, policy or procedure, that deprived and abridged Ms. Inscoe's right to live and express herself freely as a woman;

   v. The Americans with Disabilities Act ("ADA") by discriminating against Ms. Inscoe on the basis of her intersex status.

c. Compensatory damages in the amount and form to be determined at trial, including but not limited to compensation for:

   i. Ms. Inscoe's pain, suffering, emotional distress, anguish, and humiliation from being subject to cross-gender strip searches, being forced to endure being consistently verbally and sexually harassed, for being sexually abused, being consistently misgendered, denied female clothing, denied female

COMPLAINT - 39

commissary items, and otherwise being treated differently than all other

women in NCDPS custody;

    ii.  Ms. Inscoe's bodily injury, pain, suffering, emotional distress, fear, anguish

and humiliation from the sexual assault on her from December 12, 2019, and

the physical assault on her from October 5, 2020;

    iii.  The period during which Ms. Inscoe was housed and confined in a male

facility in conditions that subjected her to violence, sexual abuse, and

harassment and placed her life and safety in jeopardy.

d.  Punitive damages on all claims allowed by law, in an amount to be determined at

trial;

e.  For prejudgment interest at the maximum rate, pursuant to applicable law;

f.  For all fees and costs associated with this action to be charged to Defendants;

g.  Any further relief as this court deems just and proper.

COMPLAINT - 40

Dated: October 26, 2022

Respectfully Submitted,

Ashlee Inscoe

Ashlee Inscoe

In Pro Per

**Demand For Jury Trial**

COMPLAINT - 41

1

**VERIFICATION**

2   I, Ashlee Inscoe, verify under penalty of perjury under the laws of the United States of America that the factual

3   statements in the foregoing complaint concerning myself, my activities, and my intentions are true and correct to my

4   personal knowledge.

5           NAsh C.I

6   Executed at   NAShville NC    on  October 26    , 2022.

7

8

9   Ashlee Inscoe

10  (f/k/a William Inscoe)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 42