THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE No. 1:22-CV-00243-MR

| | | |
|---|---|---|
| ASHLEE INSCOE, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANTS' RESPONSE** |
| | ) | **TO PLAINTIFF'S MOTION** |
| v. | ) | **FOR PARTIAL SUMMARY** |
| | ) | **JUDGMENT** |
| NORTH CAROLINA | ) | |
| DEPARTMENT OF ADULT | ) | |
| CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

Defendants respond to Plaintiff's Motion for Partial Summary Judgment as follows:

## FACTS

Plaintiff's exhibit 1 is an affidavit of Plaintiff. DE-57-2. In it, Plaintiff testifies to conditions at NASH CI. *Id*. Plaintiff claims to live in daily fear and deals with daily harassment and sexual abuse; to be the only woman in a dorm of over 100 men; that Plaintiff cannot lock the cell door; to have to eat with men; to shower in the vicinity of men; to have to interact with men while conducting daily activities. *Id*, ¶¶ 17-23.

Talena Lee, Nash CI Warden, is familiar with Plaintiff. See Exhibit 1, Declaration of Warden Talena Lee. From her personal observations, Plaintiff is safe and content with the housing at Nash CI. *Id*, ¶ 7. After a brief transfer to Harnett CI

for administrative reasons, Plaintiff advocated for a special exemption from any future transfers to any other facility. *Id.* Warden Lee has observed Plaintiff's interactions with other inmates and Plaintiff has developed a close relationship with another offender and is observed spending all available time with this offender. *Id.* Nash CI houses 8 other transgender and/or intersex inmates. *Id*, ¶ 6. Plaintiff does not ever appear to fear for personal safety or be in any stress from interacting with other male and transgender inmates. *Id.*, ¶ 7; See Exhibit 1B. Videos collected from December 2023 showing Offender Inscoe mingling with other offenders to share a news article written about Offender Inscoe, filed manually pending leave to so allow.

Nash CI has a unique cell setup. *Id*, ¶ 3. All cells are designated for only one inmate. *Id*. The bed goes below the window and there will be no double-bunking. *Id*. Every inmate at Nash CI can lock themselves into their cell to the exclusion of other inmates. *Id*. There is a setting for "inmate access." Inmate Access means that the offenders can lock themselves into their cells and also let themselves back out. *Id*. When the Inmate Access setting is off, the offenders can secure themselves in their cell, but they cannot let themselves back out. *Id*. The Inmate Access setting is turned off for cell counts and lockdowns and overnight. *Id*. Plaintiff has always had this security option. *Id*. Each cell also contains a sink with running water and a flushing toilet. *Id*.

Showers at Nash CI are set up such that each floor has two showers. *Id*, ¶ 4. Downstairs has two showers and upstairs has two showers. *Id*. The showers are near

the front where there are staff visuals, meaning staff can see if anyone is lingering around the showers and doing anything inappropriate. *Id*. Generally, offenders use the shower on their floor. *Id*.

Plaintiff uses the upstairs showers. *Id*. The upstairs showers are positioned such that no one walks by unless intentionally going to the showers or to the janitor closet. *Id*. Plaintiff has not requested private showers in years. *Id*, ¶ 5. This is because of the private nature of the shower set up at Nash. *Id*. This is similar with other transgender inmates who transfer to Nash. *Id*. Some will request private showers when initially entering and after experiencing the setup, they remove this requested accommodation. *Id*. Private showers are accommodated by allowing the requesting offender to shower during lockdowns when all other offenders are secured. *Id*. If Plaintiff requested private showers, they would be provided. *Id*.

In the Wake County trial, Plaintiff's safety, security, and programmatic needs were addressed and deemed appropriate. Defendants' Exhibit 4 to memorandum for summary judgment, DE-64-4, Transcript from 21 CVS 013401-910 (T pp 92, 94-95). It was litigated that Plaintiff can secure the cell door. *Id*, (T, p 94-95). It was litigated that Plaintiff is afforded private showers. *Id*, (T, pp 41, 92, 94-95). It was also confirmed Plaintiff has a private cell. *Id*, (T, p 94). These facts and issues were included in the DTARC decision. *Id*, (T, pp 91-92). The trial court concluded there was no abuse of discretion in denying Plaintiff's transfer request. DE-64-3, Defendants' Exhibit 3 to their summary judgment motion.

Plaintiff attempts to support the threat of danger with the PREA report. DE-58-14, Exhibit 16; DE-47-1, DE-48-5.

The report records 13 reports. *Id*. Plaintiff claims the reports increase with feminization (DE-57-1, p 7.); however, they also coincide with Plaintiff's increasing litigation for a court ordered transfer to a women's facility. DE-64-14, Exhibit 4(j) (June 30, 2023 DTARC minutes). The minutes find:

> While the persistence for gender identity related surgeries has continued, offender Inscoe has relatively recently begun reporting numerous PREA related complaints dating back multiple years covering periods of time when Offender Inscoe was previously reporting, at that time, feeling safe and supported at the then-current prison assignment and only wanting to go to a female facility. The relatively recent PREA reports now dating back multiple years were placed under investigation, but soon into that investigation, Offender Inscoe recanted the reports.

*Id*.

Plaintiff's Exhibit 2, Hartzog report, is a psychological update provided by Sean Hartzog, a masters level staff psychologist for consideration by the DTARC on a facility change. DE-58-1. The exhibit is a single page and does not include a referenced Appendix A, which references laboratory results from California DOC records. *Id*. The Hartzog report states Inscoe was born with ovaries and a uterus. *Id*.

4

This was later determined to be untrue by review of current medical screening and finding the report of XX male karyotype lacked appropriate supporting records. DE-64-4, (T p 75:21-22). Plaintiff did not trust DAC to conduct karyotype testing to verify the California results. *Id*, (T p 48:1-10, 78:1-25). Additional testing was not clinically necessary. *Id*.

Plaintiff's Exhibit 3, health problems list, further cites the unsupported XX karyotype. DE-58-3.

Plaintiff's Exhibit 4, Dr. Klett note, is a 2020 encounter indicating XX karyotype based off the single California record and noting the lack of anything other than Plaintiff's report for having been born with female organs. DE-58-3. Although this note recommends transfer to a women's facility, the recommendation is based on the unverified and questioned report of xx karyotype. *Id*.

Plaintiff's Exhibit 9, is the letter from Dr. Figler, provided to support Plaintiff's gender marker change on Plaintiff's birth certificate. DE-58-7. Dr. Figler claimed it was gender affirming surgery. *Id*.

Dr. Figler was approved to conduct the surgery based on testicular pain. DE-64-4, (T p 86). Dr. Figler, in fact, performed the surgery based on testicular pain. *Id;* Exhibit 2, operative notes. Dr. Figler either lied in the affidavit to Vital Records supporting gender marker change or lied to DAC as to the basis for conducting the surgery. *Id* (compare to DE-58-7).

5

Plaintiff's Exhibit 21 is a lab test result from California showing XX karyotype. DE-58-21. This report was never substantiated, despite efforts, never duplicated, never agreed to be duplicated, and lacking a clinical basis to having karyotyping medically recommended. DE-64-4, (T p 36-37; 75:21-22; 48:1-10, 78).

Plaintiff offers multiple medical professional statements alleging support for transfer to a women's facility and that Plaintiff is a female. DE-57-1, p 8. The statement by Dr. Klett in the string of cited medical professional support only includes Plaintiff's report of wanting a transfer in the subjective section. DE-58-16, Exhibit 18. The full context of the excert in Plaintiff's brief is as follows: Dr. Klett notes "40 yo genetic female gender female (?? intersex) returns for follow up. . . . Karyotype in 2008 showed XX. Though recent CT abdomen/pelvis 4/2021 showed male genitourinary structures (prostate and seminal vesicles)" DE-58-16. Dr. Klett did recommend transfer, which was based on the unsupported XX karyotype. DE-58-3. Plaintiff offers Dr. White's encounter, which relies on the XX karyotype and Dr. Klett's recommendation for the determination of female and recommendation to transfer. DE-57-17, Exhibit 19. The nature of the encounter is HIV/AIDS management. *Id*. With the Bowers encounter, Plaintiff's Exhibit 21, the female designation comes by way of the California report of XX karyotype. DE-58-19. The recommendation to transfer to a female facility is merely a copy of Dr. Klett's encounter. *Id*. In the Dr. Uhren, administrative note, without any basis provided, Dr. Uhren recommends transfer and cites to Dr. Klett, as also recommending transfer.

DE-58-20. Plaintiff's Exhibit 24, P.A. Carpenter's note, references the XX karyotype result from California. DE-22.

In the June 30, 2023 DTARC minutes the DTARC reviewed Plaintiff's transgender accommodation request. DE-64-14 (Exhibit 3(j).In addition to a transfer to a women's facility, Plaintiff also sought to be strip searched by women. *Id*.

**Of other note in Plaintiff's exhibits:**

In Exhibit 11, Plaintiff reports no staff have asked for any sexual favors or touched him inappropriately. DE-58-9.

In Exhibit 12,  it is noted in a mental health progress note on July 18, 2022, that "there are no elevated risk factors presently noted for Offender Inscoe" related to violence or self injury alerts. DE-58-10; DE-58-23, Exhibit 25, May 14, 2021 mental health encounter, same.

In an August 30, 2017, mental health encounter, Plaintiff reports no current suicidal ideations with any previous history of suicide being more than 5 years prior. DE-58-24, Exhibit 26. In a January 10, 2023, health note, Plaintiff has no complaints for mental health and no suicidal ideations present. DE-58-25, Exhibit 27.

In Plaintiff's Exhibit 29, Dr. Graham's psychiatric note from August 24, 2023, it is recorded Plaintiff "**reports that while she feels very uncomfortable living *in a male* prison, denies any *acute* or specific concerns about her safety recently or currently." DE-58-27.**

7

In Exhibit 28, the Dr. Graham October 12, 2023 Psychiatric report, it is noted Plaintiff is "uncomfortable residing in a male facility, but denies any specific threats or concerns about her safety acutely." DE-58-26, Exhibit 28.

In Plaintiff's Exhibit 30, a report from psychologist Hartzog, dated January 27, 2022, Plaintiff reports having been sexually assaulted in 2019, but is not currently experiencing any sexual abuse or harassment and feels safe in the current setting. DE-58-28, Exhibit 30. It is also recorded that Plaintiff is unable to work on issues with past trauma due to focusing on desired accommodations. *Id.* Plaintiff also wants the diagnosis of gender identity disorder removed and replaced with intersex. *Id.*

In Plaintiff's Exhibit 48, Hartzog Adendum, Psychologist Hartzog presents a lengthy narrative of Plaintiff's history, based on Plaintiff's report, not medical or other competent records, which he used as a basis for validating Plaintiff as a female and recommending transfer to a women's facility. DE-58-42. Of note, Psychologist Hartzog reports gender dysphoria is not an appropriate diagnosis. *Id.*

In Plaintiff's Exhibit 49, October 1, 2020, Bowers recommends transfer to a women's facility based on the previous endocrinologist report. DE-58-43.

In Plaintiff's footnote 6 Plaintiff claims Defendants have failed to produce records of at least eight PREA investigations, including one investigation at Avery Mitchell C.I., one investigation at Harnett C.I., and at least six investigations at Nash C.I. D.E. 47-1 at 7. See Exhibit 3 (PREA report).

Plaintiff claims recurring UTI's are from not showering and choosing to wash in the cell. DE-57-2.

## STANDARD OF REVIEW

Summary judgment is warranted only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 32223 (1986); *Cox v. Cnty. of Prince William,* 249 F.3d 295, 299 (4th Cir. 2001). "An issue is 'genuine' if a reasonable jury, based on the evidence, could find in favor of the non-moving party." *Acosta v. Del Sol P 'ship 2, Inc.*, No. 5:16-CV-231-BO, at *2 (E.D.N.C. Feb. 14, 2018) (citing *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986)) (other citations omitted). To prevent summary judgment, nonmoving parties must present "sufficient evidence" to allow reasonable jurors to find for them. *Jones v. Harrison, No. 4*:12-CV-90-D, at *5 (E.D.N.C. July 21, 2014) (citing Anderson, 477 U.S. at 249-50).

## ARGUMENT

### Res Judicata Bars relitigation of Resolved Claims, Facts, and Issues

Plaintiff's attempt to relitigate transfer to a women's facility should be denied. Plaintiff asks the court to "order Defendants to transfer Ms. Inscoe to a women's prison facility, where she may be strip-searched by female officers like DAC's other female prisoners." DE-57-1, p 41.[1]

---

[1] Cites to Plaintiff's brief reference the page number applied by the docket entry footer.

9

For reasons argued in Defendants' brief in support of their Motion for Summary Judgment (DE-64) and Reply to Plaintiff's Response filed concurrently with this brief, Plaintiff's issues have been litigated in Wake County Superior Court and Plaintiff's attempt to relitigate in this court should be denied.

Plaintiff's Footnote 8 attempts to marginalize the court of appeals ruling so as to be able to relitigate the issue of transfer to a women's facility. DE-57-1, P 19. Plaintiff argues the Wake County case was solely regarding a writ of mandamus relating to a state statute in order to try and force Plaintiff's transfer to a women's facility and does not preclude other available federal remedies. Regardless of other available remedies in a Section 1983 suit, Plaintiff moves for partial summary judgment solely to seek injunctive relief of trying to force Plaintiff's transfer to a women's facility. Despite purported other available remedies, Plaintiff seeks the same remedy.

Plaintiff does raise different claims (Section 1983 and ADA as opposed to a writ of mandamus), however, res judicata bars relitigation of the same facts and issues and all claims that should have been brought together. Plaintiff acknowledges this fundamental principle in relying on the Wake County case to confirm Plaintiff is intersex. DE-57-1, p 27. The Wake County case litigated Plaintiff's sex as appropriately male for housing in a men's facility and that the DTARC decision denying Plaintiff's requested transfer to a women's facility and to only be strip searched by women was denied without abuse of discretion, a necessary conclusion

10

for a writ of mandamus action. Thus, res judicata bars relitigation of these same issues in this action. *Rye v. U.S. Steel Min. Co*., 856 F. Supp. 274, 278 (E.D. Va. 1994)."; *Treadwell Original Drifters, LLC v. Original Drifters, Inc.* 2016 2016 U.S. Dist. LEXIS 184587, *14, (E.D.Va.  Jan. 28, 2016)  Affirmed at 678 Fed. Appx. 90 (4th Cir. Va., Feb. 24, 2017); *Northwestern Financial Group v. County of Gaston*, 110 N.C. App. 531, 430 S.E.2d 689, disc. review denied, 334 N.C. 621, 435 S.E.2d 337 (1993) (Section 1983 claims barred after resolved writ of mandamus action); *Southerland v. Atlantic C. L. R. R*., 148 N.C; 442 (1908)  ("It is a well-established rule of law that every material fact involved in an issue must be regarded as determined by the final judgment in the action, so as not to be a subject of trial in any subsequent proceeding between the same parties.").

**Plaintiff Seeks Affirmative Injunctive Remedy which if granted, must be narrowly tailored and the least intrusive option**

"The Eleventh Amendment  permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Anselme v. Fluvanna Corr. Ctr. for Women*, 2020 U.S. Dist. LEXIS 237537, *17, 2020 WL 7407467 (W.D.Va. Dec. 17,  2020) citing *Ex parte Young*, 209 U.S. 123, 128 (1908). "[T]he *Ex parte Young* exception only applies where there is an ongoing violation of federal law, not in instances where a plaintiff attempts to rectify the harm done in the past. *Id*, citing *Doe v. Virginia* Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479, 488-89 (W.D. Va. 2019). And, [a]bsent a constitutional violation, plaintiffs may not obtain

injunctive relief." *Id*, citing *Bolding v. Holshouser,* 575 F.2d 461, 466 (4th Cir.), cert. denied, 439 U.S. 837 (1978); *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

Thus, if the court finds a constitutional amendment is violated, "it may grant appropriate injunctive relief." *Farmer v. Brennan, 511 U.S. 825,* 846 (1984). In crafting a remedy, the Prison Litigation Reform Act ("PLRA") specifically provides that a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Anselme,* 2020 U.S. Dist. Lexis, at *18 quoting 18 U.S.C. § 3626(a)(1)(A), (g)(7).

"Federal courts have traditionally been reluctant to interfere in the problems of prison administration." *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980). "[T]he decisions made by prison administrators in their informed discretion have been accorded "wide-ranging deference" by the federal courts." *Id*, citing *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 126 (1977). "Judicial recognition that courts are ill-equipped to deal with problems of prison administrators '… reflects no more than a healthy sense of realism.'" *Id*, quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974).

### Equal Protection

Plaintiff argues an Equal Protection violation from Plaintiff being "trapped as a female person inside a men's prison facility." DE-57-1, p 20. equal protection

violations occur two ways: "(1) when the government explicitly classifies people based on [sex], or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown." *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009).

A viable equal protection claim in the prison context must state facts showing that state officials have treated "differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). The inmate must also show that "the unequal treatment was the result of intentional or purposeful discrimination." *Id.* at 731.

Plaintiff claims to be similarly situated to female inmates. DE-1; DE-557-1. However, Plaintiff has not demonstrated being similarly situated in all relevant respects to female inmates held in DAC custody. Plaintiff identifies as intersex. DE-57-1, DE-1. Plaintiff states that "because her birth certificate's legal sex marker is 'female,' she unequivocally identifies as female, prison officials have conceded that she sincerely identifies as female, she presents (physically and socially) as a female person, and she has no male reproductive capacity" that she is similarly situated to females. DE-57-1, p 18. "These external factors are, no doubt, important to [Plaintiff], but they alone do not make [Plaintiff]similar to female inmates in all relevant respects," *Sabbats v. Clarke*, 2022 U.S. Dist. LEXIS 164430, *18, 2022 WL 4134771 (W.D.Va. Sep. 12, 2022), as evidenced by Plaintiff's allegations and

arguments of being intersex. DE-1; DE-57-1.

**Rational basis applies.**

In subsections I(a) and (b) of Plaintiff's brief, Plaintiff incorrectly argues a heightened level of scrutiny applies under sex based discrimination or as a quasi-suspect class. DE-57-1, p 17-21. Generally, sex-based classifications are subject to intermediate scrutiny. *Grimm v. Gloucester* Cnty. *Sch. Bd.,* 972 F.3d 586, 608 (4th Cir. 2020), as amended (Aug. 28, 2020) (explaining that courts "have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes"). However, the Fourth Circuit has explained that when equal protection challenges arise in a prison context, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (evaluating equal protection claim brought by inmate); See *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, 2024 U.S. Dist. LEXIS 230288, *56, 2024 WL 5186706 (D.Md. Dec. 20, 2024)(applying *Veney* rational basis to transgender prisoner claim of discrimination under equal protection clause).

Under this more deferential standard, courts must determine whether the disparate treatment is "reasonably related to [any] legitimate penological interests." *Id*. (explaining that while courts are to "apply this deferential standard even when

14

the alleged infringed constitutional right would otherwise warrant higher scrutiny[,] . . . this more deferential review does not make [the court] ignorant to the concerns that justify application of a heightened standard outside of the prison context") (citation and internal quotation marks omitted). In determining whether an action is reasonable under this deferential standard, courts consider the following factors: (1) whether there is a valid, rational connection between the policy and penological interest; (2) whether an alternative means of exercising the right remains available to the inmate; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that accommodate prisoners' rights at de minimis cost to valid penological interests. Morrison, 239 F.3d at 655  (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).

**Defendants decisions are rationally related to a legitimate government interest and would otherwise meet the heightened scrutiny test**

Plaintiff argues *Doe v. Massachusetts*, 2018 U.S. Dist. Lexis 99925, 2018 WL 2994403 (Jun. 14, 2018) and *Tay v. Dennison*, 457 F.Supp.3d 657 (S.D.Il.  May 1, 2020) support a claim of an Equal Protection violation. Both cases lack controlling or persuasive reasoning applicable to this case.

In *Doe*, the Equal Protection violation alleged was the prison's refusal to transfer a transgender woman inmate to a women's facility based solely on the sex assigned at birth. *Doe*, 2018 U.S. Dist. Lexis, at *27. In this case, the DTARC gave

Plaintniff a full review and based its decision on a multitude of factors, including programatic needs being met, Plaintiff's questionable history of transitioning, and security concerns for Plaintiff and other women at a women's facility. DE-64-4 (transcript of hearing discussing full DTARC process provided to Plaintiff's request); DE-64-4(j) (June 30, 2023 DTARC minutes). Although *Doe*, a 2018 case did not follow the level of scrutiny required by the Fourth Circuit in *Veney* and followed in *Gilliam*, a December 2024 case, it offers some guidance on factors to weigh. *Doe* acknowledges "prison systems give priority to inmate safety and security and that this imperative will frequently warrant an interference with fundamental rights of inmates." *Doe*, at *27-28 citing *Washington v. Harper*, 494 U.S. 210, 223 (1990). And,

> It is also true that courts are instructed to afford deference to state prison officials in formulating policies that facilitate order, discipline, and safety in the prison system. See *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," the means of which "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.")

*Id*, at *28.

While *Doe* admonished "generalized concerns for prison security" as being insufficient to meet intermediate scrutiny, it specifically cited a situation where the

16

transgender inmate has a criminal history of violence or sexual assault as sufficient to meet heightened scrutiny. *Id*. Such is the case with Plaintiff, among other factors upon which the DTARC deliberated. DE-64-4; DE-64-4(j).

In *Tay*, again, applying an intermediate level of scrutiny not adopted in the Fourth Circuit, the primary issue was whether housing assignments based on genitals failes intermediate scrutiny and then whether the proffered reasons made sense. *Tay,* at 681. The court's review determined the Illinois transgender review committee focused on Tay's functioning male anatomy and problems others have had, avoiding an individualized basis. *Id*. The *Tay* decision did try to justify the decision based on Tay's size, declining to take hormones, sexual orientation, and other inmate's problems. *Id*. Here, Plaintiff had a much more deliberative process, encompassing the totality of Plaintiff's situation, thus having a marked difference from the *Tay* analysis.

Here, although rational basis is the correct scrutiny to apply, even under intermediate scrutiny, Plaintiff's DTARC decision is valid.

Defendants decision, as determined by the June 30, 2023, DTARC minutes and as found to lack an abuse of discretion when litigated in Wake County Superior Court, holds up as having both a rational basis to security concerns and to the heightened intermediate scrutiny.

Plaintiff argues Plaintiff is at risk based merely on being intersex, conceded by the records. DE-57-1, p 24. Plaintiff cites to PREA, however, PREA advises

transgender requests to facilities of a different gender should be made on a case-by-case basis. 28 C.F.R. 115.42. This directly contradicts an argument that status alone creates a danger requiring facility change. Moreover, Plaintiff recanted all of the allegations, admits to being safe, and has been observed and determined safe. DE-64-4; Exhibit 1, Lee Declaration.

Plaintiff also argues as to not having reproductive capacity after the orchiectomy, however, testimony elicited at the Wake County trial opined sexual assaults can take place post orchiectomy. DE-64-4 (T p 87).

The PREA regulations instruct that cross gender prison transfer requests be considered on a case-by-case basis, understanding that not every request should be granted. "The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same." *Roller v. Gunn*, 107 F.3d 227, 234 (4th Cir. 1997) quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

Prison transfers are fundamentally left to the discretion of the prison administrators. *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system"); *McKune v. Lile*, 536 U.S. 24, 39 (2002) (noting that the "decision where to house inmates is at the core of prison administrators' expertise").

Thus, Plaintiff's Equal Protection claim should be denied.

**ADA and Rehab Act**

18

Plaintiff argues ADA discrimination by denying the requested transfer. To state a claim under Title II, a plaintiff must allege that he (1) has a disability, (2) is otherwise qualified for the benefit he claims to have been denied, and (3) was excluded from the benefit due to discrimination based on disability. *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir. 1995).

"Courts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. County*, 515 F.3d 356, 362 (4th Cir. 2008).

Plaintiff's premise of discrimination is flawed. Plaintiff argues, as a heading "Ms. Inscoe is denied the benefits of being a female prisoner because of her intersex status and her gender dysphoria." DE-57-1, p 28. This argument relies on a premise that if Plaintiff were not intersex and did not have gender dysphoria, that Plaintiff would be a woman. This is the opposite direction of Plaintiff's gender journey. DE-64-4, (T p 32-33). Plaintiff had fully functioning testicles removed which Plaintiff precured by claiming testicular pain and then after-the fact proclaimed as gender affirming surgery. DE-64-4 (T pp 41, 79); DE-57-1.

"Based on all of the objective studies, physical exams, imaging studies that have been performed, Plaintiff is a male, has male external genitalia, has male internal reproductive organs, fully formed….male testes." DE-64-4 (T p77).

Plaintiff is not "Being denied the benefits of being a female prisoner because

of her intersex status and her gender dysphoria." Plaintiff has merely had the transgender accommodation request of a transfer to a women's facility and to be strip searched by women denied as not yet appropriate.

Plaintiff further argues "If she did not need to take hormone replacement to present outwardly as a woman, she would be housed among women and strip-searched by female officers." DE-57-1. To put this more straightforwardly, if Plaintiff naturally had the hormones of a woman, Plaintiff would not need feminizing hormones to create an outward appearance of being a woman and consequently would have originally been a woman for placement in a women's facility. Because the DTARC provided Plaintiff with a full and thorough review and gave a reasoned decision, the mere fact that Plaintiff disagrees with the decision does not mean there is discrimination. *Gates v. Rowland*, 39 F.3d 1439, 1446-47 (9th Cir. 1994) (While prisoners have a right to reasonable accommodations for disabilities, prison officials may determine the reasonableness of the accommodation request in consideration of other penological needs in the prison setting, such as security, safety and administrative exigencies); *Bell v. Wolfish*, 441 U.S. 520 (1979)(prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve the internal order and discipline and to maintain institutional security).

Plaintiff has been reasonably accommodated. Plaintiff has been provided HRT and private showers. Further, the facilities accommodate Plaintiff's request to

be strip searched by women to some extent. Exhibit 1, (female chaperone). Plaintiff has had security concerns alleviated by being provided a self-secured single cell. Plaintiff's programmatic needs are being met.

Plaintiff's request for a transfer to a women's facility was appropriately denied. There are no benefits Plaintiff would obtain from placement at a women's prison other than fulfilling Plaintiff's desires. The DTARC noted all of Plaintiff's needs being met at Nash CI and risks if Palintiff was transferred to a women's facility. Plaintiff's complaints of having to conduct daily activities around other men is nothing more than what Plaintiff would be exposed to if living outside the confines of prison. Women interact with men in nearly every public setting. As differences with treatment decisions do not give rise to constitutional violations, *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975), merely not being provided the desired accommodations are likewise not actionable under the ADA. Nothing in the ADA requires Defendants to accommodate the whims of a disabled inmate simply because he is disabled." *Alton v. Md. Dep't of Pub. Safety, 2016 U.S. Dist. LEXIS 143712, *12* (D.Md. Oct. 14, 2016) (*A plaintiff's failure to complete work release eligibility requirements "was simply due to his dissatisfaction with all efforts to accommodate his disability and the denial of his requests to be sent to a prison of his choice. Those circumstances vitiate his claim under the ADA.").

**Plaintiff's Fourth Amendment Rights not Violated by Strip Searches**

Plaintiff's Fourth Amendment rights are not violated by being strip searched by men. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. This right is necessarily abridged when an individual enters the prison setting. *Alexander v. Connor*, 105 F.4th 174, 180 (4th Cir. 2024), citing, *Bell v. Wolfish*, 441 U.S. 520, 557 (1979) (dismissing any suggestion that prison officials need a warrant to search a prisoner's cell). Notwithstanding, the Fourth Amendment continues to guarantee prisoners "some legitimate expectation of privacy in [their] person," *Alexander*, at 180, quoting *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016).

In deciding whether an in-prison search violates the Fourth Amendment, courts consider: (1) "the scope of the particular intrusion"; (2) "the manner in which it is conducted; (3) "the justification for initiating it"; and (4) "the place in which it is conducted." *Id*.

Plaintiff's alleged Fourth Amendment violations stem from being subjected to strip searches by male officers. The Plaintiff alleges the searches violate PREA. DE-1, ¶ 195. PREA advises that cross gender strip searches should not occur except in exigent circumstances. 28 C.F.R. § 115.15. First, as an initial matter, violations of PREA do not give rise to a cause of action under 42 U.S.C. § 1983. *Bracy v. Tully*, 1:22cv827 (RDA/WEF), 2022 U.S. Dist. LEXIS 143051, 2022 WL 3229325, at *3 (E.D. Va. Aug. 10, 2022) (collecting cases).

22

Second, Plaintiff was not subjected to a cross gender strip search as contemplated by PREA. Under PREA, "The facility shall not conduct cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) except in exigent circumstances or when performed by medical practitioners." 28 C.F.R. 115.15(a). The regulation recognizes a difference in a cross gender strip search and a transgender strip search in subsection (f). "The agency shall train security staff in how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs." 28 C.F.R. 115(f).

When comparing subsections A and F, the PREA regulations clearly differentiate between crossgender and transgender. Further, Subsection D requires opposite gender officers to announce themselves when entering a housing unit. 28 C.F.R. 115.15(d). And subsection 115.42(c) assumes transgender women will be in a men's facility, "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety...." 28 CFR § 115.42(c).

Further, the PREA definitions do not specifically define "gender" or "cross-gender." It does define intersex and transgender. Definitions in 115.5 define Intersex as "a person whose sexual or reproductive anatomy or chromosomal pattern does

not seem to fit typical definitions of male or female" and transgender as "a person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth." 28 CFR § 115.5.

In statutory interpretation, when a word is specifically defined and then used elsewhere within the statute, e.g., transgender and intersex, and specifically omitted from other parts, it is deemed intentional. *United States v. Harris*, 719 F. Supp. 2d 616, 623 (D.Md. Jun. 28, 2010) ("When the legislature includes particular language in one section of a statute, but omits it from another, it is presumed that the omission is intentional.") citing *Miller v. Miller*, 142 Md. App. 239, 788 A.2d 717, 723 (Md. Ct. Spec. App. 2001). "Further, 'a statute is to be read so that no word, phrase, clause or sentence is rendered surplusage or meaningless.'" *Id*, quoting *Prince George's Co. v. White*, 275 Md. 314, 340 A.2d 236 (1975).

If cross gender searches in Section 115.15 had been intended to incorporate transgender, then it would have.

In subsection 115.15(e.), the instructions are for the agencies to "train law enforcement staff in how to conduct cross-gender pat-down searches and searches of transgender and intersex detainees in a professional and respectful manner." 28 CFR 115.15(e). This specifically recognizes a difference between cross-gender searches and transgender or intersex searches.

Third, Even if the strip search is considered a cross-gender strip search, it is not cognizable. *Fly v. United States* (D.N.D. Dec. 15, 2023) (strip searches of a

prisoner with gender dysphoria not found to be a constitutional violation); *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990), the Eighth Circuit Court of Appeals explained: "Whatever minimal intrusions on an inmate's privacy may result from [opposite-sex] surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities." See also *Hill v. McKinley*, 311 F.3d 899, 904-905 (8th Cir. 2002) (holding that a female detainee's "very narrow zone[ ] of privacy" was not violated even though she was made to undress in front of a male guard); *Zamal'iah Asia-Unique Carter-el v. Boyer,* 2020 U.S. Dist. LEXIS 33860, 2020 WL 939289 (E.D.Va. Feb. 25, 2020) (transgender strip search is not a cross gender strip search).

Here, Plaintiff is generally only strip searched when returning from outside appointments or visitation in order to ensure contraband does not enter the facility. Exhibit 1, ¶ 8. The officer conducting the strip search is always accompanied by a second officer who stands off to the side. *Id*. When staffing permits, the second officer is a female. *Id*. Regardless, Plaintiff has never alleged any inappropriate strip searches were conducted at Nash CI. *Id*.

Furthermore, finding a Fourth Amendment violation and granting Plaintiff the requested relief would be granting administrative control over the prison to the prisoner, a function even courts avoid. *Wetzel v. Edwards* 635 F.2d 283, 288 (4th Cir. 1980) ("Federal courts have traditionally been reluctant to interfere in the problems of prison administration"). Plaintiff would be vested with deciding who

will be conducting the strip search as granting Plaintiff the requested relief would grant Plaintiff as the arbitor of determining which guards are male and which are female or subject staff to an improper intrusion on their privacy to sufficiently prove their gender to Plaintiff in order for Plaintiff to be searched to Plaintiff's satisfaction. *West v. Kind*, 2020 U.S. Dist. LEXIS 40210, *37-9, 2020 WL 1139800 (E.D.Wi. Mar. 9, 2020) (finding a compelling government interest in not preventing transgender men from strip searching a Muslim inmate who beliefs prevent him from being naked in front of women.).

## CONCLUSION

For the forgoing, Plaintiff's Motion should be denied.

This the 27th day of August, 2025.

**Jeff Jackson**
**ATTORNEY GENERAL**

/s/ J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General
N.C. State Bar No. 35449
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6545
Fax: (919) 716-6761
E-mail: jmilholland@ncdoj.gov

26

**\*\*\*CERTIFICATION OF INTELLIGENCE USED IN PREPARATION OF FILING\*\*\***

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This, the 27th day of August, 2025.

/s/J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the Court utilizing the CM/ECF system, and have served the Plaintiff, a *non* CM/ECF participant via regular United States Mail, first-class, postage prepaid, addressed as follows:

> Elizabeth Simpson
> N.C. Bar No. 41596
> EMANCIPATE NC
> P.O. Box 309
> Durham, NC 27702
> 919-682-1149
> elizabeth@emancipatenc.org
> *Counsel for Plaintiff*

This the 27th day of August, 2025.

/s/J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General
