IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ASHLEE INSCOE, | Civil Action No. |
| | 1:22-cv-00243-MR |
| Plaintiff, | |
| v. | |
| NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, *et al.*, | |
| Defendants. | |

## **PLAINTIFF'S REPLY BRIEF**

Plaintiff replies to Defendants' response (DE 75)[1] to Plaintiff's partial motion for summary judgment. (DE 57, 57-1).

Plaintiff directs the Court to the undisputed facts. The undisputed material facts are sufficient, standing alone, to grant Ms. Inscoe the relief that she seeks as a matter of law. There is no genuine issue of material fact that Ms. Inscoe: (1) identifies as a female, (2) has undergone an irreversible surgery that qualifies for "sex reassignment," (3) has a "female" sex marker on her certified birth certificate, and (4) lives in a men's prison facility among hundreds of men where she is regularly strip-searched by male officers. These facts, alone, qualify her for the

---

[1] Plaintiff notes that Defendants' brief is formatted in 1.8 spacing, in contravention of Local Rule 7.1(d) and the judge's Standing Order, which prescribe double-spacing.

1

relief that she seeks, regardless of the parties' ongoing vehement disputes about other factual details.

Contrary to the Defendants' argument, the state court action does not preclude her federal relief. There were minimal Findings of Fact by the state court in the mandamus proceeding. If the trial court didn't write it down in its order under the heading "FINDINGS OF FACT," it wasn't a finding of fact. *See* DE 64-3. Acting with restraint, the state court found only the facts that were strictly relevant to the narrow state statutory question presented. The trial court found that Ms. Inscoe was both "intersex" and "female," and that it was therefore mandatory under state statute for Prisons to quarter Ms. Inscoe with other females under N.C. Gen. Stat. § 148-44. *Id.* The Court of Appeals reversed, ruling that mandamus does not apply to this context, and in any event, an "intersex" person is neither "male" nor "female," so may be housed according to Prisons' complete discretion. *See Inscoe v. Ishee*, 915 S.E.2d 448, 462 (N.C. COA 2025).

The State court did not make any finding that Ms. Inscoe's housing assignment or search protocols comply with the U.S. Constitution or the Americans with Disabilities Act (ADA). It did not make any finding of fact about the validity of her PREA complaints, whether she ever intentionally hoarded estrogen pills, or whether Nash is a prison facility that meets her programmatic

needs—all of these are disputed facts that cannot be resolved on summary judgment, and which do not need to be resolved for the questions presented here.

Just because prison officials offered copious irrelevant evidence during the State court hearing does not mean that the trial court found it to be credible or accepted it as true. In fact, some of the evidence that Defendants now cite from the State court hearing was incompetent and inadmissible. There were medical opinions offered by a person who was never qualified as an expert witness and there was hearsay evidence offered without exception. The trial court rightly disregarded such evidence. *See* DE 64-4 at 38 ("Well, let me tell you this, since this is a bench trial, the appellate courts assume that I disregard anything that is not otherwise admissible as evidence, even absent an objection.").

## **Undisputed Material Facts:**

- Ms. Inscoe identifies as a female and a top-level prison official concedes this. *See* DE 64-4 at 23 (Dr. Lewis Pieper: "She had identified as female to us prior to this. We did understand that that's how she identified.")
- Prisons approved an orchiectomy as treatment for "persistent testicular pain," and on September 7, 2022, Ms. Inscoe underwent the orchiectomy, which is surgical removal of the testicles. DE 75-4.
- The orchiectomy had the impact of affirming Ms. Inscoe's gender identity as a female, which a high-level prison official conceded. *See* DE 64-4 at 43 (Dr.

Lewis Pieper: "Dr. Figler [ ] did a medical procedure to remove testicles that were causing Ms. Inscoe pain. If you're asking if Ms. Inscoe appreciated that in a gender-affirming way, I would imagine, yes, I think she has said that she appreciated it.")

- The orchiectomy qualified Ms. Inscoe for a female sex marker on her birth certificate based on long-standing North Carolina law as a "sex reassignment surgery." *See* DE 58-7; N.C. Gen. Stat. § 130A-118(b)(4) (2023).

- Ms. Inscoe's certified North Carolina birth certificate has a "female" sex marker. DE 57-3.

- The North Carolina Superior Court found that Ms. Inscoe is "intersex," DE 64-3, and the North Carolina Court of Appeals affirmed that factual finding, which was unchallenged by prison officials on appeal, and therefore binding. *Inscoe v. Ishee*, 915 S.E.2d 448, 462 (N.C. COA 2025).

- Ms. Inscoe lives in a men's prison facility at Nash Correctional, where she is regularly subjected to complete strip searches by male officers. DE 75-1.

## Disputed & Immaterial Facts

- Whether Ms. Inscoe feels "safe," "comfortable," and "content" living in men's prisons.

- To what extent the Nash showers are "private" and to what extent Ms. Inscoe can control outside access to her cell during the day time.

- Whether Ms. Inscoe's genitals are "fully formed" or whether they are ambiguous in some manner.
- Whether she ever intentionally "hoarded" estrogen pills and if so, why.
- Whether the 2008 chromosome test showing Ms. Inscoe to have XX chromosomes is valid and replicable.
- Whether Ms. Inscoe "recanted" her Avery-Mitchell PREA reports because she was threatened by staff with solitary confinement or for some other (unstated) reason.

The reason that Ms. Inscoe is entitled to relief is basic and fundamental: she qualifies as a "woman" under relevant federal precedents, so she must be treated like a woman for purposes of the Fourth Amendment and Equal Protection Clause, just like the plaintiffs in the cases she has cited here and in the opening brief.[2]

### I. The Fourth Amendment

While Defendants' counsel repeatedly insists that Ms. Inscoe's search preferences are accommodated "to some extent," DE 75 at p. 21, Nash Correctional prison officials have been crystal clear when they communicate directly with Ms. Inscoe: they will <u>not</u> accommodate Ms. Inscoe's requests to be pat-searched and strip-searched by female staff to <u>any</u> extent whatsoever. Her

---

[2] Ms. Inscoe also continues to proceed on the alternative theory that she has been diagnosed as intersex and gender dysphoric, and therefore, she is entitled to special relief under the Equal Protection Clause and ADA.

requests for such accommodations were denied completely yet again in a facility memo issued to her on July 25, 2025 (rescinding a memo issued three days prior). (Exhibit 1, Walyko Memo, 7/25/25)).

Of course it is true, as Defendants state, that "women interact with men in nearly every public setting." DE 75 at p 21. Women are not, however, regularly subjected to pat-searches and strip-searches by men, whether in jail, prison, or while going through airport security. Plaintiff has never argued that PREA constitutes a free-standing cause of action, DE 75 at p 24, nor that the courts ought to turn over "administrative control" of North Carolina prisons to an incarcerated plaintiff. DE 75 at p 25. Rather, Ms. Inscoe argues that having male officers repeatedly and routinely search her naked body violates the Fourth Amendment's protection against unreasonable searches. Plaintiff is similar to the incarcerated plaintiff in *Shaw v. District of Columbia*, 944 F.Supp.2d 43, 55 (D.D.C. 2013), who underwent a sex-reassignment operation and amended her birth certificate to reflect a "female" sex, and who was searched by male officers who knew that she was a female during a non-emergency:

> All of the relevant factors—"the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"—support a finding of unreasonableness. *Shaw*, 944 F.Supp.2d at 57.

Ms. Inscoe is not similarly-situated to the plaintiff in *Carter-el v. Boyer*, 2020 WL 939289, *4 (E.D. Va., Feb. 25, 2020), who still had a male sex marker and was pre-operative. The decision in *Carter-el* explicitly distinguishes *Shaw* based on these differences. Ms. Inscoe is also dissimilar to the woman whose naked body was handled by male officers during an emergency in *Hill v. McKinley*, 311 F.3d 899, 904-905 (8th Cir. 2002), because Ms. Inscoe is complaining about repeated, routine searches, rather than a one-time event during an emergency. The two *pro se* prisoner cases Defendants cite, both dismissed on frivolity review, are also inapposite.

## II. Equal Protection

Defendants argue that because Ms. Inscoe is "intersex," she is not similar to female incarcerated people in "all relevant respects." DE 75 at p 13-14. In other words, they argue that Ms. Inscoe may be treated differently from other females *because* she is regarded as having an immutable congenital biological condition that means her "natural" hormone production does not match her gender identity, i.e., intersexuality. Defendants do not respond to Plaintiff's argument that "intersex" status should be considered a quasi-suspect class, though their "special" treatment of Ms. Inscoe is, itself, an example of why intersex people are in need of special constitutional protection. *See* D.E. 57-1 p 19-21.

In terms of cases about traditional transgender plaintiffs, Defendants fail to persuasively distinguish *Doe v. Massachusetts*, 2018 WL 2994403 (D. Mass. June 14, 2018) or *Tay v. Dennison*, 457 F.Supp.3d 657 (S.D. Ill. 2020), factually or legally. Ms. Inscoe is similarly-situated to or better-situated than the plaintiffs in those causes, without any outlying circumstances that would fairly explain the difference in her treatment:

| *Doe* | *Tay* | *Ashlee Inscoe* |
|---|---|---|
| Legal Sex: female | Legal Sex: male | Legal Sex: female |
| Yes hormone therapy | No hormone therapy | Yes hormone therapy |
| No sex-reassignment surgery | No sex-reassignment surgery | Yes sex-reassignment surgery |
| Not a disciplinary problem | Unknown disciplinary record | Not a disciplinary problem |
| Current crime: "nonviolent drugs" | Current crime: "violent crimes" | Current crime: habitual felon (robbery/larceny) |

In terms of law, Defendants cite an unpublished case, *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, 2024 WL 5186706 (D.Md. Dec. 20, 2024), for the proposition that "rational basis" review applies to claims of discrimination against transgender people in prison. Defendants fail to mention that the *Gilliam* court found that the lower standard of review was met by allegations that: "[d]espite

their feminine gender presentation, Plaintiffs were each housed with male inmates at various [state prison] facilities." *Id.* at *11.

Plaintiff asserts that intermediate scrutiny is the proper standard here (with appropriate deference to prison operations), as was applied by the courts in *Tay* and *Doe*, but she also argues that her discriminatory treatment is illegal under <u>any</u> standard of Constitutional review. Defendants never state outright what they think would go wrong if Ms. Inscoe was housed with other women or why a female housing assignment would pose an operational challenge for prison officials. The focus on disputed facts is a distraction. Even the deferential *Turner v. Safely*, 482 U.S. 78, 89-91 (1989), standard would require prisons officials to articulate:

- What is the penological interest they are protecting?
- What is the impact on prison operations of accommodating Ms. Inscoe by housing her among women?

Defendants do not directly answer these questions in their briefs. Ms. Inscoe poses no greater risk to the female incarcerated population than any other incarcerated woman, and she is significantly less risky than the most violent and dangerous women housed in North Carolina prisons. There is nothing about her criminal history, disciplinary history, physiology, or anatomy that makes her unsuitable to be housed among women or searched by female staff. Indeed, Defendants won't even say that Ms. Inscoe will <u>never</u> be placed in a women's prison; they continue to insist merely that her placement in a women's facility is

"not yet appropriate." DE 75 at p. 20. This is reminiscent of psychologist Dr. Lewis Pieper's 2023 testimony in state court about "gender journeys":

> You have three pillars of factors, operational and security, medical and psychological that go into determining the best placement for somebody who is on their transitioning journey. And so at some point, Offender Inscoe may make a request and may qualify for transfer to a female facility.

DE 64-4 at p 103. What further must Ms. Inscoe do to prove that she is woman "enough" to be housed among women? What is the next step on her "journey"? Certainly the State can't require her to undergo a vaginoplasty (though she would like one), since such surgeries are categorically outlawed for prisoners by the State of North Carolina. *See* S.L. 2025-84, available [here](#).

     Defendants claim that "there are no benefits Plaintiff would obtain from placement at a women's prison other than fulfilling Plaintiff's desires," DE 75 at p 21, but this is no idle "desire." It is a federal lawsuit seeking compliance with the Constitution and the ADA. Ms. Inscoe has a federal right to be treated like a woman—not like a man and not like an "it." The State of North Carolina has ruled that there is no state statutory protection for intersex prisoners. Now, Ms. Inscoe has petitioned a federal court to ask if there is Constitutional or ADA protection for her. This question has never yet been answered, but applying relevant case law, and when comparing apples to apples, the answer is yes.

Respectfully submitted this 3rd day of September 2025,

/s/ *Elizabeth Guild Simpson*
Elizabeth Guild Simpson
N.C. State Bar # 41596
EMANCIPATE NC
P.O. Box 309
Durham NC 27702
919-682-1149
elizabeth@emancipatenc.org

## CERTIFICATION OF COMPLIANCE

I certify that, excluding the caption, signature block, and certificates of service and compliance, this brief does not exceed the 10-page limit (14-point font) prescribed by the Court's standing order.

Respectfully submitted on September 3, 2025.

/s/ *Elizabeth Guild Simpson*

## AI CERTIFICATION

The undersigned counsel hereby certifies as follows.

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted on September 3, 2025.

/s/ *Elizabeth Guild Simpson*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Elizabeth Guild Simpson*