UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE No. 1:22-CV-00243-MR

| | | |
|---|---|---|
| ASHLEE INSCOE,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF ADULT CORRECTIONS, *et al*.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>L.CIV.R. 56.1 |

Defendants provide their brief in support of motion for summary judgment as follows:

## I. STATEMENT OF THE CASE

Plaintiff filed the Complaint in this action on November 14, 2022. DE-1. After protracted discovery where Plaintiff was represented by Prisoner Legal Services, dispositive motions were due on July 21, 2025. DE-28, 30, 36, 40, 53, 61. With Elizabeth Simpson, of Emancipate NC, substituting in for PLS, cross motions for summary judgment were filed in July and August 2025. DE-57, 63. Additional discovery issues caused discovery to be reopened with a new dispositive motions deadline. DE-82-95. The new close of discovery was September 15, 2026, with any dispositive motions to be filed by October 15, 2026. DE-95.

## II. STATEMENT OF THE FACTS

### A. Plaintiff and Complaint

Plaintiff is a convicted and sentenced state prisoner (OPUS No. 0568587), held at New Hanover CI under minimum security. *See* Appx. Ex. 1, Publicly Available OPUS Offender Search Screen Results). Plaintiff entered prison as a male under the name William Michael Inscoe. *Id*. Plaintiff is serving a sentence for being a habitual felon. *Id*. Plaintiff's criminal history includes larceny, breaking and entering, robbery, forgery, providing false information to an officer, and indecent liberties with a child. *Id*. Plaintiff is on the Sex Offender Registry for the indecent liberties with a minor crime, involving a 13-year-old when Plaintiff was 18 years old. Appx. Ex. 2. Plaintiff is within 60 months of expected release and has therefore been recently promoted to minimum custody, having been previously held at Nash CI under medium security. Compare Appx. Ex. 3 with Appx. Ex. 1 (custody levels).

Plaintiff, in a complaint spanning 57 pages with over 200 allegations, complains of risks to physical and psychological safety and wellbeing from being housed in a male facility while identifying as an intersex female. DE-1, ¶ 21. Plaintiff raises claims under 42 U.S.C. § 1983 for alleged violations of the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution, a claim under the Americans with Disabilities Act ("ADA"), and State law claims. *Id*. Plaintiff seeks a litany of injunctive and declaratory relief and compensatory and punitive damages. *Id.*, ¶ 208. The claims arise out of time Plaintiff was held at Avery Mitchell until Plaintiff's February 16, 2022 transfer to Nash CI. *Id.*, ¶ 10. With respect to named Defendants, Plaintiff's allegations can be grouped into nonspecific and specific allegations.

**B. Plaintiff's nonspecific Allegations**

Plaintiff alleges to be an intersex woman. *Id.*, ¶ 21. Plaintiff claims to have had a hysterectomy as a teenager, to have been born with female chromosomes, but with genitalia that took on the external form of male genitalia, and claims to have been raised as male but to identify as female. *Id.*, ¶¶ 23-24. Plaintiff claims to have primary and secondary female sex characteristics, including breasts, buttocks, wide hips and "female speech, mannerisms, and personality." *Id.*, ¶ 26. Plaintiff also asserts having "undergone gender affirming genital surgery," having been on hormone replacement therapy for almost 25 years ("HRT"), and continued HRT in Department of Adult Corrections ("DAC") custody. *Id.*, ¶ 26. Plaintiff claims being the best authority as to Plaintiff's gender identity, but cites a curated set of individuals who unanimously conclude Plaintiff is a female and should be housed in a women's prison. *Id.*, ¶¶ 28-29.

Plaintiff alleges, in general, nonspecific allegations, to being grabbed and gawked at by male inmates and being deadnamed and misgendered, and strip searched and pat down searched by male officers while held at Avery Mitchell. *Id.*, ¶¶ 31-33, 43. Plaintiff further alleges reports of harassment were not taken seriously and resulted in staff retaliation. *Id.*, ¶ 44.

Plaintiff alleges the only solution to the harassment is transfer to a women's prison. *Id.*, ¶ 33. Plaintiff alleges the "Division Transgender Accommodation Request Committee" violated Plaintiff's Fourteenth Amendment rights by refusing to provide a transfer to a women's prison. *Id.*, ¶¶ 28-42.

**C. Plaintiff's Specific allegations**

Plaintiff includes a number of allegations attributed towards specific conduct by named individuals, including some of the Defendants.[1]

1. **Strip Search by male officer and alleged sexual assault while on medical transport**

On December 12, 2019, Plaintiff alleges being sexually assaulted by Defendants Carver and Hollifeld. *Id.*, ¶¶ 45-46. Plaintiff first alleges Carver strip searched Plaintiff and the strip search should have been conducted by a female officer. *Id.*, ¶¶ 47-49. Next, Plaintiff alleges Carver sexually assaulted Plaintiff by forcing Plaintiff to have oral sex with him while being transported to a medical appointment at UNC hospital. *Id.*, ¶¶ 51-71. This allegedly happened in a restroom while Defendant Hollifield stood outside the door. *Id*. Plaintiff was strip searched by Carver on the return from the medical appointment. *Id.*, ¶ 73.

2. **Alleged sexual harassment and ineffectual PREA response**

Plaintiff alleges that on May 22, 2020, Officer FNU Honeycutt searched Plaintiff's cell in retaliation for being reported for bringing in drugs, tobacco, and allowing white supremacist gangs to assault, extort, and rob other inmates and who also verbally sexually harassed Plaintiff.[2] *Id.*, ¶¶ 74-79.

Plaintiff made PREA violation allegations to Defendant Williams in a letter dated 7/1/2020. *Id.*, ¶ 79. The report was investigated. *Id.*, ¶ 80. Plaintiff alleges the sexual harassment continued. *Id.*, ¶ 81.

3. **Alleged sexual harassment and staff assault**

[1] Plaintiff's specific allegations are largely addressed in sections l-n below.
[2] Defendant Warden Huneycutt was served and is a Defendant in the action. FNU Honeycutt is alleged to be an officer at Avery Mitchell, who is not a served Defendant.

Plaintiff alleges, on October 5, 2020, being sexually harassed by Defendant Buchanan and Defendant Hicks while Defendant Silvers failed to take action. *Id.*, ¶¶ 80-83. This allegedly stems from allegations Defendant Buchanan yelled at Plaintiff for requesting to be referred to by feminine pronouns. *Id.*

Plaintiff alleges, on the same day, being forced to "upsize" the waist of pants worn from a 40" to a 45" when the actual waist size is 34". *Id.*, ¶ 89. Plaintiff alleges having a Medical Duty Status, DC-490, allowing size 7 women's underpants and a size 40C bra. *Id.*, ¶ 90. Plaintiff alleges being forced by Defendant Hicks to undress in front of others. *Id.*, ¶ 91-93.

Plaintiff alleges Defendant Buchanan grabbed Plaintiff by the throat, slammed Plaintiff against the wall, and choked Plaintiff in front of Silver and Hicks while in Silver's office. *Id.*, ¶¶ 97-99. Plaintiff alleges Silver and Hicks did not stop this. *Id*. Plaintiff reported this to the PREA hotline the next day. *Id.*, ¶ 100.

Plaintiff alleges that on October 7, 2020, Buchanan, in front of Silver, Hicks, and Dillinger, attempted to hit Plaintiff, but missed and hit a concrete wall. *Id.*, ¶¶ 101-108. This was allegedly reported to Waldrup. *Id*.

**4. Alleged sexual harassment at drug screen**

On April 18, 2021, Plaintiff was required to submit to a drug screen. *Id.*, ¶¶ 112-129. Plaintiff claimed to have a clitoris instead of a penis and a need to sit to urinate. *Id*. Plaintiff alleges being forced to remove Plaintiff's pants and underwear and that after discovering Plaintiff does not have a penis, Plaintiff was told to go to sit to urinate for the drug screen. *Id*. Plaintiff alleges this was a search for the purpose

of identifying genitalia in violation of policy F.0103. *Id*. Plaintiff asserts Defendants Buchanan, Goforth, and Miller were actors in these allegations. *Id*.

**5. Statement of Safety**

On September 15, 2021, Plaintiff alleges being directed by Watson, Crowe, and Warden Huneycutt to write a statement admitting to be safe at Avery Mitchell or Plaintiff would be placed in segregation. *Id.*, ¶¶ 148-49.

**D. Plaintiff's history of seeking transfer to a women's prison**

Plaintiff alleges "further harm can only be avoided through DPS's immediate compliance with her request for transfer to the North Carolina Correctional Institute for Women" (*Id.*, ¶ 33), and follows with a series of allegations as to why the request should not be denied. *Id.*, ¶¶ 34-42. Plaintiff fully litigated this issue in a petition for writ of mandamus in Wake County Superior Court in civil action no.: 21 CVS 13401, granting writ based on birth certificate status, and reversed on appeal at *Inscoe v. Ishee,* NC COA 24-272, 2025 N.C. App. Lexis, 165, 915 S.E.2d 448 (2025*)*.[3] *See* Appx. Ex. 4, Plaintiff's Petition for Writ of Mandamus; Appx Ex. 5, Order on Writ of Mandamus; *Inscoe v. Ishee* 21 CVS 013401-910. The trial court concluded in the order on writ of mandamus that: "[DAC] has discretionary authority relating to the actions of FTARC and DTARC and their decisions made under PREA. 34 U.S.C.S. § 30301-09; 28 C.F.R. Part 115." Appx. Ex. 5, (Conclusion of Law 2). And, "There was no abuse of discretion by [DAC] as it relates to FTARC, DTARC, or discretionary decisions made under PREA." *Id.*, Conclusion 2. The Trial Court considered voluminous evidence, including Plaintiff's history of PREA allegations,

[3] The court may take judicial notice of publicly available cases.

medical and mental health histories, and other security and operational concerns. *Inscoe*, 915-S.E.2d 448; Appx. Ex. 6 (Trial Transcript).

**E. Plaintiff's transgender accommodations**

Transfers of offenders to facilities of a different gender are highly discretionary nonroutine decisions made on a case-by-case basis. Appx. Ex. 6, Transcript from 21 CVS 013401-910 (T pp 28-31). The DTARC is the Division level component of the Transgender Accommodation Request process that reviews and decides nonroutine transgender accommodation requests. *Id.*, (T pp 10:15-18). Routine accommodation requests are made at the facility level by the Facility Transgender Accommodation Request Committee ("FTARC"). (*Id.*, T p 11:1-5). The DTARC is a multidisciplinary committee modeled after several different aspects of recommended practices, including Prison Rape Elimination Act ("PREA") standards and other state practices. *Id.*, (T p 28:8-25). The disciplines on the committee at the time of Plaintiff's requests were representatives from psychology and behavioral health, by Dr. Lewis Peiper; psychiatry, by the Chief of Psychiatry, Dr. Brian Sheitman; medical represented by Dr. Arthur Campbell, the Chief Medical Officer; nursing from the director of nursing, Valerie Langley; Family Services, from Wanda Carlisle; operations and security, from Joshua Panter, the Director of Operations; program input from the Director of Rehabilitative Services, Charles Mautz;and, the Prison Rape Elimination Act ("PREA") input, from PREA Director, Charlotte Williams. *Id.*, (T p 30:5-22); 31:4-5); Appx. Ex. 7, (6/30/2023 DTARC Summaries). Each represented discipline provides input from the full collection of

the file and ensures all pertinent information is brought forward. Appx. Ex. 6, (T p 28 1-10). The DTARC discusses the requests, deliberates, and comes to a decision. *Id.*, (T p 29:3-25). DTARC Reviews of transgender accommodation requests include psychological evaluation summaries, medical examination summaries, medical and mental health records, and, if available, recent infraction history and PREA allegations. *Id.*, (T pp 12:23-13:1). Nonroutine accommodation requests will be evaluated by the DTARC on a case-by-case basis to ensure the requesting offender's health and welfare needs are met without compromising facility safety and security. *Id.* The requests to be transferred to a facility designated for a different gender than the gender where presently held is a nonroutine request reviewed by the DTARC. (*Id.*, T p 28:7-25).

The committee has been trained on how to evaluate such requests. (*Id.*, T pp 30-32). Training involved applying recognized best practices for placing offenders into a facility of a different sex than that as assigned at birth. (*Id.*, T p 32:1-8). The DTARC applies these practices in its deliberative process. *Id*. The process includes a systematic review of the offender's criminal record, arrest history, history of any sexually violent or assaultive behavior, sexual aggression towards the gender in the facility requested to be transferred, the offender's participation and cooperation in their overall treatment and care, participation in program assignments at the facility, the ability of the current facility to manage the offender's programming and treatment needs, and where the offender is in their gender journey, that is, how far

along the individual is in their goal of transitioning to the gender to which they identify. (*Id.*, T p 32:1-25).

**F. Petitioner's Transgender Accommodation Request and DTARC Decisions**

The DTARC provided Plaintiff with the full DTARC process and in its discretion, denied the requested transfer in its June 30, 2023, DTARC meeting. (*Id.*, T p 34:11-12, 59:1-25); Appx. Ex. 7 (Respondent's 3, DTARC Summary). A summary of the decision was made a part of Inscoe's medical record and mental health record. Appx. Ex. 6, (T p 60:1-25, 61:1-25); Appx. Ex. 8, (Health Electronic Records Online ("HERO") Note).

Plaintiff's only other DTARC review since 2023 was a review on June 26, 2025. Appx. Ex. 9 (6/26/2025 DTARC Summary). In 2025, DTARC began including their decision-making criteria as a preface to the summaries. *Id*. In 2025, Plaintiff requested certain searches, complete (strip) searches and pat and frisk searches, to be conducted by female staff only, transfer to a female institution, and gender affirming surgery in the form of vulvaplasty. *Id.*, at bates 6790. In considering the requests, DTARC reviewed Plaintiff's history of incarceration, current incarceration, programmatic needs, mental health needs, medical needs, and security concerns for Plaintiff and potential transferring facilities. *Id.*, bates 6790-98.

DTARC noted Plaintiffs admitted history of fabricating PREA allegations, and making more allegations in close proximity to TARC requests.. *Id.*, at bates 6792. DTARC noted Plaintiff's report of sex organs and function being inconsistent with medical evidence. *Id*. DTARC noted Plaintiff's inconsistent transgender

transition, appearing to desire transition while incarcerated and less so or not at all while released. *Id*. The DTARC reviewed Plaintiff's PREA history, acknowledging one substantiated, with the rest unfounded or unsubstantiated. *Id.*, at bates 6792. Additionally, DTARC noted Plaintiff's "desire to have female staff perform searches exclusively does not seem to be contingent on issues related to her safety." *Id.*, at bates 6797. Based on the thorough review, the DTARC supported denying transfer to a female facility, denying searches to be conducted by female staff, and denying vulvoplasty. *Id.,* at bates 2798.

**G. Plaintiff's history of false PREA allegations**

In its June 30, 2023 and June 26, 2025, review process, The DTARC considered Inscoe's PREA history. *Appx.Ex. 7; Appx. Ex. 9; see Appx. Ex. 6*, (T p 34:13-25). The DTARC review found no PREA concerns with Inscoe's placement in a male facility. *Appx. Ex. 6*, (T p 44:15-25). The absence of substantiated PREA concerns within Inscoe's existing housing versus the potential for security and assaultive behavior concerns on other women if placed in a women's facility weighed in favor of denying placement in a women's prison. *Id.*, (T p 35); Appx. Ex. 7; Appx. Ex. 9. At the writ of Mandamus hearing, it was testified that Plaintiff has eleven different PREA allegations totaling over 200 pages. Appx. Ex. 6, (T p 34:16-25-35:1-6). DAC investigated. *Id*. Plaintiff recanted all the reports. *Id.*; Appx. Ex. 7; Appx. Ex. 9. It was noted that Plaintiff's PREA reports, though dating back several years, including periods when Plaintiff had reported feeling safe, were made

in close proximity to Plaintiff's request for transfer to a women's facility. Appx. Ex. 7.

Plaintiff has since made additional PREA allegations. DE-85-2, (Declaration of Charlotte Williams); Appx. Ex. 10, 15th PREA allegation; Appx. Ex. 11, 16th PREA allegation. All but one of Plaintiff's PREA allegations have concluded as unsubstantiated, unfounded, or non PREA. *Id*. The only substsantiated PREA allegation involved another offender who masturbated in Plaintiff's direction. Appx. Ex. 12 (Substantiated PREA). DAC acted swifty, it was immediately addressed and Plaintiff's safety was maintained. DE-95.

### H. FTARC Decisions and Accommodations

FTARC decisions are documented and accommodations recorded in medical records. *See* Appx. Ex. 13, (FTARC minutes); Appx. Ex. 14, (updated FTARC); Appx. Ex. 15 (Medical Duty Status indicating allowed accommodations possessed); Appx. Ex. 16 (updated MDS). FTARC accommodations were allowed for accommodated pat down searches by female officers when viable and allowed accommodated showers. *Id*. Plaintiff has also been allowed to wear women's underwear and upsized pants, as well as to use women's cosmetic items. *Id*.

### I. Plaintiff's Orchiectomy was not Gender Affirming Surgery

On 11 May 2023, Plaintiff's birth certificate was changed to reflect female as the assigned sex. Appx. Ex. 6, (T p 27:1-5; Appx. Ex. 18 (Petitioner's H, Amended Birth Certificate). Birth certificates have become easier to change in light of a recent consent decree with the NC Department of Health and Human Services. (Appx. Ex.

6, T p 49:15-25, 50:1-15). Plaintiff's birth certificate was changed based on a letter provided by Dr. Figler, in which Dr. Figler reported to have provided Plaintiff an "orchiectomy for gender affirmation" on 7 September 2022. (*Id.*, (T p 49, --without admission of the letter--). Plaintiff received an orchiectomy (removal of the gonads) while in DAC custody. (*Id.*, T p 40:15-25). Because the surgery was conducted while Plaintiff was in DAC custody, DAC had to approve any surgery and Inscoe first came to DAC requesting cryptorchidism, which is undescended testicles. (*Id.*, T pp 84-85). The surgery was initially approved; however, subsequent evaluations concluded Plaintiff had retractile testicles, for which an orchiectomy is not an appropriate treatment. (*Id.*, T p 85). After that orchiectomy request was denied, Plaintiff requested an orchiectomy based on testicular pain. (*Id.*, T p 85: 20-25). The treatment for testicular pain is pain medication, and surgical orchioplexy, or surgically attaching the testicles to the scrotal sack. (*Id.*, T p 85). Plaintiff did not want that treatment and began to complain of blood in the urine and testicle pain. (*Id.*, T p 85:20-25). Additional clinical visits resulted in Plaintiff being seen by Dr. Figler, who treated Plaintiff for testicular pain, put a surgical request in for orchiectomy because of that testicular pain, which was approved, and the surgery was provided based on testicular pain. (*Id.*, T p 86). All of the preoperative and postoperative notes indicate the orchiectomy was provided due to testicular pain. (*Id.*, T p 86). There is no comment anywhere in the actual medical records to indicate the surgery was gender affirming surgery. (*Id.*, T pp 85-86).

**J. Plaintiff's reported medical history questioned**

Plaintiff's Petition in the Wake County case states that Plaintiff is XX male karyotype and therefore intersex. Appx. Ex. 4 (Petition for Writ. Plaintiff also alleges medical staff report Plaintiff is XX karyotype. DE-1, ¶ 29. Plaintiff's karyotype was never verified. Appx. Ex. 6, (T p 75:21-22). Additional karyotype testing was not conducted by DAC because Inscoe did not trust DAC to conduct the test. *Id.*, (T p 48:1-10, 78:1-25). Moreover, when DAC requested testing by the outside provider, Dr. Figler with UNC recorded there were no clinical indications to perform the karyotype test. *Id*. Dr. Campbell, DAC Chief Medical Officer, agrees and explains that karyotyping is not clinically indicated because short of a court order, testing is conducted when it helps direct the management or therapeutic approach. (*Id.*, T p 78). Here, repeating the karyotype test would not have changed Plaintiff's treatment. (*Id.*, T p 78:20-25). Dr. Campbell confirmed that at this point, there is no need for additional karyotype testing to make management decisions for Plaintiff. (*Id.*, T p 79:1-5). Karyotype testing is appropriate at an early age to help direct how the individual will be raised. (*Id.*, T p 78:20-25-79:1-5).

Dr. Campbell further explains that determining sex is not as simple as an XX karyotype. (*Id.*, T p 77:23-25) When Inscoe was examined through physical examination, imaging, and other objective studies, Inscoe's phenotype is inconsistent with the XX karyotype. (T p 76:1-4). Even additional karyotype testing would be insufficient with a masculinized person such as Plaintiff because a single karyotype test would not present the full picture. (*Id.*, T p 76:5-25). When there is a disconnect between the phenotype, or masculine physical characteristics and the

claimed XX karyotype, additional testing is needed to explain the disconnect. *Id*. To be masculinized, like Plaintiff, there would need to have been sufficient testosterone present in utero, at birth, all the way up through puberty and beyond. *Id*. A possible explanation for the disconnect is the translocation of the SRY gene from the Y chromosome to the X chromosome. (*Id.*, T p 7614-25).

In sum, multiple factors are involved in determining an individual's sex. (*Id.*, T p 77). And, in a case like this, additional genetic analysis would be needed to check for additional SRY markers on the X chromosome and also to conduct a mosaicism, involving multiple dilations of cells to determine the ratio of XX to XY chromosomes. (*Id.*, T p 77:1-12). An individual can have XX (female) cells and XY (male) cells. (*Id.*, T p 77). When the ratio of XX to XY cells is determined, a discussion of sex can be held. (*Id.*, T p 77).

According to Dr. Campbell, upon review of all of the objective studies, physical exams, and imaging studies that have been performed, Plaintiff is a male, has male external genitalia, has male internal reproductive organs, and had fully formed testes. (*Id.*, T p 77:13-24). When Plaintiff's orchiectomy was performed, the testicles were examined. *Id*. An intersex individual can have a combination of male and female organs. *Id*. That was not the case with Plaintiff. *Id*. Plaintiff is biologically male and had male testes. *Id*.

Plaintiff was provided a CT scan of the pelvis. (*Id.*, T pp 79:1-25, 80:1-18); Appx. Ex  17 (Trial on Writ Of Mandamus, Respondent's Ex. 5, CT Scan). The results showed internal anatomy consistent with the male sex and an absence of

female anatomy. *Id*. The scan does not remark on external genitalia; however, reviewed records show Inscoe has a fully formed penis. *Id*.

Review of the medical records showed Petitioner has reportedly been treated for Clinefelter's syndrome. (*Id.*, T p 37:1-5). Clinefelter's syndrome is a condition where the patient almost always has ambiguous genitalia with XXY karyotype. (*Id.*, T p 80:19-25). However, according to Dr. Campbell, based on the single karyotype information and unambiguous genitalia, Plaintiff does not have Clinefelter's. (*Id.*, T p 81:1-5).

Although Plaintiff has reported having had a hysterectomy, there is no medical history of a patient ever having fully formed male anatomy and having also had fully formed female anatomy. (*Id.*, T p 81:1-25). DAC attempted to obtain records of Plaintiff's treatment from the hospital where Plaintiff reported having been treated, however, the response was that Plaintiff had never been treated there and does not appear in their database. (*Id.*, T p 82:1-25)

There is no evidence from medical records or imaging studies that Plaintiff has ever had any female internal or external organs. *Id.*, (T p 82:19-21). Plaintiff has requested feminine hygiene products, but Plaintiff does not have any need for feminine hygiene products and Plaintiff cannot menstruate. (*Id.*, T p 83:4-25).

**K. Plaintiff's HRT inconsistency**

Plaintiff is treated by DAC with feminizing hormones, however, there are DTARC concerns for Plaintiff's true intent to transition based on incidents of Plaintiff hoarding the medication and overdosing on the hormone medication. *Id.*,

(T p 38:15-25-39:1-25); Appx. Ex. 7-9 (DTARC Summaries and HERO Note). When reviewing records from Plaintiff's 2010 Wake Forest Baptist Hospital treatment, Plaintiff reported as stopping taking the feminizing hormones which resulted in Plaintiff's testosterone levels being at a healthy male level, which caused the medical doctors treating Plaintiff at the time to question the XX karyotype and Clinefelter's Syndrome. *Id.*, (T p 37:7-25).

**L. Plaintiff's December 12, 2019 Transport to Medical Appointment**

On December 12, 2019, Plaintiff had a transport to an outside medical appointment at UNC facilitated by Officers Carver and Hollifield. *See* Appx. Ex. 19, verified Discovery responses, Carver Interrogatories 1-11; Appx. Ex. 20, Declaration of Hollifield.

On December 12, 2019, Carver was working as a Transportation Officer at Avery-Mitchell. *Id.*, Int. ## 3-4. Around 5:30am, Plaintiff was called to Receiving. *Id.*, Int # 10. Officer Myron Hollifield and Carver prepared to transport Plaintiff and when Plaintiff arrived, the offender was strip searched according to policy, the same as all inmates entering and exiting the facility. *Id.*, Int. ##9-11. Officer Hollifield and Carver transported Plaintiff to Duke Hospital. *Id*.

After entering the hospital, Plaintiff requested to use the bathroom on the way to the room for the appointment. *Id*. Hollifield and Carver found a bathroom that the offender could use. *Id*. Carver checked the bathroom to make sure it was unoccupied. *Id*. Hollifield and Carver then allowed Plaintiff to enter the bathroom. *Id*.

Carver handed off his weapon to Officer Hollifield, who stood at the door to

stop anyone from entering the bathroom. *Id*. Plaintiff waited in the stall doorway. *Id*. Carver put his gloves on and removed the black box and hooked the waist chain to the cuff chain so Plaintiff could use the restroom. *Id*. Carver stood at the stall door to observe Plaintiff's feet and hands while Officer Hollifield stood at the bathroom door and watched Carver. *Id*.

After approximately five (5) minutes, Carver told Plaintiff to 'finish up'. *Id*. Plaintiff stood up, secured clothing and stepped out of the stall. *Id*. Once Plaintiff was out of the stall, Carver secured the black box back on the hand cuffs. *Id*. Carver then removed his gloves and retrieved his weapon from Officer Hollifield. *Id*. Hollifield and Carver then exited the restroom and proceeded to the appointment. *Id*. After the appointment, Plaintiff was transported back to AMCI and searched, again as required by policy. *Id.*, Int. ##8-11.

Carver had no other contact with Plaintiff and Carver and Hollifield did not do any of the acts alleged by Plaintiff in the complaint. *Id.*, Int. ## 1-11; Appx. Ex. 20. The procedure for allowing prisoners to use the restroom was conducted the same as with any other prisoner being transported. Appx. Ex. 19*,* Int. ## 1-11.

Officer Hollifield confirms the transport was conducted according to standard procedures. Appx. Ex. 20, ¶¶ 3-5. Although he cannot remember specific dates of transports or specific locations, he knows that there was never a transport where Carver had oral sex with an inmate or otherwise sexually harassed an inmate. *Id*. In other words, this alleged incident did not happen. *Id., ¶ 5*.

**M. October 5-8, 2020 and April 18, 2021 alleged encounters with Hicks, Buchanan, Goforth, and Miller**

Hicks, Buchanan, Goforth, and Miller never sexually harassed Plaintiff. Appx. Ex. 21, Declaration of Matthan Hicks; Appx. Ex. 22, Declaration of Shawn Buchanan, Appx. Ex. 23, Declaration of Chris Goforth. Hicks did upsize Plaintiff's pants. Appx.. Ex. 20, Hicks Dec., ¶ 5. This was due to Plaintiff wearing inappropriately tight pants hemmed contrary to policy. *Id*. Hicks required Plaintiff to change, but Plaintiff changed behind a closed door. *Id*. Hicks also confiscated the other improperly tight pants. *Id*.

Plaintiff was required to submit to a drug screen, but Plaintiff was not sexually harassed during the screen. Appx. Ex. 21, ¶ 4 (Hicks); Appx. Ex. 23, ¶ 3 (Goforth).

Defendants treated Plaintiff professionally and with respect in all dealings. Appx. Ex., 21-23.

**N. Allegations towards supervisors**

Plaintiff names multiple supervisors as Defendants. DE-1. There are no specific allegations towards Eddie Buffaloe or Todd Ishee, Secretaries of DPS and DAC at relevant times. DE-1. No allegations with respect to Defendant Williams demonstrate any direct participation with Plaintiff. *Id*. Williams is the PREA Director and did not investigate PREA allegations. Appx. Ex. 19, Disc. Williams Int. ## 9-12. Warden Huneycutt did not coerse Plaintiff into signing a document claiming to be safe. Appx. Ex. 24, ¶ 3 (Huneycutt Dec). Huneycutt only acted in the capacity of Warden and only from June 2020 through November 2021. *Id.*, ¶¶ 2-7. As a Warden, he did not have direct interactions with inmates. *Id.*, ¶ 3. If a statement

was needed from an inmate officers would gather it. *Id*. Huneycutt's only contact was in intermittent and inadvertent passing in the hall or when present at the FTARC meetings. *Id.*, ¶ 3. Warden Huneycutt's understanding is that Plaintiff wanted a transfer to a women's facility, but if that could not happen, then Plaintiff preferred to stay at Avery Mitchell, where Plaintiff felt comfortable and safe. *Id.*, ¶ 7.

Fox, Watson, Waldroop, and Silver are mid-level facility supervisors. Appx. Ex. 19, Disc. Watson, Fox, Waldroop, Silver, Goforth Int. # 2. Watson was a Captain and PREA Compliance manager. *Id*. Fox was support lieutenant and PREA investigator. *Id*. Waldroop was Unit Manager. *Id*. Silvers was a sergeant. *Id*.

Plaintiff's allegations towards these Defendants go towards failing to supervise or ensure PREA investigations were conducted. DE-1. PREA investigations were conducted. Appx. Ex. 25 (PREA Part 1); Appx. Ex. 26 (PREA Part 2).

Additional Allegations towards Fox are that Fox coerced Plaintiff into making a statement of safety during the PREA allegations relating to Jimeson. DE-1, ¶¶ 135-138. These allegations were investigated and found to be without merit and unfounded. Appx. Ex.24-25, pp Baits #4141. And, Plaintiff recanted. Appx. Ex. 6, (TP ); Appx. Ex. 7).

Additional Allegations towards Watson are that the May 22, 2020, search included sexual harassment, which was relayed to Watson, who spoke to Plaintiff about it, but subsequently did not do anything. DE-1, ¶¶ 75-78. But, Plaintiff alleges writing a letter regarding these issues to Williams on July 1, 2020, which was

investigated. Appx. Ex. 25-26, PREA baits pp 4011-4015. Plaintiff also alleges informing Watson of the October sexual harassment and excessive force allegations from October 2020, but those acts did not occur. Appx. Ex. 21, Hicks Dec.; Appx. Ex., 21 (Buchanan Dec.).

Allegations towards Waldroop are that Plaintiff reported the October sexual harassment and excessive force to Waldroop, but nothing was done. DE-1, ¶¶ 95-112. Similarly, with Defendant Silvers, Plaintiff alleges a failure to intervene in the alleged October harassment and excessive force, and that Silvers directed Hicks to upsize Plaintiff's pants. *Id.*, ¶¶ 79-89, 94-96, 99, 104. The excessive force did not happen and upsizing was per accommodation. Appx. Ex. 20-21.

Plaintiff's Eighth Amendment allegations arising from Avery-Mitchell CI were reported as PREA (Appx. Ex. 25-26 (PREA Part 1 and 2)), were unsubstantiated, unfounded, or considered non-PREA (DE-85-2), and recanted (Appx. Ex. 7).

**O. Plaintiff's Current Status**

Plaintiff, until recently transferring, was housed in medium custody at Nash Correctional Institution. Appx. Ex. 6, (T p 92). Nash Correctional provided Plaintiff with a single bed cell. *Id*. Plaintiff had a private toilet in the cell. *Id*. Plaintiff has a private sink in the cell. *Id*. Plaintiff was provided private showers. *Id*. All of Plaintiff's programmatic needs were met. *Id*. Based on existing knowledge, Plaintiff was provided appropriate security at Nash CI. *Id*.

Plaintiff was promoted to minimum custody. Appx. Ex. 1. With this promotion, Plaintiff was to be transferred to a minimum security facility. Appx. Ex. 27 (Email chain relating to transfer). All minimum security facilities house inmates in dormitory style beds rather than single cell beds and Plaintiff was offered the option to transfer to a minimum security facility with dormitory style beds or to remain at Nash CI with the single bed cells and Plaintiff chose to transfer as a minimum security offender. *Id*.

## III. STANDARD OF REVIEW

Courts should grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A nonmoving party cannot rest on "the allegations…contained in his pleadings." *Id.* at 324. Instead, the Plaintiff must "identify *affirmative evidence* from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (emphasis added).

While the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor, a

bare contention that an issue of fact exists is insufficient to create a factual dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industr'l Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). Courts have an affirmative duty to prevent factually unsupported claims from proceeding to trial. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

## IV. ARGUMENT

### A. Avery-Mitchell CI and Nash CI Relief moot upon transfer

Plaintiff's requests for injunctive and declaratory relief at Avery Mitchell CI and Nash CI are moot upon Plaintiff's transfer to New Hanover CI. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, (1969). "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70(1983). "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009). Plaintiff transferred out of Avery Mitchell CI to Nash CI and now has been

transferred to New Hanover CI. DE-1, ¶ 37; Appx. Ex.1. As such, Plaintiff no longer has a legally cognizable interest in the outcome of Plaintiff's request for injunctive or declaratory relief for accommodations at Avery Mitchell CI and Nash CI. This court therefore lacks jurisdiction over those claims, and they must be dismissed.

**B. Res Judicata and Collateral Estoppel**

Plaintiff has already litigated issues raised in the Complaint in this action to final judgment in Plaintiff's Wake County Superior Court action. That action was reversed at the NC Court of Appeals. Plaintiff should be precluded from relitigating the same issues again in this action.

Federal courts adopt the forum state's analysis in determining preclusive effect of state judgments and orders. *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995). The purpose of defensive issue preclusion is to promote judicial economy by preventing needless litigation. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326.

Under Res judicata, "all matters, either fact or law, that were or should have been adjudicated in the prior action are deemed concluded." *Thomas M. McInnis & Assoc., Inc. v. Hall*, 318 N.C. 421, 428, 349 S.E.2d 552, 556 (1986). Moreover, "subsequent actions which attempt to proceed by asserting a new legal theory or by seeking a different remedy are prohibited under the principles of res judicata," *Bockweg v. Anderson*, 333 N.C. 486, 494, 428 S.E.2d 157, 163 (1993). Here, Plaintiff's first mandamus action arose from alleging to be a woman housed in a male facility, the same as alleged and argued here, subjecting to dismissal for claim

preclusion, as Plaintiff should have brought the actions against DAC together instead of conducting piecemeal litigation. *Harnett v. Billman* 800 F.2d 1308, 1313-14 (4th Cir. 1986). "[T]he judgment in the former action or proceeding is conclusive in the latter not only as to all matters actually litigated and determined, but also as to all matters which could properly have been litigated and determined in the former action or proceeding." *Fickley v. Greystone Enters., Inc*., 140 N.C. App. 258, 260, 536 S.E.2d 331, 333 (2000).

"In order to assert collateral estoppel under North Carolina law, a party must show that the issue in question was identical to an issue actually litigated and necessary to the judgment, that the prior action resulted in a final judgment on the merits, and that the present parties are the same as, or in privity with, the parties to the earlier action." *Sartin v. Macik*, 535 F.3d 284, 287-88 (4th Cir. 2008) (adopting North Carolina law, citing *Thomas*, 429, 318 N.C., at 349 S.E.2d, at 556-57). North Carolina courts do not require the final element of mutuality for defensive use of collateral estoppel, as long as the party seeking to reopen the issue had a full and fair opportunity to litigate the issues in the prior action. *Id.*

The Order on Appeal in *Inscoe v. Ishee*, NC COA 24-272, is a final judgment. *Denney v. Wardson Constr., Inc.*, 264 N.C. App. 15, 17, 824 S.E.2d 436, 438 (2019) (As a general rule the Court of Appeals only hears cases after a final judgment). The parties are identical with respect to DAC and in privity with respect to all other DAC Defendants.

Plaintiff also had a full and fair opportunity to litigate the issues. "[A]n issue is actually litigated, for purposes of collateral estoppel or issue preclusion, if it is properly raised in the pleadings or otherwise submitted for determination and [is] in fact determined." *City of Asheville v. State*, 192 N.C. App. 1, 17, 665 S.E.2d 103, 117 (2008), *appeal dismissed, disc. review denied*, 363 N.C. 123, 672 S.E.2d 685 (2009); *Meritor Transmission Corp. v. Eaton*, 2006 U.S. Dist. LEXIS 95409, *11 (W.D.N.C. Sep. 26, 2006) (recognizing some manner of allowed discovery, proffering of testimony, submission of evidence and expert and witness testimony, and an ability to submit briefs and arguments as a full and fair opportunity to litigate even when the prior judgment was litigated in a different venue); *Hillsboro Partners, LLC v. City of* Fayetteville, 226 N.C. App. 30, 37, 738 S.E.2d 819, 825 (2013) (finding a full opportunity to be heard exists even when the party to be estopped did not avail themselves of the opportunity by, at a minimum, attending). Here, Plaintiff was present and represented, called witnesses, and presented evidence. Plaintiff clearly had a full and fair opportunity to be heard.

The remaining issue when determining that Plaintiff's claims are barred by issue preclusion is that of identical issues having been adjudicated. Facts resolved in the NC Superior Court action and acknowledged as determinative in appeal to the North Carolina Coart of Appeals include:

Plaintiff's history of 200 pages of PREA allegations that were subsequently recanted and unsubstantiated; Plaintiff's medical history as it relates to being transgender or intersex; Plaintiff's history of inconsistent HRT usage and hording

medication; Plaintiff's needs being met and the requested transfer to a women's prison not being appropriate. *Inscoe v. Ishee*, NC COA 24-272, 2025 N.C. App. Lexis 165, 14, 915 S.E.2d 448, (2025).

The Court of Appeals noted the trial court found no abuse of discretion in its decision to deny transfer to a women's prison and that the DTARC reviewed voluminous records. *Id.*, N.C. App., at *34.

> From evidence elicited at trial, the DTARC Considered the following: The DTARC's Report noted that Petitioner "has been medically examined and reports indicate functioning male anatomy including a penis and testicles." Although Petitioner "self-report[ed]" as intersex, the DTARC noted that this "[s]elf-report [is] not confirmed by Medical." The DTARC Report included the following summary of its findings:
>
> [Petitioner] is registered as a sex offender related to an offense involving a teenage girl who (per official crime version) [Petitioner] took for a drive, got drunk, and sexually assaulted (victim said she woke up to [Petitioner] on top of her). [Petitioner's] own version of the crime (per OPUS) described the victim as a girlfriend and said her parents were upset and had [Petitioner] "locked up."
> [Petitioner's] gender identity history has been complicated by various and repeated unreliable, inconsistent, and at times demonstrably false reports. Examples include reporting undergoing a hysterectomy, experiencing menstruation, describing her testicles as ovaries, and requesting a clitoral reduction to remove her penis. [Petitioner]'s case had been previously reviewed by the DTARC [in 2022] for requested surgeries and transfer to a female facility; these requests were not supported at that time. [Petitioner] recently had an orchiectomy due to medical complaints related to testicular pain. The surgery was approved medically, based on external consultations, but was not related to [Petitioner]'s request for gender-identity related surgeries. Although inaccurate, [Petitioner] has reported to mental health and other providers in the prison system that she is the first person to have gender-identity related surgery in a North Carolina prison.

> [Petitioner]'s facility housing status was reviewed by the DTARC with input from PREA, Programs, and Operations. In review of [Petitioner]'s current facility (Nash) placement, the DTARC notes that she has been at the facility for approximately 1.5 years without any major adjustment issues (with exception to the issues created by [Petitioner]'s hoarding hormone medications as described below). According to PREA records, she has no substantiated PREA cases, but has made PREA reports in the recent past which she subsequently recanted or indicated were not accurate. Her medical, mental health, and program service needs are being met at the current facility. In this regard the DTARC review did not find issue with her current facility assignment.

*Id.*, N.C. App. Lexis, at *18-20.

The Superior Court judgment determined whether the DTARC abused its discretion in denying Plaintiff's request to transfer to a women's prison. In doing so, it was necessary to determine whether the DTARC assessed whether Plaintiff was at risk from sexual harassment or assault due to Plaintiff's status as transgender or intersex and whether Plaintiff's needs were being met. It was critical in the Wake County proceeding to determine Plaintiff's safety and that Plaintiff's needs are being met. As Plaintiff's current claim relates to claims of sexual harassment and excessive force, which were a part of the PREA allegations, the same facts are critical in both actions. The same is true for any transgender accommodations. *Id.*, 2016, U.S. Dist. Lexis, at *15.

All elements of issue and fact preclusion have been met and Plaintiff should be precluded from relitigating the issues as to whether any of Plaintiff's allegations of sexual assault, harassment, and excessive force at Avery-Mitchell happened when Plaintiff is concluded to have recanted the PREA allegations or otherwise had them

unfounded or unsubstantiated. Likewise, Plaintiff's issues of whether Plaintiff is appropriately housed in a men's facility has been adjudicated and Plaintiff is precluded from raising the same issues under an alternative theory. All allegations raised in the Complaint in this action were alleged prior to and litigated in the Wake County *Inscoe v. Ishee* action, thus such issues are barred.

**C. 42 U.S.C. § 1983**

**1. Respondeat Superior**

Plaintiff alleges Defendants Secretary Buffaloe and/or Ishee, PREA Director Williams, Warden Huneyutt, Sgt. Silver, Lt. Watson, Waldroop, and CHUM Fox, are liable, in whole or in part, as supervisors. DE-1. 42 U.S.C. § 1983 does not allow claims for respondeat superior. It is axiomatic that the doctrine of *respondeat superior* does not apply in actions brought pursuant to 42 U.S.C. §1983. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Instead, to hold an individual liable under § 1983, "it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). Actions against officials in their individual capacities will not succeed "absent proof of some degree of personal involvement in the alleged deprivation of rights." *Harrison v. Prince William Cty. Police Dep't*, 640 F. Supp. 2d 688, 711 (E.D. Va. 2009). Plaintiff does not include Ishee as having any direct involvement, Defendant Williams is merely the PREA Director and not responsible for investigating PREA allegations, and Plaintiff alleges Silvers, Waldroop, Watson, and Fox have instances where they were supervisors when subordinates are alleged

to have violated Plaintiff's rights. Assertions of knowledge are insufficient to attach liability. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted) (absent a showing the Defendant had actual or constructive knowledge, supervisor liability cannot attach). Plaintiff alleges that officials failed in promulgating proper policies or training employees but does so only in a conclusory fashion that fails to specifically identify such failures or set out facts sufficient to demonstrate their existence. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Plaintiff's unanswered letters are insufficient to create supervisory liability or personal involvement in Plaintiff's allegations. *Rizzo v. Goode*, 423 U.S. 362, 376-77 (1976) (Permitting supervisory liability where a defendant, after being informed of the violation through the filing of grievances, reports or appeals, failed to take action to remedy the alleged wrong is not enough to show that the defendant has the necessary personal involvement.); *Inesti v. Hogan,* 2013 U.S. Dist. LEXIS 141041, 2013 WL 5677046, at *8 (S.D.N.Y. Sept. 30, 2013) (no personal liability because "letter complaints alone do not establish personal involvement"); *Johnson v. Townsend*, 2004 U.S. Dist. LEXIS 33527, *9 7340337 (M.D.Pn Jan. 8 2004)(unanswered letters insufficient to establish personal liability); *Walker v. Pataro*, 2002 U.S. Dist. LEXIS 7067, 2002 WL 664040, at *12 (S.D.N.Y. Apr.23, 2002) ("if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") Because Plaintiff has not alleged more than supervisory roles for these Defendants, summary

judgment should be granted in their favor.

**2. Eighth Amendment**

The court should grant Defendants summary judgment motion as to Plaintiff's alleged Eighth Amendment violations by staff sexual assault allegations on December 12, 2019 and excessive use of force and sexually harassing drug screen in October 2020 as these events did not happen. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" through its guarantee against cruel and unusual punishments. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); see *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).

The deliberate indifference standard applies to cases alleging failure to safeguard an inmate's health and safety, including failing to protect inmates from sexual assaults, whether by other inmates or prison guards. See *Carrington v. Dorsey*, 2023 U.S. Dist. Lexis 159616, *14, 2023 WL 5831088 (D.Md. Sep. 8, 2023); *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

An Eighth Amendment deliberate indifference claim is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, *v. Commonwealth of Va*., 878 F.3d 89, 97-98 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837-38). The Fourth Circuit recognizes the two-pronged test as having both an objective and a subjective component. *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021). Objectively, a

plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014); see *Younger v. Crowder*, 79 F.4th 373 382 (4th Cir. 2023) (stating that the plaintiff must "first show that he was exposed to an objectively 'substantial risk of serious harm.'") (quoting *Farmer*, 511 U.S., 834). The objective inquiry requires courts to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Even in the complete absence of any physical or psychological injury, the objective prong is deemed to have been met when a guard sexually assaults an inmate. *Carrington*, 2023 U.S. Dist. Lexis, at *17. Thus, sexual abuse of an inmate by a corrections officer constitutes a violation of the Eighth Amendment. *Id.*, at *17.

The subjective component requires showing "that the prison official had a 'sufficiently culpable state of mind,' which . . . consists of 'deliberate indifference to inmate health or safety.'" *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834). To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *Washington v. Housing Authority of the City of Columbia*, 58 F. 4th 170, 179 (4th Cir. 2023) In proving deliberate indifference, a plaintiff must show "that the [defendants] subjectively recognized a substantial risk of harm and that [their]actions were inappropriate in light of the risk." (*Dean ex rel. Harkness v.*

*McKinney*, 976 F.3d 407, 416 (4th Cir. 2020)).

Eighth Amendment liability "must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." *Wilson*, 501 U.S. at 299 (quoting *Whitley*, 475 U.S. 312 at 319) (emphasis added in *Wilson*). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), cert. denied, 529 U.S. 1067 (2000).

Here, for the sexual assault claims, Plaintiff cannot meet either prong because There was no sexual assault. Appx. Ex. 6, (T p 34:16-25-35:1-6); Appx. Ex. 19, Disc. Carver Interrogatories, ## 9-11; Appx. Ex. 20, ¶¶ 3-5 (Hollifield); Appx. Ex. 23, ¶ 3 (Goforth). Unsupported allegations cannot be relied upon to defeat a supported defense. Here, Defendants declarations and verified responses refute Plaintiff's allegations. The allegations themselves were recanted by Plaintiff through the PREA process. Absent any evidence the assault took place, summary judgment should be granted in Defendants favor.

Plaintiff also asserts an Eighth Amendment excessive force claim by allegations of staff assault and failure to intervene. DE-1, ¶¶ 84-104. When an inmate brings an excessive force claim against prison officials, the court must determine "whether force was applied in good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-321 (1986). "Eighth Amendment analysis necessitates inquiry as to whether the prison officials acted with a sufficiently culpable statement of mind (subjective component) and whether the deprivation suffered, or injury inflicted on the inmate was sufficiently serious objective component." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Even a serious injury cannot establish an 8th amendment violation when the subjective component cannot be met. *Whitley*, at 319.

Additionally, an omission to act, when coupled with a duty to act, may provide a basis for liability. *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 202 (4th Cir. 2002). The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them. *Id*. Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly. *Id*. at 203 (internal citation omitted). In other words, "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id*. at 204 (internal footnote omitted).

Here, no force was used and further analysis is unnecessary. Plaintiff neither suffered an injury nor had any Defendants who sadistically and maliciously used force, and no officer failed to intervene. Appx. Ex. 6, (T p 34:16-25-35:1-6); Appx. Ex. 21 (Hicks), Appx. Ex. 22, (Buchanan), Appx. Ex., 23 (Goforth); Appx. Ex. 19,

Disc. Carver Interrogatories 1-11.

As with Plaintiff's sexual assault allegations, Plaintiff's unsupported allegations are insufficient to withstand a summary judgment motion when Defendants have provided Declarations as to the events and prior testimony confirms Plaintiff recanted the allegations.

**3. Fourth Amendment**

Defendants' summary judgment motion as to Plaintiff's Fourth Amendment claims for strip searches and urine screen should be granted. Preliminarily, the only individual Defendant identified to be directly involved in Plaintiff's strip search is Carver and the Defendants involved in the drug screen are Goforth, Hicks, and Miller. Other Defendants would only have a supervisory role and should be dismissed under Section 1983's failure to recognize respondeat superior liability as discussed above. As for perspective relief seeking to prevent DAC as an agency from having male officers conduct Plaintiff's strip searches, summary judgment should be granted as, even if considered a cross gender search, cross gender strip searches are not unconstitutional.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. This right is necessarily abridged when an individual enters the prison setting. *Alexander v. Connor*, 105 F.4th 174, 180 (4th Cir. 2024), citing, *Bell v. Wolfish*, 441 U.S. 520, 557 (1979) (dismissing any suggestion that prison officials need a warrant to search a prisoner's cell).

Notwithstanding, the Fourth Amendment continues to guarantee prisoners

"some legitimate expectation of privacy in [their] person," *Alexander*, at 180, quoting *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016).

In deciding whether an in-prison search violates the Fourth Amendment, courts consider: (1) "the scope of the particular intrusion"; (2) "the manner in which it is conducted"; (3) "the justification for initiating it"; and (4) "the place in which it is conducted." *Id*.

Plaintiff's alleged Fourth Amendment violations stem from being subjected to strip searches by male officers. The Plaintiff alleges the searches violate PREA. DE-1, ¶ 195. The searches are neither a violation of PREA nor unconstitutional.

First, as an initial matter, violations of PREA do not give rise to a cause of action under 42 U.S.C. § 1983; PREA does not provide for a private cause of action because there is "no basis in law for a private cause of action under [42 U.S.C.] § 1983 to enforce a PREA violation." *Bracy v. Tully*, 1:22cv827 (RDA/WEF), 2022 U.S. Dist. LEXIS 143051, 2022 WL 3229325, at *3 (E.D. Va. Aug. 10, 2022) (collecting cases). Plaintiff cannot maintain a claim under PREA violations because the PREA "does not create a private cause of action that can be brought by an individual plaintiff." *Powell v. Temple*, 1:22cv302 (TSE/JFA), 2022 U.S. Dist. LEXIS 113494, 2022 WL 2306762, at *4 (E.D. Va. June 27, 2022).

Second, Plaintiff was not subjected to a cross gender strip search as contemplated by PREA. Under PREA, "The facility shall not conduct cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) except in exigent circumstances or when performed by

medical practitioners." 28 C.F.R. 115.15(a). The regulation recognizes a difference in a cross gender strip search and a transgender strip search in subsection (f, which states, "[t]he agency shall train security staff in how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs." 28 C.F.R. 115.15(f).

Looking particularly at subsections 115.15(a) and 115.15(f), the PREA regulations clearly differentiate between crossgender and transgender. Further, Subsection D requires opposite gender officers to announce themselves when entering a housing unit. 28 C.F.R. 115.15(d). And subsection 115.42(c) assumes transgender women will be in a men's facility, when stating, "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety...." 28 CFR § 115.42(c).

Further, the PREA definitions do not specifically define "gender" or "cross-gender." It does define gender nonconforming, intersex, and transgender. Definitions in 115.5 define Gender nonconforming as "a person whose appearance or manner does not conform to traditional societal gender expectations[,]" 28 C.F.R. 115.5.

Section 115.5 defines intersex as "a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or

female." *Id*. Section 115.5 defines transgender as "a person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth." *Id*.

In statutory interpretation, when a word is specifically defined and then used elsewhere within the statute, e.g., transgender, and specifically omitted from other parts, it is deemed intentional. *United States v. Harris*, 719 F. Supp. 2d 616, 623 (D.Md. Jun. 28, 2010) ("When the legislature includes particular language in one section of a statute, but omits it from another, it is presumed that the omission is intentional.") citing *Miller v. Miller*, 142 Md. App. 239, 788 A.2d 717, 723 (Md. Ct. Spec. App. 2001). "Further, 'a statute is to be read so that no word, phrase, clause or sentence is rendered surplusage or meaningless.'" *Id.*, quoting *Prince George's Co. v. White*, 275 Md. 314, 340 A.2d 236 (1975).

It follows, if prohibition of cross gender searches in Section 115.15(a) had been intended to incorporate transgender, then it would have included language to that effect, such as –cross gender identity strip searches are prohibited--. It does not. Bolstering this reasoning, in subsection 115.15(f.), the instructions are for the agencies to "train law enforcement staff in how to conduct cross-gender pat-down searches and searches of transgender and intersex detainees in a professional and respectful manner." 28 CFR 115.15(f). This specifically recognizes a difference between cross-gender searches and transgender or intersex searches. This language used in Subpart A, Standards for Adult Prisons, is consistent throughout Section 115. *See* Subpart B, Standards for Lockups, 115.115(a), (e); Subpart C, Standards for

Community Confinement Facilities, 115.215(a), (f); Subpart D, Standards for Juvenile Facilities, 115.315(a), (f).

Third, under Fourth Amendment standards, Plaintiff's allegations are not cognizable. *Fly v. United States* (D.N.D. Dec. 15, 2023) (strip searches of a prisoner with gender dysphoria not found to be a constitutional violation); *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990), the Eighth Circuit Court of Appeals explained: "Whatever minimal intrusions on an inmate's privacy may result from [opposite-sex] surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities." See also *Hill v. McKinley*, 311 F.3d 899, 904-905 (8th Cir. 2002) (holding that a female detainee's "very narrow zone[ ] of privacy" was not violated even though she was made to undress in front of a male guard); *Zamal'iah Asia-Unique Carter-el v. Boyer,* 2020 U.S. Dist. LEXIS 33860, 2020 WL 939289 (E.D.Va. Feb. 25, 2020) (transgender strip search is not a cross gender strip search). Because there is no right not to be strip searched, no right to be strip searched by an officer of a preferred sex, or right not to be crossgender strip searched, Defendants' motion for summary judgment should be granted.

**4. First Amendment Retaliation**

Defendants summary judgment motion should be granted as to Plaintiff's retaliation claim. The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." *Suarez Corp. v. McGraw*, 202 F.3d 676 (4th Cir.

2000). Prison officials may not retaliate against an inmate for exercising a constitutional right. See *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978). In order to maintain a colorable retaliation claim under § 1983, a plaintiff must show: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citation omitted). Once the prisoner-plaintiff shows that his "protected conduct was a substantial motivating factor in a prison guard's decision to take adverse action," the burden then shifts to the defendant to prove a permissible basis for taking that action. *Id*. at 300. Bare or conclusory assertions of retaliation are insufficient to establish a retaliation claim. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). And, in the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Id*.

For the causal link necessary to support a § 1983 retaliation claim, the Plaintiff must prove the alleged "retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Plaintiff must prove the exercise of his constitutional rights was the substantial factor motivating the alleged retaliatory act. *Constantine*, 411 F.3d at 501, *Wolfe v. Churray*, 2022 U.S. Dist. LEXIS 31742, *24-25 (D.S.C. 2022), citing *Cochran v. Morris*, 73 F.3d 1310, 1318 (4th Cir. 1996). As

a subset of causation, Defendants "may still prevail by proving that [they] would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Hendrick v. Bishop*, 2016 U.S. Dist. LEXIS 33607, *26-7 (D.Md 2016) quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). The United States Court of Appeals for the Ninth Circuit has similarly held that "a successful retaliation claim requires a finding that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

Plaintiff's alleged retaliation includes generalized allegations of being retaliated against after staff did not take Plaintiff's reports seriously. DE-1, ¶ 44. Plaintiff alleges FNU Honeycut conducted a retaliatory search. *Id.*, ¶¶ 74-77. And, Plaintiff also alleges being moved by Officer Young based on retaliation. *Id*, ¶ 177. As FNU Honeycutt and Young are not defendants, the other allegations of retaliation are too generalized to be maintained.

While Plaintiff states generally that all Defendants were responsible for Plaintiff's alleged constitutional retaliation, "legal conclusions masquerading as factual allegations" are insufficient. *Parham v. Pepsico, Inc.*, 927 F. Supp. 177, 178 (E.D.N.C. 1995), *aff'd*, 86 F.3d 1151 (4th Cir. 1996). In considering the "factual plausibility" of a claim, the Court "must draw on its judicial experience and common sense" to determine whether the well-pleaded facts of the complaint "permit the court to infer more than the mere possibility of misconduct." *Id.* The courts have

reasoned that requiring specific factual allegations for each defendant gives fair notice to that defendant of the plaintiff's claim and the underlying factual support. *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023).

Listing everyone that could have been involved for every specific act is insufficient to hold Defendants liable. *Proctor v. Metro*. *Money Store Corp.,* 579 F. Supp. 2d 724, 744 (D.Md. Sep. 29, 2008) (analyzing under the *Twombly standard)*. Such assertions amount to insufficient speculation. *Id*. And, a complaint of this type cannot be salvaged by then arguing all Defendants acted in concert. *Id*. A court simply cannot allow a complaint to go forward when "based on factual allegations in which basic questions of who did what are completely unclear." *Id*.

Plaintiff's allegations in the Complaint are too generalized to proceed. An allegation that staff retaliated and did not take Plaintiff's reports seriously is conclusory and fails to identify any defendant. DE-1, ¶44.

Arguendo, even if Plaintiff has demonstrated Defendants acts adversely affected Plaintiff's First Amendment activity, the claim must fail when Defendants had a permissible basis for their actions. *Martin*, 977 F.3d, at 300. Searches and drug screens have a permissible basis in a prison setting. *Richardson v. Irons*, 1989 U.S. App. Lexis 21522 (4th Cir. 1989) (unpublished) (jrecognizing prison security concerns with drug use and possession); *Willard v. Ozmint*, Civ. Act. No.: 6:08-2907-GRA-WMC, 2009 U.S. Dist. Lexis 49997, *5(D.S.C. Apr. 3, 2009) (Drugs and other contraband present a threat to institutional security).

**5. Fourteenth Amendment Equal Protection**

Defendants' Summary judgment motion should be granted as to Plaintiff's Equal Protection claim. The Fourteenth Amendment's Equal Protection Clause states "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). (internal quotation marks and alteration omitted). The equal protection requirement "does not take from the States all power of classification," *Personnel Adm'r v. Feeney*, 442 U.S. 256, 271 (1979), but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Thus, "An equal protection violation occurs in one of two ways: (1) when the government explicitly classifies people based on [sex], or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown." *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009).

"To succeed on an equal protection claim, a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). The court then considers "whether the disparity in treatment can be justified under the

requisite level of scrutiny." *Id*.; see *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016).

Generally, sex-based classifications are subject to intermediate scrutiny. *Grimm v. Gloucester* Cnty. *Sch. Bd.,* 972 F.3d 586, 608 (4th Cir. 2020), as amended (Aug. 28, 2020) (explaining that courts "have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes"). However, the Fourth Circuit has explained that when equal protection challenges arise in a prison context, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (evaluating equal protection claim brought by inmate).

Under this more deferential standard, courts must determine whether the disparate treatment is "reasonably related to [any] legitimate penological interests." *Id*. (explaining that while courts are to "apply this deferential standard even when the alleged infringed constitutional right would otherwise warrant higher scrutiny[,] . . . this more deferential review does not make [the court] ignorant to the concerns that justify application of a heightened standard outside of the prison context") (citation and internal quotation marks omitted). In determining whether an action is reasonable under this deferential standard, courts consider the following factors: (1) whether there is a valid, rational connection between the policy and penological

interest; (2) whether an alternative means of exercising the right remains available to the inmate; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that accommodate prisoners' rights at de minimis cost to valid penological interests. Morrison, 239 F.3d at 655 (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).

In Plaintiff's Complaint, Plaintiff alleges discrimination in not being allowed a transfer to a women's facility. DE-1, ¶ 42. Plaintiff also alleges discrimination in being referred to by male pronouns, not being allowed female clothing, commissary, and hygiene items, verbally and physically harassing Plaintiff, by having male officers strip search Plaintiff, and by not otherwise respecting Plaintiff as a woman. DE-1. Plaintiff's lengthy history of FTARC and DTARC decisions gave Plaintiff a full and fair evaluation of all of Plaintiff's requested accommodations. Based on security and operations concerns, Plaintiff's safety at men's facilities, Plaintiff's history of misrepresenting medical history, and that other accommodations were allowed, including women's clothing options and HRT, there is no discrimination demonstrated. All of Plaintiff's treatment was given appropriate consideration and as the Wake County Superior Court court concluded, DTARC has not abused its discretion in reaching its decision. Plaintiff's FTARC minutes demonstrate accommodations made for Plaintiff's preferred gender identity. DTARC decisions otherwise demonstrate consideration for Plaintiff's requests balanced against security and programmatic needs of the prison, other inmates, and Plaintiff.

### 6. Qualified Immunity

"The test for qualified immunity is a two-pronged inquiry. The court must determine, in no particular order, (1) whether a constitutional right has been violated on the facts alleged and (2) whether the right was clearly established at the time so that it would be clear to an objectively reasonable officer that his conduct violated that right." *Adams v. Parsons*, 2011 WL 1464856 at *4 (S.D. W.Va. April 15, 2011) (citing *Saucier v. Katz,* 533 U.S. 194, 200–02 (2001)). Qualified immunity protects government officials from "bad guesses in gray areas" and ensures that they are only liable for crossing bright lines. *Maciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). As argued above, Defendants have not violated any of Plaintiff's rights. Additionally, there is no clearly established right to a transfer to a women's facility, *Inscoe v. Ishee*, 915 S.E.2d 448.

There is also no right to be strip searched by an officer of the gender of the prisoner's choice. The Supreme Court has recognized that "convicted prisoners ... retain some Fourth Amendment rights upon commitment to a corrections facility." *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979). Strip searches, as the held in the 6th circuit, may under some circumstances violate an inmate's Fourth Amendment right to bodily privacy; A "prison policy forcing prisoners to be searched by members of the opposite sex," for example, "would provide the basis of a claim on which relief could be granted." *Mills v. City of Barbourville*, 389 F.3d 568, 579 (6th Cir. 2004); accord *Cornwell v. Dahlberg*, 963 F.2d 912, 916-17 (6th Cir. 1992) ("[A] convicted prisoner maintains some reasonable expectations of privacy while in prison,

particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners."). But, the federal courts have not yet concluded whether those rights encompass a prisoner's asserted interest in being strip searched by a member of the sex with which that prisoner identifies; As a district court recently recognized, "[a]lthough there is a robust body of case law analyzing the constitutional bounds of strip searches and cross-gender searches in prison, little if any case law addresses the issue of the propriety of cross-gender searches of transgender inmates." *Carter-el v. Boyer*, No. 1:19-cv-243, 2020 U.S. Dist. LEXIS 33860, 2020 WL 939289, at *4 (E.D. Va. Feb. 25, 2020) (addressing plaintiff who "self-identifies as female, [but] is legally male"). Another district court recently concluded that "[a] nationwide review of caselaw shows that no court ... has found that there is a constitutional right for a transgender inmate to have a strip search performed by an officer of the gender with which the inmate identifies." *Naisha v. Metzger*, No. 18-738, 2020 U.S. Dist. LEXIS 182222, 2020 WL 5821751, at *7 (D. Del. Sept. 30, 2020).

**D. ADA**

Plaintiff's ADA claims should be dismissed. To state a claim under the ADA a plaintiff must show that: (1) she has a disability; (2) she was otherwise qualified to receive the benefits of a public service, program, or activity; and (3) she was denied the benefits of such service, program, or activity, or was otherwise discriminated against, on the basis of the disability. See *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016); *Doe v. Univ. of Md*. Med. Sys. Corp., 50 F.3d

1261 (4th Cir. 1995). Plaintiff cannot meet these elements.

Plaintiff alleges to be a qualified person with a disability under the ADA pursuant to the medical diagnoses of gender dysphoria and intersex status and that Defendants discriminated against Plaintiff by denying Plaintiff reasonable accommodations of medical treatment owed to women. DE-1, ¶¶ 199-203. While prisoners have a right to reasonable accommodations for disabilities, prison officials may determine the reasonableness of the accommodation request in consideration of other penological needs in the prison setting, such as security, safety and administrative exigencies. *Gates v. Rowland*, 39 F.3d 1439, 1446-47 (9th Cir. 1994) (applying the *Turner v. Safley*, 482 U.S. 78 (1987) rational relationship test in determining the reasonableness of accommodations requested under the ADA for HIV-positive prisoners in light of other penological concerns). Further, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve the internal order and discipline and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520 (1979).

In this case, the crux of the issue is whether Plaintiff is being provided reasonable accommodations for Plaintiff's disability of gender dysphoria and/or being intersex by not being transferred to a women's facility, being strip searched by men, and not being provided medical care consistent with women.

Plaintiff has been provided HRT, women's underwear, and private showers. Plaintiff's request for a transfer to a women's facility was appropriately deliberated

and appropriately denied. Plaintiff's anatomy does not require medical care specific to being a woman. Plaintiff's testosterone levels return to appropriate male levels when going off HRT, Plaintiff has fully formed male anatomy and medical care has been appropriately provided on that basis. As differences with treatment decisions do not give rise to constitutional violations, *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975), merely not being provided the desired accommodations are likewise not actionable under the ADA. Nothing in the ADA requires Defendants to accommodate the whims of a disabled inmate simply because he is disabled." *Alton v. Md. Dep't of Pub. Safety, 2016 U.S. Dist. LEXIS 143712, *12* (D.Md. Oct. 14, 2016) *(*A plaintiff's failure to complete work release eligibility requirements "was simply due to his dissatisfaction with all efforts to accommodate his disability and the denial of his requests to be sent to a prison of his choice. Those circumstances vitiate his claim under the ADA."). By syntax alone, a reasonable accommodation does not require catering to the subjective desires of the person with a disability.

**E. Supplemental State Law Claims, Article 1, Section 27**

Plaintiff asserts State constitution violations. DE-1, Count 5. Specifically, Plaintiff alleges violations of Article 1, Section 27, prohibiting cruel or unusual punishments. Plaintiff adopts all allegations supporting the alleged Eighth Amendment violations to support the NC Constitution violations. *Id*. Defendants should be granted summary judgment on this claim.

**1. Plaintiff's *Corum* Claim is Barred as There is an Adequate State Remedy.**

"[A] direct cause of action under the State Constitution is permitted only 'in the absence of an adequate state remedy.'" *Hawkins v. State*, 117 N.C. App. 615, 629 (1995). Plaintiff's claims could have been raised as common law intentional torts or as common law negligence filed in the NC Industrial Commission, common law assault and/or violations of the North Carolina Persons with Disabilities Act. Since Plaintiff had an adequate state remedy at the time the Complaint was filed, the claims under the North Carolina Constitution should be dismissed.

**2. Plaintiff's State Constitutional Claim is Barred Against the Individual Defendants**

"Our Supreme Court has held that a plaintiff cannot maintain a claim against government employees in their individual capacities for alleged violations of state constitutional free speech rights. Based on the Court's discussion in Corum, we hold that the Court's holding applies equally to alleged violations of other state constitutional rights." *Hawkins*, 117 N.C. App. at 630. Thus, the individual Defendants should be dismissed from the state constitutional claim.

**3. Alternatively, Plaintiff Cannot Satisfy the Elements for Such a Claim**

Article I, Section 27 is the counterpart to the Eighth Amendment of the U.S. Constitution, prohibiting infliction of "cruel or unusual punishments" N.C. Const. Art. I, Sec. 27. Claims under the North Carolina "cruel or unusual punishments" clause are generally analyzed the same as under the U.S. Constitution. *State v. Kelliher*, 381 N.C. 558, 584-85, 873 S.E.2d 366, 385-86 (2022) (acknowledging the textual difference in North Carolina's "Cruel or unusual" and the Eighth Amendment's "cruel and unusual" clauses, evolving cruel and unusual punishment

analysis guies Section 27 analysis); See *Griffin v. Mortier*, 837 Fed. Appx. 166, 170-171 (4th Cir. 2020).. Thus, for the reasons discussed above, Plaintiff fails to sustain a N.C. Const. Article I, Sec. 27 claim.

**F. Eleventh Amendment Immunity**

Plaintiff's claims against DAC and Defendants in their official capacities should be dismissed because the Eleventh Amendment bars such claims unless the state has waived its immunity, and the State of North Carolina has not done so. The Eleventh Amendment "bars claims against the State for § 1983 civil rights claims unless the State has waived its immunity…or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989). The Eleventh Amendment is also applicable to state officers sued in their official capacity. *See Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459 (1945). "[A]suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71. "State officials acting in their official capacity are therefore not 'persons' for the purposes of § 1983 and are not proper defendants to a § 1983 lawsuit." *Diggs v. Balogun*, 2017 WL 4921690, at *4 (D. Md. Oct. 31, 2017) (citing *Will*, 491 U.S. at 71). Plaintiff cannot sustain claims against Defendants in their official capacities because Defendants are not "persons," but instead, an extension of the State of North Carolina, who has not waived immunity. Therefore, Defendants are entitled to summary judgment on Plaintiff's official capacity claims.

## V. CONCLUSION

For the forgoing, summary judgment should be granted in favor of Defendants.

This the 15th day of October, 2026.

**JEFF JACKSON**
**Attorney General**

/s/ J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General
N.C. State Bar No. 35449
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6545
E-mail: jmilholland@ncdoj.gov

## ***CERTIFICATE OF SERVICE***

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the Court utilizing the CM/ECF system, and have served the Plaintiff, by and through counsel, a CM/ECF participant, as follows:

Elizabeth Simpson, N.C. Bar No. 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org

This the 15th day of October, 2026.

/s/J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General

*****CERTIFICATION OF INTELLIGENCE USED IN PREPARATION OF FILING*****

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This, the 15th day of October 2026.

/s/J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General