**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ASHLEE INSCOE,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.<br>1:22-cv-00243-MR |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. There Are Genuine Issues of Material Fact That Must Be Resolved By A Jury

The record contains competing affidavits, thus rendering summary judgment inappropriate. The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may

not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006).

Ashlee swears that she was sexually assaulted by Carver at UNC Meadowmont Endocrinology in December 2019, on a medical trip that Hollifield also escorted. D.E. 70-1, ¶ ¶ 23-32. Ashlee swears she was sexually harassed by Buchanan, Hicks, Goforth, Miller, and Jimeson with explicit and knowing failure to take action by a supervisor, Silver. *Id.* at ¶ ¶ 36-48. Ashlee alleges Goforth and Fox threatened her with solitary confinement unless she agreed to say she was safe. *Id.* at ¶ ¶ 51-64, 20. In November 2021, Ashlee asked in writing to speak to Watson about this type of threat. D.E. 70-4.

Defendants' brief cites some state court testimony of a medical doctor who is a high-ranking prison administrator, Dr. Arthur

Campbell. D.E. 100 at 13-14. The State's brief claims, without competent evidence, that Ashlee has a "fully formed penis." *Id.* Dr. Campbell has never personally examined Ashlee and has no basis for any opinions about her anatomy. D.E. 70-1, ¶ 14. The scan that was actually offered as an exhibit in state court and discussed in Dr. Campbell's testimony reflects that she has "ambiguous genitalia." D.E. 64-17 (Tomography Results). Dr. Campbell was not qualified to be, nor offered as, an "expert" witness qualified to opine on sex or intersex issues when he testified in state court about Ashlee. D.E. 101-6.

The trial court did not use Campbell's testimony in any of its Findings of Fact, and the trial court reminded counsel at one point during the bench hearing: "Well, let me tell you this, since this is a bench trial, the appellate courts assume that I disregard anything that is not otherwise admissible as evidence, even absent an objection." *Id.* at 38. The State did not challenge any of the trial court's Findings of Fact on appeal, and indeed, the Court of Appeals reminds the reader that the trial court's Findings of Fact were "unchallenged" on 10 separate occasions. *Inscoe v. Ishee*, 915 S.E.2d 448 (N.C. COA 2025).

Thus, it is inappropriate for Defendants to act as though Campbell's testimony is binding or competent. Indeed, the credibility and objectivity of Dr. Campbell's extraneous medical "opinions" about gender and sex issues were called into serious question by Judge Cogburn of the Western District of North Carolina. *Zayre-Brown v. N.C. Dep't of Public Safety*, 2024 WL 1641795 (W.D.N.C. Apr. 16, 2024), *vacated as moot*, 2024 WL 4925046 (4th Cir. Nov. 25, 2024).

> Plaintiff's Eighth Amendment claim boils down to a single question: is Dr. Campbell's testimony credible? Because Defendants are not entitled to trial by jury on Plaintiff's request for equitable relief under the Eighth Amendment, the Court is authorized to assess Dr. Campbell's credibility at the summary judgment stage. At the February 2024 evidentiary hearing before this Court, Dr. Campbell testified that, despite authoring a position paper to the contrary, the DTARC would under certain circumstances approve gender-affirming surgery as medically necessary for an inmate suffering from gender dysphoria. He gave no examples of what he might consider a medical necessity. Despite receiving more than thirty such requests, the DTARC has never approved gender-affirming surgery as medically necessary to treat gender dysphoria. Dr. Campbell has impressive qualifications and has served this country admirably for several decades. But considering Dr. Campbell's authorship of the position statement, other DTARC members' deference to his medical judgment, and the DTARC's track record of denying dysphoric prisoners' requests for gender-affirming surgery, the Court cannot credit Dr. Campbell's testimony. A judge sharing Dr. Campbell's views would be expected to recuse themselves

> from this case. A juror holding those same views would be excused for cause.

Defendants claim that after the substantiated PREA allegation involving an "offender who masturbated in Plaintiff's direction," "DAC acted swifty [sic], it was immediately addressed and Plaintiff's safety was maintained." D.E. 100 at 11. In actuality, DAC permitted the aggressor to be transferred back into Ashlee's prison <u>after</u> he was substantiated as an aggressor (in violation of the Prison Rape Elimination Act regulations), and DAC only moved him away from Ashlee again after she filed an emergency motion for preliminary injunction in this Court asking for safety. D.E. 82. DAC failed to turn over the PREA report related to this highly relevant incident, despite repeated discovery requests and a motion to compel. D.E. 47; *see also* D.E. 83 (motion for spoliation sanctions); D.E. 87 (Order granting discovery sanctions in part).

Defendants argue generally that Ashlee has "hoarded" her hormone medication (D.E. 100 at 15), but this allegation is not credible, and it is not particularly probative of any relevant fact. It conflicts with the actual evidence in the medical file and with Ashlee's affidavit, where she explains the 283 pills in her possession on June 21, 2023, by

pointing to the Department's own Medication Administration Record. D.E. 70-1; 70-12; 70-13; 70-14.

Defendants falsely claim that Ashlee's orchiectomy was not "gender affirming," yet the surgeon who actually consulted with Ashlee about her desires regarding her medical care and who literally performed the procedure signed an affidavit swearing to the North Carolina Department of Vital Records that it was "gender affirming." D.E. 58-7. The prison administrator doctor, Dr. Campbell, admitted that an orchiectomy may be considered a gender affirming surgery. D.E. 101-6 at 89. A high-ranking prison psychologist testified that he understood that Ashlee "appreciated" the surgery "in a gender-affirming way." D.E. 101-6 at 43.

Defendants assert, irrelevantly, that "birth certificates have become easier to change in light of a recent consent decree with the N.C. Department of Health and Human Services," D.E. 100 at 11, but Ashlee corrected her birth certificate pursuant to a materially objective and longstanding statutory methodology that was enacted in 1983 (Session Laws 1983, c. 891 (available here)), a methodology that was unaffected by "the recent consent decree." The consent decree involved

individuals who have a sincere gender identity different from their sex assigned at birth, but who have not undergone any "sex reassignment surgery." An orchiectomy, in contrast, is an irreversible sex reassignment surgery involving permanent removal of testicles/gonads.

Defendants no longer assert, as they did in August 2025, that "the facilities accommodate Plaintiff's request to be strip searched by women to some extent." D.E. 65 at 41. Whenever Ashlee is strip searched, she is searched by a male officer. D.E. 70-1.

## II. This Federal Action Is Not Precluded By The Prior, Narrow State Court Mandamus Petition

In September 2021, Ashlee filed a petition for writ of mandamus in Wake County Superior Court presenting one simple State statutory question alone: does N.C. Gen. Stat. § 148-44, regarding separate quartering of "female prisoners" from "male prisoners," mandate that the Department of Adult Corrections quarter Ashlee in a female prison facility. On November 21, 2023, Wake County Superior Court Judge Graham Shirley held a bench trial on this question and concluded that the answer was "yes." D.E. 64-3. He ordered Ashlee transferred to a women's prison. He made the following Findings of Fact, all of which were unchallenged by the State on appeal, and thus, became binding:

- Petitioner is an intersex individual, and DTARC identified that under Prison Rape Elimination Act ("PREA") standards she is at a high risk of being an abuse victim.

- [B]oth parties agree that her gender identity is now female and that Petitioner has undergone hormone therapy consistent with her gender identity as a woman since at least 2019.

- Both parties agree that Petitioner underwent an orchiectomy on September 7, 2022. In a notarized letter signed by the attending physician, Dr. Brad Figler, this orchiectomy was classified as "gender affirmation surgery." Dr. Figler's letter satisfies the requirement to change a birth certificate under N.C. Gen. Stat. 130A-118(b)(4).

D.E. 64-3.

On appeal, the State did not challenge any Findings of Fact. *Inscoe*, 915 S.E.2d at 461 ("Based on the trial court's *unchallenged* findings of fact, Petitioner is neither male nor female; she is intersex." (emphasis in original)). Under North Carolina law, failing to challenge a Finding of Fact renders that Finding of Fact binding. *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (Where no exception is taken to a finding of fact by the trial court, the finding is

presumed to be supported by competent evidence and is binding on appeal).

On April 2, 2025, the North Carolina Court of Appeals reversed the trial court, holding that issuing a writ of mandamus infringed upon the Department of Adult Correction's discretionary authority to determine appropriate housing assignments. The Court of Appeals majority stated: "Mandamus was not the proper remedy in this case." *Inscoe*, 915 S.E.2d at 462. Mandamus is only appropriate if there is no alternative legal remedy; both the majority and the concurrence referred to "other remedies" being available for Ashlee. *Id.* at 462 n. 12, 462. 463 (Hampson, concurring) ("I agree that the Writ of Mandamus was not the proper remedy in this case").

When a federal court considers the issue preclusive effect of a state court judgment, it must apply the law of the forum state regarding issue preclusion. *See Hagan,* 62 F.3d at 624. The forum state is North Carolina; therefore, the court must apply North Carolina's law on issue preclusion. *Cudmore v. Howell*, 232 B.R. 335 (E.D.N.C. 1999). Issue preclusion, also known as "collateral estoppel" and "estoppel by judgment," prohibits re-litigation of an issue resolved in a final

judgment "'involving identical parties or parties in privity with a party or parties to the prior suit.'" *State v. Safrit*, 145 N.C. App. 541, 552, 551 S.E.2d 516, 523–24 (2001) (quoting *Masters v. Dunstan*, 256 N.C. 520, 524, 124 S.E.2d 574, 576 (1962)). Issue preclusion requires: "(1) a prior suit resulting in a final judgment on the merits; (2) identical issues involved; (3) the issue was actually litigated in the prior suit and necessary to the judgment; and (4) the issue was actually determined." *McDonald v. Skeen*, 152 N.C. App. 228, 230, 567 S.E.2d 209, 211 (2002).

"[A]n issue is actually litigated, for purposes of collateral estoppel or issue preclusion, if it is properly raised in the pleadings or otherwise submitted for determination and [is] in fact determined." *See Williams v. Peabody*, 217 N.C. App. 1, 6, 719 S.E.2d 88, 93 (2011) (quoting *City of Asheville v. State*, 192 N.C. App. 1, 17, 665 S.E.2d 103, 117 (2008)). Concerning the second element, "[a] very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical. If they are not identical, then the doctrine of collateral estoppel does not apply." *Beckwith v. Llewellyn*, 326 N.C. 569, 574, 391 S.E.2d 189, 191 (1990).

The State argues that issue preclusion applies to four alleged "facts," but the State is incorrect about three of the alleged "facts." Issue preclusion applies only to actual Findings of Fact, i.e., that Ashlee is "intersex" with a "female" "gender identity." The State's other three alleged "facts" were neither "found" by any court, nor did they "need to be found" because they were not "necessary" to the holding regarding the applicability of mandamus to a prisoner's housing assignment. While the Court of Appeals majority does discuss some of the prison's contested record evidence—a choice that the concurrence described as "improper[]," "irrefutably unnecessary," and "dicta"—the trial court's Findings of Fact went "unchallenged" by the State on appeal and are now binding. *Inscoe*, 915 S.E.2d at 464.

There are four "facts" that the Defendants claim have been "precluded." One is correct.

- "Plaintiff's medical history as it relates to being transgender or intersex" (D.E. 100 at 25).
    - The Trial Court made a Finding of Fact that Ashlee was "intersex." D.E. 64-3.
    - The State did not challenge this or any Finding of Fact on appeal and thus, it was binding on the Court of Appeals.

- The Court of Appeals majority agreed that Ashlee is "intersex." *Inscoe*, 915 S.E.2d at 462 ("Based on the trial court's *unchallenged* findings of fact, Petitioner is neither male nor female; she is intersex") (emphasis in original).

- The Trial Court found that: "[B]oth parties agree that her gender identity is now female and that Petitioner has undergone hormone therapy consistent with her gender identity as a woman since at least 2019." D.E. 64-3.

- The State did not challenge this or any Finding of Fact on appeal and thus, it was binding on the Court of Appeals.

The State is incorrect as to three purported "facts":

- "Plaintiff's history of 200 pages of PREA allegations that were subsequently recanted and substantiated" (D.E. 100 at 25).

  - The trial court made no Finding of Fact about Ashlee's PREA allegations, and to do so would have been unnecessary to the holding (i.e., that Ashlee's housing assignment was subject to writ of mandamus). D.E. 64-3.

  - The Court of Appeals is not a Finder of Fact.

  - The Court of Appeals majority does discuss PREA investigations to a degree, but the discussion was *dicta* and unnecessary to the holding (i.e., a mandamus remedy doesn't apply in this scenario).

- "Plaintiff's history of inconsistent HRT [hormone replacement therapy] usage and hording (*sic*) medication" (D.E. 100 at 25).

    - The trial court made no Finding of Fact about Ashlee's HRT medication, and to do so would have been unnecessary to the holding (i.e., that Ashlee's housing assignment was subject to writ of mandamus). D.E. 64-3.

    - The Court of Appeals is not a Finder of Fact.

    - The Court of Appeals majority does discuss the testimony about HRT medication, but the discussion was *dicta* and unnecessary to the holding (i.e., a mandamus remedy doesn't apply in this scenario).

- "Plaintiff's needs being met and the requested transfer to a women's prison not being appropriate." (D.E. 100 at 26).

    - The trial court made no Finding of Fact about Ashlee's "needs," and to do so would have been unnecessary to the holding (i.e., that housing Ashlee in a female prison was mandatory). D.E. 64-3.

    - The Court of Appeals is not a Fact Finder.

    - The Court of Appeals majority discusses the State's testimony about programmatic needs, but the discussion was *dicta* and unnecessary to the holding (i.e., a mandamus remedy doesn't apply in this scenario).

The three extra purported "facts" that the Defendants seek to preclude were never "found" by the Finder of Fact. D.E. 64-3. The Court of Appeals is not a Finder of Fact. *See e.g.*, *State v. Massey*, 195 N.C.App. 423 (2009) ("This Court is not a fact-finding court[.]") As the

concurrence in the Court of Appeals points out, there was no need for the majority to discuss any of these subjects, because they were not necessary to the holding about mandamus's applicability, and therefore, anything the majority said about them was "dicta." *Inscoe*, 915 S.E.2d at 464. The Findings of Fact that the trial court did make (i.e., that Ashlee is "intersex" and that she has a "female" "gender identity") went unchallenged[1] by the State on appeal, and thus are binding for purposes of issue preclusion.

## III. Ashlee's Transfer From One Men's Prison to Another Men's Prison Does Not Moot Her Complaints About Being Treated Like a Man

The mootness doctrine is part of Article III's limitation of court's jurisdiction to cases and controversies. It prevents the court from advising on legal questions when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *See Eden, LLC v. Justice*, 36 F.4th 166, 169 (2022). Ashlee's complaints are not moot: fundamentally, they are complaints about living in a men's prison and being treated as though she were a man, even though she is an intersex woman who has undergone hormone replacement and

[1] Again, the Court of Appeals reminds the reader that the trial court's Findings of Fact were "unchallenged" on 10 separate occasions. *Inscoe*, 915 S.E.2d 448.

surgery to align her body with her gender identity and even though she has followed longstanding state statutory procedure to update her legal sex marker.

Due to a record of good behavior and compliance with prison rules, Ashlee was transferred in October 2026 to a minimum security men's facility, New Hanover Correctional Center, two months prior to her technical eligibility for the transfer. D.E. 101-1 (Offender Profile, showing a projected release date of December 5, 2031 (62 months from her October 9, 2026, transfer date)); *see also* Division of Prisons, Handbook for Family and Friends of Offenders, available here (reporting offenders are eligible for promotion to minimum when they reach 60 months of their release date).

Ashlee continues to live in a men's prison in North Carolina. Her conditions are inextricable from living life inside a men's prison as a female.

## IV. <u>Ashlee Shows Direct Involvement of the Named Supervisors</u>

Ashlee produces specific evidence regarding direct involvement of the named supervisors. She is not replying upon "*respondeat superior*" as a theory of liability. In the last round of summary judgment, in

Summer 2025, Defendants provided a sworn statement from the PREA Director, Charlotte Williams, in which she falsely claimed not to have any personal involvement with investigating any PREA reports by Ashlee. D.E. 65-6 at 8 (signed and sworn at D.E. 65-6 at 39). But Defendants produced voluminous evidence to Plaintiff in discovery showing Ms. Williams' personal involvement. Ms. Williams made notes throughout the type-written version of the grievance Ashlee submitted on December 26, 2021 as follow-up to an interview Williams conducted. D.E. 70-7. She was carbon copied on an email from Secretary Ishee about Ashlee's "inappropriate" transfer to Harnett in January 2023. D.E. 70-10. On January 9, 2023, Ms. Williams wrote in an email: "Anything else on Inscoe, please escalate to me as well. May require a call or text to check marked urgent." D.E. 70-19.

Ashlee also provides evidence that she personally reported harassment to Sgt Silver and that Sgt. Silver witnessed and permitted Hicks and Buchanan to scream and yell at Ashlee in a sexually harassing manner. D.E. 70-1. Ashlee reported sexual harassment directly to Watson, who advised her to be mindful of her changing body due to male attention. (D.E. 70-1; D.E. 58-9). Waldroop personally

threatened Ashlee with solitary confinement/the hole if she filed a grievance and told her that staff would not use female pronouns. D.E. 70-1. Fox personally threatened Ashlee with the hole if she didn't recant a PREA report, and the threat was frightening enough that Ashlee did temporarily half-recant to avoid the restrictive housing placement. *Id.*

Ishee's personal knowledge of Ashlee's situation is confirmed in his January 9, 2023 email about the "inappropriateness" of Ashlee's temporary transfer to Harnett from Nash. Ishee wrote to prison officials: "Offender Insco (*sic*) was inappropriately transferred from Nash CI to Harnett. Insco is being returned to Nash tomorrow. The allegations related to Harnett are being investigated. Measures have been put in place to prevent unnecessary transfers of Insco (*sic*) in the future." D.E. 70-10. Ishee's email address is copied on correspondence involving Ashlee and PREA Director Charlotte Williams seventeen times. D.E. 70-19. He was placed on notice as early as August 10, 2021, when counsel sent him a letter prior to initiating litigation. D.E. 70-2.

## V. <u>Fourth Amendment</u>

As in their brief in Summer 2025, Defendants once again cite "*Fly v. United States* (D.N.D. Dec. 15, 2023) without providing the case's full

citation." D.E. 100 at 38; *see also* D.E. 65 at 33. The *Fly* case is a summary dismissal of a *pro se* prisoner complaint on frivolity review based on "bare assertions unsupported by the necessary level of detail, even for a *pro se* litigant." *Fly v. United States*, 2024 WL 1188806, *1 (D.N.D. Jan. 29, 2024), adopting in part the magistrate's report and recommendation, 2023 WL 10447544 (Dec. 15, 2023) (unpublished). This is hardly a reasoned legal judgment offering federal court sanction of repeated cross-gender strip searches of an intersex person who has undergone a sex reassignment surgery, taken hormone replacement therapy, and updated her legal birth certificate.

Misleadingly, Defendants cite *Carter-El v. Boyer*, 2020 WL 939289 (E.D.Va. Feb. 25, 2020) for the proposition that "a transgender strip search is not a cross-gender strip search." D.E. 100 at 38. This is disingenuous because the *Carter-El* holding was explicitly distinguishing another case (*Shaw*) on the basis that Ms. Carter-El (unlike Ashlee, for instance) had not undergone a sex change operation and had not amended the sex on her birth certificate. The *Carter-El* court reasoned:

> In *Shaw*, the plaintiff, unlike plaintiff in this case, had undergone sexual reassignment surgery and had taken the

> necessary steps, under D.C. law, to have her birth certificate amended to change the plaintiff's legal sex to female. . . . This case is unlike *Shaw* in two critically important respects: (i) although plaintiff self-identifies as female, she is legally male; and (ii) defendant did not physically touch or examine plaintiff. Moreover, there is no admissible record evidence in this case that suggests that defendant knew of plaintiff's self-identified transgender status at the time of the challenged search.

*Carter-El*, 2020 WL 939289 at *4. Here, Ashlee has undergone sex reassignment surgery; she has updated her birth certificate to reflect a female sex; and Defendants are completely aware of her sex/gender status and her desire to be searched by females.

Plaintiff incorporates her arguments on the Fourth Amendment in her Motion for Partial Summary Judgment, D.E. 96-1.

## VI. Fourteenth Amendment

Plaintiff hereby incorporates her arguments on the Fourteenth Amendment in her Motion for Partial Summary Judgment. D.E. 96-1.

## VII. Americans with Disabilities Act

Title II of the Americans with Disabilities Act ("ADA") prohibits discrimination by public entities against individuals based on disability, including when a person with a disability is "excluded from the participation in or [] denied the benefits of the services, programs, or

activities of the public entity.'" 42 U.S.C. § 12132; *see also Williams v. Kincaid*, 45 F.4th 759, 766 (4th Cir. 2022). Claims under ADA's Title II and the Rehabilitation Act may be combined for analytical purposes because the analysis is substantially the same. *Seremeth v. Bd. Of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n. 1 (4th Cir. 2012). Title II of the ADA applies to state prisoners. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998).

To establish a claim under the ADA, a plaintiff must allege that (1) she has a disability; (2) she is otherwise qualified to receive the benefits of a public service, program, or activity; and (3) she was denied the benefits of such service, program, or activity, or otherwise discriminated against, because of her disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016). "Courts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. County*, 515 F.3d 356, 362 (4th Cir. 2008).

While the language of the statute speaks of "services, programs, or activities" denied to an individual with disabilities, in reality this

provision "has been interpreted to be a catchall phrase that prohibits all discrimination by a public entity." *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012); *see also Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172–173 (9th Cir. 2002) ("[T]he ADA's broad language brings within its scope anything a public entity does.").

**A. <u>Ms. Inscoe is a state prisoner with a gender dysphoria disability caused by a disorder of sex development.</u>**

Ms. Inscoe meets prongs (1) and (2) of the ADA test. Ms. Inscoe is a state prisoner who is intersex and who undergoes hormone replacement therapy to treat a diagnosis of "gender dysphoria." D.E. 58-2; 58-28. Additionally, and as a matter of collateral estoppel, the State of North Carolina considers Ms. Inscoe to be an "intersex" person. *Inscoe v. Ishee*, 915 S.E.2d 448, 462 (N.C. COA 2025) ("Based on the trial court's *unchallenged* findings of fact, Petitioner is neither male nor female; she is intersex.") (emphasis in original). An "intersex" condition is a "disorder of sex development"—a congenital condition in which development of chromosomal, gonadal, or anatomical (genital) sex is atypical for that expected for a male or female.[2]

---

[2] American Academy of Pediatrics, "disorder of sex development," available here (accessed Nov. 12, 2026).

Under the ADA, a "disability" is a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12101(1)(A). Gender dysphoria limits several major life activities, including interacting with others, reproduction, and social/occupation functioning. *Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017); *see also* 42 U.S.C. § 12102(2)(B) (providing that a disability is a physical or mental impairment that substantially limits a major life activity, notably "the operation of a major bodily function, including . . . endocrine, and reproductive functions"); *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("[W]e agree ... that reproduction is a major life activity for the purposes of the ADA."). Ms. Inscoe has received hormone replacement therapy prescribed by an endocrinologist to treat her "gender dysphoria" from at least 2019 to the present. D.E. 58-4; D.E. 58-6.

### B. Ms. Inscoe is denied the benefits of being a female prisoner because of her intersex status and her gender dysphoria.

Ms. Inscoe also meets prong 3. DAC discriminates against Ms. Inscoe due to disability by housing her among men and by subjecting her to strip-searches conducted by male officers. Unlike non-disabled female prisoners in North Carolina, she is denied access to facilities and

programs that correspond with her legal sex and her gender identity. She is forced to live in a male prison environment among hundreds of men. Living in this manner contradicts a critical aspect of the standard treatment for gender dysphoria—that she be permitted "social transition," i.e., to live her life outwardly as a woman. D.E. 58-3, 58-18, 58-19, 58-20, 58-43. The prison's excuse for this discriminatory treatment towards Ms. Inscoe is her disorder of sex development (intersex status) and her gender dysphoria. If she did not need to take hormone replacement to present as her gender and sex, she would be housed among women and strip-searched by female officers.

Indeed, the North Carolina Court of Appeals ruled that because Ms. Inscoe is "intersex," she is "neither male, nor female," making her not entitled to the benefits of either sex. *Inscoe v. Ishee*, 915 S.E.2d at 462. Instead of being mandatorily segregated from opposite-sex prisoners, like everyone else, Ms. Inscoe is subject to prison officials' absolute discretion as to her housing assignment. *Id.* Accordingly, her housing assignment and strip searches violate the ADA.

The ADA requires accommodation of disability, rather than discrimination. The ADA allows an intersex person like Ms. Inscoe to

select her sex/gender and undergo voluntary medical treatments to conform her body to the gender she chooses.[3] Ms. Inscoe is both intersex *and* female. She has undergone a sex change operation, taken years of hormone replacement therapy, amended her birth certificate in accordance with longstanding state law, and adopted a female name and female persona.

While intersex litigation is uncommon, transgender prisoners with gender dysphoria have repeatedly established that the ADA protects individuals with this diagnosis. In *Williams v. Kincaid*, the Fourth Circuit ruled that a transgender plaintiff with gender dysphoria successfully stated an ADA claim contending that a correctional policy requiring prisoners to be housed based solely on their genitalia was discriminatory. *See Williams*, 45 F. 4th 772, 778 (4th Cir. 2022). In *Cano v. South Carolina Dep't of Corr.*, the District of South Carolina ruled

[3] Indeed, respecting the right of people born with disorders of sex development to select a sex and to undergo voluntary medical treatment is a right that has consistently been preserved during recent debates about gender affirming care for minors. The Tennessee bill banning gender affirming care that was upheld by the U.S. Supreme Court in *United States v. Skrmetti*, 605 U.S. __ (2025), allows children with disorders of sex development (congenital defects) to undergo otherwise-banned gender-affirming care, out of respect for the medical necessity of this type of care for intersex people. *See* Tenn. Code § 68-33-103(b) ("It is not a violation . . . if a healthcare provider knowingly performs, or offers to perform, a medical procedure on or administers, or offers to administer, a medical procedure to a minor if: (A) The performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury;")

that a transgender prisoner with a gender dysphoria diagnosis was likely to succeed on the merits of her ADA claim challenging a prison policy that forbade hormone replacement therapy to prisoners who were not already taking the treatment when they first became incarcerated. 2023 WL 10286851, *18, *19 (D.S.C. July 31, 2023). In *Doe v. Massachusetts*, the District of Massachusetts agreed with an incarcerated transgender plaintiff that gender dysphoria qualifies as a disability because it impairs her ability to reproduce and is "a physiological disorder or condition … affecting … the endocrine system." 2018 WL 2994403, *8 (citing 28 C.F.R. 35.108(b)(1)(i)).

In these cases, courts discuss head-on the exclusion under the ADA for "gender identity disorders not resulting from physical impairments." *Kincaid* and *Doe* both conclude that "gender dysphoria" diagnoses are not barred under this exception for the following reasons:

- "gender dysphoria" is distinct from "gender identity disorder," which has now been removed from the fifth edition of the Diagnostic and Statistical Manual;
- there are physical manifestations of "gender dysphoria";
- there would be constitutional concerns about interpreting the statute to exclude "gender dysphoria."

*Williams v. Kincaid*, 45 F.4th at 767–74; *Doe v. Massachusetts*, 2018 WL 2994403 at *6–*8. All these reasons also apply to Ms. Inscoe's case, plus

one more: Ms. Inscoe's gender dysphoria diagnosis stems from a "physical impairment," i.e., her intersex condition, which is considered by physicians to be a "disorder of sex development." D.E. 58-2.

Allowing Ms. Inscoe to live among women and be treated like a woman would not fundamentally alter the nature of the DAC's services, programs, and activities. 28 C.F.R. § 35.130(b)(7). DAC would be unimpeded in its efforts to provide "care and custody" to more than 30,000 people housed in its state prisons after housing Ms. Inscoe appropriately in a women's prison facility.

## VIII. First Amendment Retaliation

A First Amendment retaliation claim requires a plaintiff to show that (1) she engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendant's conduct. *Martin v. Duffy (Martin II)*, 977 F.3d 294, 299 (4th Cir. 2020). The right of a prisoner to petition the government for redress of grievances is constitutionally protected activity. *Turner v. Safley*, 482 U.S. 78, 84 (1987). In the Fourth Circuit, placement in a more restrictive setting such as solitary confinement

constitutes retaliation when done by the State in response to a prisoner's protected First Amendment activity. *Jones v. Solomon*, 90 F.4th 198, 214 (4th Cir. 2024); *Gowen v. Winfield*, No. 22-6380, 2025 WL 678642 (4th Cir. Mar. 4, 2025).

Here, the State asserts Ashlee's First Amendment retaliation claims are too generalized to proceed in light of "recanted" allegations. (D.E. 100 at 40). However, Ashlee very specifically claims that in response to filing a grievance reporting sexual harassment by Officer Jimeson as is her constitutional right, Defendant Fox threatened that he would place her in solitary confinement *unless* she recanted her grievance in 2021. D.E. 70-1, 70-6 at 78, 70-7 at 30. That she "recanted" under duress in order to avoid solitary confinement. Similarly, Ashlee alleges that Defendant Waldroop threatened to place her in segregation if she filed a grievance about officer assault and harassment that Ashlee experienced in 2020. D.E. 70-1.

Finally, Ashlee specifically alleges that Defendant Goforth forced her to show him her genitals in order to "show us you don't have a dick!" in retaliation for Ashlee asking for an accommodation to be permitted to sit down to urinate for a urinalysis drug test. *Id.* In this instance,

Ashlee was forced to strip by Defendant Goforth for the PREA non-compliant purpose of determining her genitals in retaliation for asking for a gender-related accommodation.

## IX. Qualified Immunity

Qualified immunity provides government officials with immunity from suit for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Scott v. Harris*, 550 U.S. 372, 377 (2007). Courts ruling on a claim of qualified immunity must consider two questions: (1) "whether the facts that a plaintiff has...shown...make out a violation of a constitutional right[,]" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); and (2) "this violation was of a clearly established right of which a reasonable person would have known." *Price* 22 F. Supp. 3d at 561 (citing *Occupy Columbia*, 738 F.3d at 124). The Fourth Circuit has "repeatedly . . . held that there is no requirement that the precise right allegedly violated already have been recognized specifically by a court before such right may be held 'clearly established' for qualified immunity purposes." *Hutchinson v. Lemmon*, 436 F. App'x 210, 215 (4th

Cir. 2011) (unpublished) (collecting six such cases); *see also Williams v. Hansen*, 326 F.3d 569, 581 (4th Cir. 2003). if there are " 'genuine issues of historical fact respecting the officer's conduct,' the United States Court of Appeals for the Fourth Circuit has stated, 'summary judgment is not appropriate, and the issue must be reserved for trial.' *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir.1992)) As of the time of the incidents, it was clearly established that:

- Prison officials may not sexually abuse or harass prisoners, or retaliate against them for reporting sexual abuse and harassment. *Jackson v. Holley*, 666 Fed.Appx. 242 (4th Cir. 2016)
- Post-sex reassignment surgery, such a prisoner should be treated the same as other females. *See Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 55 (D.D.C. 2013) ("[t]he flaw in [the defendants'] argument is that it fails to account for the fact that plaintiff is legally a female and that the [defendants] knew it").

With regard to Ashlee's forward-looking injunctive claims, qualified immunity does not apply. *See Pearson,* 555 U.S. at 243, 129 S.Ct. 808 (indicating that the "defense [of qualified immunity] is not available [in] ... § 1983 cases against individuals where injunctive relief is sought"); *Lefemine v. Wideman,* 672 F.3d 292, 303–04 (4th Cir.2012) (noting that "[c]laims for declaratory and injunctive relief are not

affected by qualified immunity”), *rev'd on other grounds,* —— U.S. ——, 133 S.Ct. 9, 184 L.Ed.2d 313 (2012); *see also Rowley v. McMillan,* 502 F.2d 1326, 1331 (4th Cir.1974) (recognizing that “the doctrine of immunity, whatever its scope ... has no application to a suit for declaratory or injunctive relief”).

## X. <u>11th Amendment</u>

Eleventh Amendment Immunity does not extend to claims against state officers that seek injunctive relief. *Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). When a “plaintiff is seeking injunctive relief, then the state official acting in an official capacity is a person under 42 U.S.C. § 1983, and ‘official-capacity actions for prospective relief are not treated as actions against the State.’” *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099 (1985) (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)); *see also Jennings v. Univ. of N. Carolina at Chapel Hill*, 240 F. Supp. 2d 492, 499 (M.D.N.C. 2002). The *Ex Parte Young* exception to the doctrine of sovereign immunity allows “suits against state officers for prospective equitable relief from ongoing violations of federal law.” *Franks v. Ross,*

313 F.3d 184, 197 (4th Cir. 2002) (quoting *Lytle v. Griffith,* 240 F.3d 404, 408 (4th Cir. 2001)).

## XI. State Law Claims

The North Carolina Supreme Court "has recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights." *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992). When there is no remedy available, North Carolina common law "guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional [] rights." *Id.* "[W]hen public officials invade or threaten to invade the personal or property rights of a citizen…they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State." *Corum*, 330 N.C. at 786. In deciding *Corum*, the North Carolina Supreme Court stated "[t]he doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights." *Corum*, 330 N.C. at 785-86. Allowing sovereign immunity to bar a Plaintiff's constitutional claim

would effectively defeat the purpose of *Corum* claims. *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 338, 678 S.E.2d 351, 354 (2009).

## CONCLUSION

For the reasons set forth above, Ashlee respectfully requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted this 12th day of November, 2026,

/s/ *Elizabeth Guild Simpson*
Elizabeth Guild Simpson
N.C. State Bar # 41596
EMANCIPATE NC
P.O. Box 309
Durham NC 27702
919-682-1149
elizabeth@emancipatenc.org

## CERTIFICATION OF COMPLIANCE

I certify that, excluding the caption, signature block, and certificates of service and compliance, this brief does not exceed the 50-page limit prescribed by Court Order dated November 10, 2026, and is printed double-spaced in 14-point Century Schoolbook font.

Respectfully submitted on November 12, 2026.

/s/ *Elizabeth Guild Simpson*

## AI CERTIFICATION

The undersigned counsel hereby certifies as follows.

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;
2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted on November 12, 2026.

/s/ *Elizabeth Guild Simpson*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Elizabeth Guild Simpson*